UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA LEAGUE OF FOOD PRODUCERS; AMERICAN FOREST & PAPER ASSOCIATION; CALIFORNIA APPLE COMMISSION; CALIFORNIA BLUEBERRY COMMISSION; CALIFORNIA GROCERS ASSOCIATION; CALIFORNIA RESTAURANT ASSOCIATION; CALIFORNIA STRAWBERRY COMMISSION; CALIFORNIA TABLE GRAPE COMMISSION; CALIFORNIA WALNUT COMMISSION; CALIFORNIANS FOR AFFORDABLE PACKAGING; DAIRY INSTITUTE OF CALIFORNIA; FLEXIBLE PACKAGING ASSOCIATION; GROWER SHIPPER ASSOCIATION OF CENTRAL CALIFORNIA; OLIVE OIL COMMISSION OF CALIFORNIA; PET FOOD INSTITUTE; PRINT CREATIVE ALLIANCE; SNAC INTERNATIONAL; WESTERN GROWERS ASSOCIATION; CONSUMER BRANDS ASSOCIATION; PERSONAL CARE PRODUCTS COUNCIL; and CALIFORNIA RETAILERS ASSOCIATION, | Case No.: 3:26-cv-01675-WQH-BLM<br><br>**ORDER** |

Plaintiffs,

v.

ROB BONTA, In His Official Capacity as Attorney General of the State of California,

Defendant.

HAYES, Judge:

The matter before the Court is the Motion for Preliminary Injunction (ECF No. 14) filed by Plaintiffs California League of Food Producers, American Forest & Paper Association, California Apple Commission, California Blueberry Commission, California Grocers Association, California Restaurant Association, California Retailers Association, California Strawberry Commission, California Table Grape Commission, California Walnut Commission, Californians for Affordable Packaging, Consumer Brands Association, Dairy Institute of California, Flexible Packaging Association, Grower Shipper Association of Central California, Olive Oil Commission of California, Personal Care Products Council, Pet Food Institute, Print Creative Alliance, SNAC International, and Western Growers Association (collectively, "Plaintiffs").

## I.    PROCEDURAL HISTORY

On March 17, 2026, Plaintiffs initiated this action by filing a Complaint against Defendant Rob Bonta ("Defendant"). (ECF No. 1.)

On April 7, 2026, Plaintiffs filed a First Amended Complaint for Declaratory and Injunctive Relief ("FAC"). (ECF No. 7.) Plaintiffs are trade associations representing members of the food packaging industry. *Id.* ¶¶ 21–41. Plaintiffs challenge the constitutionality of a California bill that amends portions of the California Business and Professions Code and the California Public Resources Code to regulate the circumstances under which businesses may make recyclability claims related to their products and packaging. *Id.* ¶ 4. Plaintiffs seek a declaration that the California bill is "facially and as applied" unconstitutional under the First and Fourteenth Amendments to the U.S. Constitution. *Id.* at 52.

On April 24, 2026, Plaintiffs filed the pending Motion for Preliminary Injunction. (ECF No. 14.) On May 18, 2026, Defendant filed an Opposition. (ECF No. 16.) On May 26, 2026, Plaintiffs filed a Reply. (ECF No. 18.)

On June 3, 2026, the Court held a Motion Hearing. (ECF No. 21; *see* Motion Hearing Transcript, ECF No. 22.)

## II.     BACKGROUND[1]

On October 5, 2021, the California Governor approved Senate Bill 343, Stats. 2021, Ch. 507 ("SB 343"). (FAC ¶¶ 4, 61; Exhibit A, ECF No. 14-26 (full text of SB 343).) The bill is an "act to amend Sections 17580 and 17580.5 of the [California] Business and Professions Code, and to amend Sections 18015 and 42355.5 of, and to add Section 42355.51 to, the [California] Public Resources Code." (Exhibit A, ECF No. 14-26 at 2.)

SB 343 is an environmental advertising bill establishing criteria that a manufacturer must satisfy to mark its products or packaging with words or images indicating that those items are recyclable. *Id.* The Legislative Counsel's Digest summarizes the bill:

> [SB 343] would provide that, except as specified, a product or packaging that displays a chasing arrows symbol, among other symbols, statements, or directions, is deemed to be a deceptive or misleading claim unless the product or packaging is considered recyclable pursuant to statewide recyclability criteria and is of a material type and form that routinely becomes feedstock used in the production of new products or packaging.

*Id.* at 3. The Legislative Counsel's Digest also describes, in general terms, the bill's criteria for determining recyclability: "a product or packaging is considered recyclable in the state if, based on the information provided by the department, the product or packaging is of a material type and form collected for recycling by recycling programs for jurisdictions that encompass at least 60% of the population of the state, among other statewide recyclability criteria." *Id.* at 2.

The text of SB 343 states:

Section 42355.51 is added to the Public Resources Code, to read:

42355.51(a) A person shall not offer for sale, sell, distribute, or import into

---

[1] This factual background is based, in part, on legislative materials, government reports, and publicly available websites that are also the subject of Plaintiffs' Request for Judicial Notice. (ECF No. 14-24; *see also* Defendant's Request for Judicial Notice, ECF No. 16-1.) Neither party opposes the other's request for judicial notice. To the extent the Court discusses materials submitted in support of the parties' briefs, their Requests for Judicial Notice are granted. *See* Fed. R. Evid. 201(d) (permitting judicial notice of "a fact that is not subject to reasonable dispute because it [] can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

the state any product or packaging for which a deceptive or misleading claim about the recyclability of the product or packaging is made.

(b) (1) Subject to paragraph (2), a product or packaging that displays a chasing arrows symbol, a chasing arrows symbol surrounding a resin identification code, or any other symbol or statement indicating the product or packaging is recyclable, or otherwise directing the consumer to recycle the product or packaging, is deemed to be a deceptive or misleading claim pursuant to this section and Section 17580.5 of the Business and Professions Code unless the product or packaging is considered **recyclable in the state pursuant to subdivision (d)** and is of a **material type and form that routinely becomes feedstock used in the production of new products or packaging**.

(2) Paragraph (1) does not apply to either of the following:

(A)  Any product or packaging that is manufactured up to 18 months after the date the department publishes the first material characterization study required pursuant to subparagraph (B) of paragraph (1) of subdivision (d), or before January 1, 2024, whichever is later. . . .

*Id.* at 7–11 (emphasis added); Cal. Pub. Res. Code §§ 42355.51(a)–(b).[2]

SB 343 further provides:

Subject to paragraph (3), a product or packaging is considered recyclable in the state if; based on information published by the department pursuant to subparagraph (B) of paragraph (1), the product or packaging is of a material type and form that meets both of the following requirements:

(A) The material type and form is **collected for recycling by recycling programs for jurisdictions that collectively encompass at least 60 percent of the population of the state**.

(B) (i) The material type and form is **sorted into defined streams for recycling processes by large volume transfer or processing facilities**, as

---

[2] Subparagraph (B) of paragraph (1) of subdivision (d) also requires that, "[t]o get a representative sample of recycling programs in the state, the department shall conduct and publish on its internet website a characterization study of material types and forms that are collected, sorted, sold, or transferred by solid waste facilities deemed appropriate by the department for inclusion in the study," and must update the "material characterization study . . . every five years." (Exhibit A at 9; Cal. Pub. Res. Code §§ 42355.51(d)(1)(B)(i)–(ii).)

4

defined in regulations adopted pursuant to Section 43020, **that process materials and collectively serve at least 60 percent of recycling programs statewide**, **with the defined streams sent to and reclaimed at a reclaiming facility consistent with the requirements of the Basel Convention**.

(ii) The department may adopt regulations modifying this requirement to encompass transfer or processing facilities other than large volume transfer or processing facilities, as the department deems appropriate for achieving the purposes of this section.

(Exhibit A, ECF No. 14-26 at 9–10 (emphases added); Cal. Pub. Res. Code § 42355.51(d)(2).) This provision—which requires that materials be collected by recycling programs encompassing 60 percent of the state's population and be processed by facilities that serve 60 percent of recycling programs statewide—is referred to by the parties and throughout this Order as the "60/60 requirement."

SB 343 provides additional, specific criteria for product and package types, including the following:

A product or packaging shall not be considered recyclable in the state unless the product or packaging meets all of the following criteria, as applicable:

(A) For plastic packaging, the **plastic packaging is designed to not include any components, inks, adhesives, or labels that prevent the recyclability of the packaging according to the APR Design® Guide** published by the Association of Plastic Recyclers.

(B) For plastic products and non-plastic products and packaging, the product or packaging is **designed to ensure recyclability** and **does not include any components, inks, adhesives, or labels that prevent the recyclability** of the product or packaging.

(Exhibit A, ECF No. 14-26 at 10 (emphases added); Cal. Pub. Res. Code §§ 42355.51(d)(3).)

Persons or businesses violating these requirements are subject to liability under multiple statutory provisions. Under the California Business and Professions Code, a violation is "a misdemeanor punishable by imprisonment in the county jail not to exceed

3:26-cv-01675-WQH-BLM

six months, or by a fine not to exceed two thousand five hundred dollars ($2,500), or by both." Cal. Bus. & Prof. Code §§ 17580.5, 17581. Under the California Public Resources Code, a "city, a county, or the state may impose civil liability in the amount of five hundred dollars ($500) for the first violation of this chapter, one thousand dollars ($1,000) for the second violation, and two thousand dollars ($2,000) for the third and any subsequent violation." Cal. Pub. Res. Code §§ 42358(a). Under California's Unfair Competition Law, a violation may also provide the basis for "a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General" or "any district attorney." Cal. Bus. & Prof. Code §§ 17200, 17206. Under the same law, any person may file suit seeking injunctive relief and restitution against a violator. *Id.* § 17203; *see also id.* § 17535 (authorizing any person to "pursue representative claims or relief on behalf of others" to obtain injunctive relief for violations of California's False Advertising Law). Under the Consumers Legal Remedies Act, any "consumer who suffers any damage" may seek to obtain actual damages, injunctive relief, restitution, and punitive damages, attorney's fees, and costs. Cal. Civ. Code. §§ 1770, 1780.

On April 4, 2025, the California Department of Resources Recycling and Recovery ("CalRecycle") published its SB 343 Final Findings Report (the "Material Characterization Report"). (Exhibit E, ECF No. 14-30 (SB 343 Material Characterization Study Final Findings 2023/24).) The Material Characterization Report states that its "study findings provide information on whether a product or package is commonly recyclable in California for the purposes of section 42355.51." *Id.* at 6.

The Material Characterization Report states that it "provides data only on jurisdiction residential curbside recycling program collection and the sorting behaviors of [large volume transfer/processing facilities ("LVTPs")] in California" as it relates to the 60/60 requirement of SB 343. *Id.* at 7 (citing Cal. Pub. Res. Code §§ 42355.51(d)(2)(A), (B)(i)). The Material Characterization Report includes tables with data on recycling programs and facilities. *See id.* at 25–30 (Table 1: Percentage of Statewide Population with

Access to a Residential Curbside Recycling Program Which Accepts SB 343 Material Types and Forms); *id.* at 30–34 (Table 2: Sorting of Material Types and Forms to All Outflows, by Counties Served by Surveyed LVTP Facilities); *id.* at 36–53 (various tables describing "the makeup of each characterized fiber, glass, metal, plastic, or residual outflow by material type and form"); *see also* Exhibit I, ECF No. 14-34 (Appendix 1 to the Material Characterization Report).

The Material Characterization Report states that it "does not provide information on the destination or ultimate disposition of materials sorted and sold by LVTP facilities" as it relates to the Basel Convention "[n]or does it provide information regarding the composition of design of specific products or packaging" as it relates to other requirements of SB 343. (ECF No. 14-30 at 7 (citing Cal. Pub. Res. Code §§ 42355.51(d)(2)(B)(i), (d)(3)).) CalRecycle must update the Material Characterization Report every five years. *Id.*; Exhibit A, ECF No. 14-26 at 9; Cal. Pub. Res. Code § 42355.51(d)(1)(B)(ii).

Pursuant to the eighteen-month grace period described in SB 343, the publication date of the Material Characterization Report on April 4, 2025, causes the recyclability labeling restrictions of SB 343 to take effect on October 4, 2026. (Exhibit D, ECF No. 14-29 at 4 (SB 343 Frequently Asked Questions); *see* Cal. Pub. Res. Code § 42355.51(b)(2)(A).)

### III.    CONTENTIONS

Plaintiffs move the Court to preliminarily enjoin Defendant from enforcing SB 343. (ECF No. 14.) Plaintiffs contend that standing is adequately alleged in the FAC because their members are "being forced to modify their speech and behavior to comply with the statute" in advance of its effective date on October 4, 2026. (ECF No. 14-1 at 14 (quotation and citation omitted).) Defendant responds that Plaintiffs fail to establish standing because their declarations filed in support of the Motion for Preliminary Injunction do not "identify[] particular members and their alleged difficulties complying with particular provisions of SB 343" and fail to provide "evidence of imminent intent by [Defendant] to enforce SB 343 against their members." (ECF No. 16 at 11–13.)

With respect to the likelihood of success on the merits of their claims, Plaintiffs contend that SB 343 is (1) unconstitutionally vague under the Fourteenth Amendment to the U.S. Constitution and (2) facially unconstitutional because it infringes on their members' free speech rights under the First Amendment to the U.S. Constitution. (ECF 14-1 at 15–32.)

First, Plaintiffs contend that SB 343 is unconstitutionally vague because: (a) businesses cannot know whether a material "routinely becomes feedstock used in the production of new products or packaging"; (b) businesses cannot know whether materials will be sent to a reclaiming facility "consistent with the requirements of the Basel Convention"; (c) businesses cannot know whether material contains elements that "prevent the recyclability of the packaging according to the APR Design® Guide published by the Association of Plastic Recyclers"; and (d) businesses cannot know whether products and non-plastic packaging are "designed to ensure recyclability" and do not "include any components . . . that prevent [] recyclability." *Id.* at 15–22. Plaintiffs contend that these provisions are not severable from the remainder of the law, and that enforcement of the law should be enjoined in its entirety. *Id.* at 22.

Defendant responds, respectively, that: (a) the term "routinely" is "easily understandable"; (b) the "Attorney General does not intend to enforce the Basel Convention requirement independently from the 60 percent sorting requirement against plaintiffs . . . until the [C]ourt can rule on the merits of their claim"; (c) the law's reference to "industry standards" does not create ambiguity; and (d) the plain meanings of "ensure" and "prevent" are reasonably clear and, as a general matter, that some degree of difficulty in determining whether certain materials meet requirements of the law does not render it vague. (ECF No. 16 at 13–19.) Defendant contends that, if the Court determines that Plaintiffs are likely to succeed on the merits of any of their four claims regarding vagueness, those provisions should be severed from the remainder of the law. *Id.* at 29–30.

Second, Plaintiffs contend that SB 343 is an unconstitutional infringement on their free speech rights because the law fails the intermediate scrutiny test for restrictions of

3:26-cv-01675-WQH-BLM

commercial speech described by the Supreme Court in *Central Hudson*. (ECF No. 14-1 at 23–32 (citing *Cent. Hudson Gas & Elec. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980)). Defendant responds that the law permissibly regulates commercial speech and survives intermediate scrutiny under the *Central Hudson* factors. (ECF No. 16 at 19–28.)

Plaintiffs also contend—with respect to the remaining elements for the issuance of a preliminary injunction—that their members will be irreparably harmed in the absence of relief and that the equitable factors weigh in their favor. (ECF No. 14-1 at 32.) Defendant responds that Plaintiffs have not shown that their members will face irreparable harm because they "do not present concrete examples of named members who have products or packaging that would not be recyclable under SB 343" and that the issuance of an injunction is against the public interest. (ECF No. 16 at 28–29.)

## IV.   LEGAL STANDARD

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Hubbard v. City of San Diego*, 139 F.4th 843, 849 (9th Cir. 2025) (quoting *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024)). "A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and that [4] an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The Ninth Circuit has also applied a "sliding scale" standard for preliminary injunctions, in which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this "alternate formulation of the *Winter* test," "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (quoting *All. for the Wild Rockies*, 632 F.3d at 1135).

A court may issue a preliminary injunction only upon "a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. The "rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 682 (9th Cir. 2023) ("[A] court may exercise its discretion to accept hearsay and make inferences in ruling on a preliminary injunction.").

## V.   DISCUSSION

### A.   Standing

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). To satisfy the requirement that an actual case or controversy is before a court, a plaintiff must establish standing. *Hum. Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1000 (9th Cir. 2010); *In re Palmdale Hills Prop., LLC*, 654 F.3d 868, 873 (9th Cir. 2011) (describing Article III standing as a "necessary component of subject matter jurisdiction"); *see Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013) ("At the preliminary injunction stage, plaintiffs must make a clear showing of each element of standing.").

An organizational plaintiff, like those in this action, may establish "associational standing" to sue on behalf of its members by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Assoc. Gen. Contractors of Am. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013); *see also NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1013 (9th Cir. 2025); ECF No. 14-1 at 14 (Plaintiffs contending that they have "standing to sue on behalf of their members"). "[O]nce the court determines that one of the plaintiffs has standing, it need not decide the standing of the others." *Melendres v. Arpaio*, 695 F.3d 990, 999 (9th Cir. 2012).

3:26-cv-01675-WQH-BLM

### 1.   *Members' Standing*

To establish standing, a plaintiff must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Assoc. Gen. Contractors of Am.*, 713 F.3d at 1194 (holding that associational standing requires "specific allegations establishing that at least one *identified member* had suffered or would suffer harm") (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009)); *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708 (9th Cir. 2025) ("As a general rule of representational standing, when it is clear and not speculative that a member of a group will be adversely affected by a challenged action and a defendant does not need to know the identity of a particular member to defend against an organization's claims, the organization does not have to identify particular injured members by name.").

In the context of First Amendment claims, the Ninth Circuit has "applied the requirements of . . . standing less stringently." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010). "It is sufficient for standing purposes that the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest and that there is a credible threat that the challenged provision will be invoked against the plaintiff." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154–55 (9th Cir. 2000) (quotations omitted). "In an effort to avoid the chilling effect of sweeping restrictions, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Arizona Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002 (9th Cir. 2003); *see LSO, Ltd.*, 205 F.3d at 1155 ("[W]hen the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing.").

To determine whether a plaintiff has shown a "credible threat of enforcement" adequate to establish injury in fact, a court considers: "[1] the likelihood that the law will be enforced against the plaintiff; [2] whether the plaintiff has shown, with some degree of concrete detail, that she intends to violate the challenged law; and [3] whether the law even

3:26-cv-01675-WQH-BLM

applies to the plaintiff." *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1172 (9th Cir. 2018) (quotation omitted).

Here, Plaintiffs submit declarations from employees of trade associations averring how their members' conduct relates to environmental packaging laws. (*See* ECF Nos. 14-3–23.)[3] For example, Plaintiffs submit the Declaration of John R. Hewitt, a Senior Vice President of State Affairs for Plaintiff Consumer Brands Association, who declares that Consumer Brands Association's members "manufacture products packaged in a wide range of materials" and "rely on recycling instructions printed on their packaging to inform consumers how to properly dispose of it." (Hewitt Decl., ECF No. 14-14 ¶¶ 5, 21 ("Many of CBA's members use packaging that is recyclable in significant portions of the country, including California, but may not consistently satisfy the statute's statewide thresholds."). Mr. Hewitt declares that, "[b]ut for the threat of enforcement under SB 343, CBA's members intend to continue using these truthful labels" but that the law's "rigid and complex criteria for recyclability place members in an untenable position" because many of their products or packaging "do not meet the criteria of SB 343 based on information published by CalRecycle." *Id.* ¶ 5–8. Mr. Hewitt declares that SB 343 will require members to incur compliance costs, including "conducting a comprehensive assessment to determine the recyclability of existing packaging under SB 343's standards, revising marketing claims across physical and digital surfaces to be compliant with SB 343, updating labels to change recyclability information, re-engineering packaging to be considered 'recyclable' in California, purchasing new equipment and materials, managing dual inventory, and incurring professional fees for legal and regulatory counseling." *Id.* ¶ 15.

---

[3] These filings are, respectively, the declarations of Mark Pitts, Todd Sanders (California Apple Commission), Todd Sanders (California Blueberry Commission), Ronald Fong, Trudi Hughes, Jot Condie, Rachel Michelin, Rick Tomlinson, Ian LeMay, Robert Verloop, Julie Landry, John R. Hewitt, Katharine Davey, Daniel Felton, Christopher Valadez, Todd Sanders (Olive Oil Commission of California), Emily Manoso, Elizabeth Flores, Ian Flynn, Cindy Kuester. (ECF No. 14 at 4.)

3:26-cv-01675-WQH-BLM

In other declarations, Plaintiffs provide similar sworn statements that their members currently manufacture, distribute, or sell products and packaging that are subject to the requirements of SB 343 and that their current and expected conduct may expose them to enforcement actions under its requirements. *See, e.g.*, Sanders Decl., ECF No. 14-4 ¶¶ 5–8, 15–16; Fong Decl., ECF No. 14-6 ¶¶ 5–8, 15–16; Felton Decl., ECF No. 14-16 ¶¶ 5–8, 17–18. The record indicates that SB 343 applies to Plaintiffs' members because their commercial activity subjects them to the requirements of the law, and that their existing practices may not comply with the law's requirements upon its effective date in October 2026.

Plaintiffs also purport to identify "no fewer than 30 lawsuits in California state and federal court alleging that businesses deceptively labeled their products as recyclable" after SB 343 was signed into law on October 5, 2021. (ECF No. 14-1 at 11; *see* FAC ¶¶ 88–94.) Defendant responds that this evidence does not support a finding of "imminent intent by the Attorney General to enforce SB 343 against [Plaintiffs'] members." (ECF No. 16 at 12.)

A plaintiff need not show that a state has threatened to enforce a law against its members to demonstrate that a credible threat of enforcement exists. In *Italian Colors*, the Ninth Circuit held that the plaintiffs' concession that California had not "communicated any threat or warning of impending proceedings" under a law banning credit card surcharges was not determinative as to their standing. *Italian Colors Rest.*, 878 F.3d at 1173. "[A] plaintiff may suffer injury by being forced to modify her speech and behavior to comply with the statute. Such self-censorship may be a sufficient injury under Article III, even without an actual prosecution." *Id.* (quotations and citations omitted). Moreover, the provisions of SB 343 permitting criminal enforcement actions by local district attorneys and civil enforcement actions by private persons militate in favor of finding that Plaintiffs face a credible threat of enforcement. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (holding that, in a pre-enforcement action, the credibility of threatened enforcement was "bolstered" by the ability of any person with knowledge of a violation to

3:26-cv-01675-WQH-BLM

file a complaint). Here, the sworn statements submitted by Plaintiffs are adequate to show that a credible threat of enforcement exists.

Plaintiffs adequately establish that the threatened enforcement of SB 343 against their members constitutes an injury in fact. That injury is traceable to Defendant's enforcement of the law, and a favorable decision at this stage of the proceedings will redress the injury because Defendant will be enjoined from enforcing the law. Accordingly, Plaintiffs establish that their members would have standing to file this action in their own right.

### 2.    *Organizational Purpose*

In determining whether the interests that an organizational plaintiff seeks to protect are germane to its purpose, a court considers the organization's stated goals. *Vasquez Perdomo v. Noem*, 148 F.4th 656, 677 (9th Cir. 2025). Here, Plaintiffs' declarations share the same language: "[The organization's] mission includes advancing sound packaging and recycling policy and facilitating compliance with all applicable requirements." *See, e.g.*, Pitts Decl., ECF No. 14-3 ¶ 3; Sanders Decl., ECF No. 14-4 ¶ 3; Fong Decl., ECF No. 14-6 ¶ 3; Hughes Decl., ECF No. 14-7 ¶ 3. These declarations adequately demonstrate that the organizations' missions are related to the interests at issue in this action because SB 343 changes the requirements applicable to manufacturers seeking to comply with recycling law in the state and label their packages or products as recyclable.

### 3.    *Individual Participation*

Plaintiffs seek "only declaratory and injunctive relief, which 'do not require individualized proof.'" *Stavrianoudakis v. United States Fish & Wildlife Serv.*, 108 F.4th 1128, 1143 (9th Cir. 2024) (quoting *Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001)).

In light of the foregoing, Plaintiffs satisfy each prong of the associational standing test and may seek relief on behalf of their members.

/ / /

/ / /

3:26-cv-01675-WQH-BLM

**B.     Likelihood of Success on the Merits**

Among the four factors for determining whether a court should issue a preliminary injunction, the likelihood of success on the merits is the "most important factor." *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024).

Here, Plaintiffs raise facial challenges to enforcement of SB 343 on the bases that the statute is unconstitutionally vague under the Fourteenth Amendment and that the law infringes on their free speech rights under the First Amendment. (ECF No. 14-1 at 16–17 (contending, with respect to their vagueness challenge, that there are "at least four bases for declaring the law unconstitutionally vague on its face"; ECF No. 18 at 7; FAC at 52.) The Supreme Court has made "facial challenges hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). "[C]ourts usually handle constitutional claims case by case, not en masse. Claims of facial invalidity often rest on speculation about the law's coverage and its future enforcement," and "threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (cleaned up). The Ninth Circuit has similarly instructed that "[a] facial challenge seeks to strike down a law in its entirety and must therefore meet a more rigorous standard" than an as-applied challenge. *Project Veritas v. Schmidt*, 125 F.4th 929, 940 (9th Cir. 2025) (en banc), *cert. denied sub nom. Project Veritas v. Vasquez*, 146 S. Ct. 90 (2025).

**1.     *Unconstitutional Vagueness***

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A statute or regulation "fails to comport with due process if . . . [it] fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement. *United States v. Williams*, 553 U.S. 285, 304 (2008). "The operative question under the fair notice theory is whether a reasonable person would know what is prohibited by the law." *Tucson v. City of Seattle*, 91 F.4th 1318, 1329 (9th Cir.

2024) (quotation omitted). Due process "requires the invalidation of laws that are impermissibly vague." *Fox Television Stations*, 567 U.S. at 253; *Tucson*, 91 F.4th at 1324.

The Ninth Circuit states:

Statutes that are insufficiently clear are void for three reasons: (1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on arbitrary and discriminatory enforcement by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms.

*Foti v. City of Menlo Park*, 146 F.3d 528, 628 (9th Cir. 1998) (quotation omitted).

In the context of statutes that implicate First Amendment interests, "rigorous adherence to [these] requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253–54; *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) ("[If] the law interferes with the right of free speech or of association, a more stringent vagueness test should apply."). "Although perfect clarity is not required even when a law regulates protected speech, vagueness concerns are more acute when a law implicates First Amendment rights, and, therefore, vagueness scrutiny is more stringent." *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022); *see also Washington Mercantile Ass'n v. Williams*, 733 F.2d 687, 692 (9th Cir. 1984) (applying the "more rigorous" vagueness standard in the context of "constitutionally protected *commercial* speech") (emphasis added). "[C]ourts have not hesitated to reject on vagueness grounds laws regulating speech protected by the First Amendment." *Butcher*, 38 F.4th at 1169. Heightened requirements are warranted in this context because "vague statutes involv[ing] sensitive areas of First Amendment freedoms [] operate to inhibit the exercise of those freedoms." *California Teachers Ass'n v. State Bd. of Educ.* ("*California Teachers*"), 271 F.3d 1141, 1150 (9th Cir. 2001).

The Supreme Court has cautioned, however, that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). "The touchstone of a facial vagueness challenge in the First Amendment context [] is not whether *some* amount of

legitimate speech will be chilled; it is whether a *substantial* amount of legitimate speech will be chilled." *California Teachers*, 271 F.3d at 1152. "[E]ven when a law implicates First Amendment rights, the constitution must tolerate a certain amount of vagueness." *Id.* at 1151. "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (quoting *United States v. Raines*, 362 U.S. 17, 23 (1960)); *see also California Teachers*, 271 F.3d at 1151 (explaining that "uncertainty at a statute's margins will not warrant facial invalidation").

"Furthermore, in analyzing whether a statute's vagueness impermissibly chills First Amendment expression, it is necessary to consider the context in which the statute operates." *Id.* at 1154. The Supreme Court has stated that "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Hoffman Estates*, 455 U.S. at 498 (citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972)). However, for statutes involving "criminal sanctions," such as SB 343, the "requirement for clarity is enhanced." *United States v. Kilbride*, 584 F.3d 1240, 1257 (9th Cir. 2009) (quotations omitted).

Here, Plaintiffs contend that there are "four bases for declaring [SB 343] unconstitutionally vague on its face." (ECF No. 14-1 at 17.)

> i.    Routinely Becomes Feedstock

SB 343 provides:

> [A] product or packaging that displays a chasing arrows symbol, a chasing arrows symbol surrounding a resin identification code, or any other symbol or statement indicating the product is packaging is recyclable, or otherwise directing the consumer to recycle the product or packaging, is deemed to be a deceptive or misleading claim pursuant to [Section 42355.51 of the Public Resources Code] and Section 17580.5 of the Business and Professions Code unless the product or packaging is considered recyclable in the state pursuant to subdivision (d) and **is of a material type and form that routinely becomes feedstock used in the production of new products or packaging**.

Exhibit A, ECF No. 14-26 at 7 (emphasis added); Cal. Pub. Res. Code § 42355.51(b)(1).

As a preliminary matter, the parties agree that the requirement under SB 343 that products and packaging be "of a material type and form that routinely becomes feedstock" to be lawfully labeled as "recyclable" is an enforceable provision operating with independent force from other parts of the law. During the Motion Hearing, counsel for Defendant stated that the provision may "overlap greatly with the 60/60 requirement" of Cal. Pub. Res. Code § 42355.51(d)(2), but that a product or packaging may violate the "routinely becomes feedstock" provision while satisfying all other requirements of the law regarding what may be labeled as "recyclable." (Motion Hearing Transcript at 45–46 (describing a scenario in which "material is collected 60 percent of the time, sorted 60 percent of the time, but there's no market for it [and] so it is baled, it's ready to go, but it never becomes feedstock [and] gets sent to the landfill"); *see* ECF No. 16 at 16 (describing a similar scenario).)

Plaintiffs contend that the "routinely becomes feedstock" provision is unconstitutionally vague because SB 343 does not define what "routinely" means in the context of the law. (ECF No. 14-1 at 17.) Plaintiffs contend that a manufacturer's ability to identify its product or packaging as recyclable "depends on an undefined level of downstream material reuse," which is subject to change based on "market conditions far beyond the control or visibility of the speaker." *Id.* Plaintiffs also contend that "businesses have no concept of the evidence that would suffice to demonstrate compliance" with this provision of SB 343. *Id.*

Defendant responds that "routinely" is an "easily understandable" word because it is defined in common usage as meaning "as part of a regular occurrence" or "regularly." (ECF No. 16 at 15–17.) Defendant contends that this provision "reflects the legislature's intent that products would not be labeled 'recyclable' in California unless the conditions exist in California for that product to actually be recycled as a matter of course" based on whether "large volume processors [can or] cannot find a market for the material type and form. *Id.* at 16 (citing Exhibit 6, ECF No. 16-2 at 310–17 (online article published on

18

September 25, 2024 stating that materials may be "difficult to market," which renders recycling facilities unable to sell the resulting feedstock).)

Although a court "can never expect mathematical certainty from our language," it must be "clear what the [statute] as a whole prohibits." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). Here, the text of SB 343 does not establish the circumstances under which a product or package qualifies as "routinely becom[ing] feedstock." Whereas the 60/60 requirement of SB 343 provides a threshold against which manufacturers can assess their products and packaging, the "routinely becomes feedstock" provision fails to provide the same clarity. The Material Characterization Report offers no answers as to how a manufacturer should determine compliance with the "routinely becomes feedstock" provision, and CalRecycle has stated that it is not empowered to answer any questions about the requirements of SB 343 apart from the 60/60 requirement. (Exhibit I, ECF No. 14-30 at 6 (Material Characterization report stating that "SB 343 neither authorizes nor directs CalReycle to determine or report on the recyclability of particular products and packaging or the appropriate use of the chasing arrows or other indicators of recyclability"); *id.* at 7 (stating that the Material Characterization Report "does not provide information on the destination or ultimate disposition of materials sorted and sold by" recycling facilities); Exhibit D, ECF No. 14-29 at 5 (Frequently Asked Questions document published by CalRecycle stating that the agency was not directed to "investigate the ultimate destination" of recycled materials after collection and sorting); *id.* at 4 ("[T]he study published by CalRecycle cannot, by itself, provide complete information for determining whether products and packaging can be considered recyclable. . . . CalRecycle has no authority to determine whether any manufacturer or other entity is liable for violations of the labeling restrictions").)

Reasonable businesses of ordinary intelligence and those seeking to enforce the requirements of SB 343 may reach different conclusions as to the meaning of "routinely" in the context of recycling behavior. It may be that only a narrow majority of recycling facilities are able to process a particular package, product, or component into material that

3:26-cv-01675-WQH-BLM

is sold and "becomes feedstock," but SB 343 is silent as to whether a narrow majority—or how much more—is required to comply with the "routinely becomes feedstock" provision. A statutory term that is "susceptible to many different interpretations," and which "raises questions with no clear answers" runs afoul of the notice requirements of due process requirements. *United States v. Hall*, 912 F.3d 1224, 1227 (9th Cir. 2019); *see also United States v. Evans*, 883 F.3d 1154, 1163 (9th Cir. 2018) (holding that, in the context of work requirements for supervised release, "the word 'regularly' has no clear meaning. . .").

In *Lungren*, the Northern District of California considered a challenge at the summary judgment stage to California's Environmental Advertising Claim Act, a 1990 statute that made it "unlawful for any person to represent that any consumer good" is "ozone friendly," "biodegradable," "photodegradable," "recyclable," or "recycled" unless the consumer good met certain requirements in the statute or other definitions established "in trade rules adopted by the Federal Trade Commission." *Ass'n of Nat. Advertisers, Inc. v. Lungren*, 809 F. Supp. 747, 750 (N.D. Cal. 1992). The Environmental Advertising Claim Act stated that "recyclable means that an article can be *conveniently recycled* . . . in every county in California with a population over 300,000 persons." *Id.* at 759 (emphasis in original). Violations were "misdemeanor[s] punishable by imprisonment of up to six months and/or a fine not exceeding $1,000." *Id.* at 760; *see* Cal. Bus. & Prof. Code §§ 17580.5, 17581 (imposing similar punishments for violations of SB 343). The *Lungren* court explained:

> The statute's definition of "recyclable" is more uncertain. The problem is that while section 17508.5(d) defines a consumer good as "recyclable" if it can be "conveniently recycled" in California counties with more than 300,000 people, the statute offers no guidance as to what recycling programs satisfy the "conveniently recycled" requirement. Section 17508.5(d) refers to section 40180 of the Public Resources Code which unambiguously defines "recycled." However, an equally lucid explication of "conveniently" is wanting. Nor is there any legislative history extant to provide the court with guidance.

3:26-cv-01675-WQH-BLM

*Lungren*, 809 F. Supp. 747 at 761. The district court discussed the ambiguity associated with the word "conveniently," including whether a recycling center in a remote location or one with irregular operating hours would satisfy the "conveniently recycled" provision of the statute. *Id.* at 761–62. The district court concluded that "questions of this nature so readily come to mind [] that it is not sufficiently clear to a manufacturer or distributor of ordinary intelligence [] what exactly the statute prohibits." *Id.* at 762.

The *Lungren* court's analysis is instructive here. Like the word "conveniently" in the Environmental Advertising Claim Act, the "routinely" provision in SB 343 invites questions about how frequently a product, material, or package must be turned into feedstock to satisfy the provision. In the absence of statutory guidance, manufacturers must undergo an independent assessment of the actual behavior of recycling facilities and determine whether that behavior comports, in their view, with the meaning of "routinely." Moreover, the requirement that recycling facilities be able to routinely turn materials into feedstock is not merely one that relies on assessments of recycling technologies and existing practices but also relies on the changing economic conditions that allow recycling facilities to find a market for materials after they have been sorted and processed. (ECF No. 16 at 16 (Defendant describing the provision as requiring consideration of whether "the conditions exist in California for that product to actually be recycled"). These market conditions, which manufacturers cannot control and may not be able to ascertain at the time of design or production, inform whether materials can be processed, sold, and turned into feedstock as a practical and economic matter.

This vagueness is only enhanced by a lack of clarity in SB 343 regarding the timing of the "routinely becomes feedstock" provision. The Court infers that shifting market forces may change whether a material does, in fact, "routinely becomes feedstock": a particular material may satisfy the provision at one point in time but later fail to "routinely become feedstock" because economic conditions related to the market for feedstock

derived from that material have changed.[4] SB 343 offers no guidance as to whether the product or packaging must satisfy the "routinely becomes feedstock" provision at the time of (1) design, (2) manufacture, (3) sale, or some combination of the three.

The "routinely becomes feedstock" provision shares similarities with a provision in the California Age-Appropriate Design Code Act that prohibited a business from providing a service "likely to be accessed by children" that uses the "personal information of any child in a way that the business knows, or has reason to know, is *materially detrimental* to the *physical health, mental health, or well-being of a child*." *NetChoice, LLC v. Bonta*, 170 F.4th 744, 764 (9th Cir. 2026) (emphasis in original). The Ninth Circuit held that, although these terms may have plain meanings in ordinary usage, there were "difficult questions" about the boundaries of the provision's meaning and the statute failed to "provide any guidance" as to the covered conduct. *Id.* at 765 (explaining that "difficult questions arise with examples like sleep loss, distraction, or hurt feelings" with respect to whether effects qualify as "materially detrimental to a child's well-being"). The appellate court affirmed the district court's preliminary injunction barring enforcement of the provision. *Id.* at 770. Here, although "routinely" may have a plain meaning in other circumstances, its context in SB 343 likewise raises questions about how businesses will determine whether their product or packaging complies with the requirement, and the law fails to provide adequate guidance to answer those questions.

This case presents a different situation than *California Teachers*, in which the Ninth Circuit upheld the constitutionality of a California ballot initiative requiring that instruction in public schools be "overwhelmingly" in the English language and, specifically for "English learners," that "nearly all" instruction be in English. *California Teachers*, 271

---

[4] To a degree, SB 343 delegates control of the legal definition of "recyclability" in California to large recyclers. For example, nothing in SB 343 prevents the recyclers in Southern California from focusing their operations only on the most profitable material and declining to accept all other materials which could be recycled but at a lower profit, thereby changing the products and packaging that "routinely become feedstock."

3:26-cv-01675-WQH-BLM

F.3d at 1146. The appellate court stated that, although the terms "nearly all" and "overwhelmingly" cannot be "readily translated into a mathematical percentage," the "difference between 'nearly all' English and 'all' English [] is necessarily small." *Id.* at 1153; *see also id.* at 1152 (explaining that the chilling effect of the law would be "negligible" because educators "do not have the option to speak to students exclusively in English" to "effectively impart knowledge to students"). Here, the ambiguity in SB 343 is more apparent. "Routinely," in its ordinary meaning, does not reasonably impose such a high threshold that the difference between a material that is unfailingly converted into feedstock and one that is "routinely" converted into feedstock is necessarily "small." The record also does not support a finding that the chilling effect on producers of potentially recyclable products and packaging would be negligible. The recycling context is unlike the academic environment in *California Teachers*, where the teachers' "affirmative obligation to effectively impart knowledge to students" required teachers to "use some non-English." 271 F.3d at 1152. Here, the circumstances do not require commercial speakers to continue to make "some" recyclability claims. Rather, the declarations filed by Plaintiffs in support of the pending motion indicate that their members "are likely to, and some have already decided to, abandon truthful recyclability messaging altogether to avoid risking liability." (Pitts Decl, ECF No. 14-3 ¶ 8; *see also* Sanders Decl., ECF No. 14-4 ¶ 8; Fong Decl., ECF No. 14-6 ¶ 8; Hughes Decl., ECF No. 14-7 ¶ 8 (repeating the same).)

The "routinely becomes feedstock" provision in SB 343 also lacks a scienter requirement, which may "mitigate a law's vagueness, especially with respect to the adequacy of notice." *Hoffman Estates*, 455 U.S. at 498. In *Hill v. Colorado*, the Supreme Court reviewed a vagueness challenge to a Colorado statute making it unlawful for a person within 100 feet of a healthcare facility to "knowingly approach" another person without consent "for the purpose of," among other things, "engaging in oral protest." 530 U.S. 703, 707 (2000). With respect to the vagueness challenge, the Supreme Court held that the "concern" about whether the law provides "people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" is "ameliorated by the fact that [the

law] contains a scienter requirement". *Id.* at 732; *see also NetChoice*, 170 F.4th at 765–66 (holding that a scienter requirement, which may "mitigate vagueness," nevertheless failed to "solve" the vagueness of the statute's "material detriment" term); *California Teachers*, 271 F.3d at 1154 (explaining that "any vagueness" is also "mitigated by the [provision's] scienter requirement").

Here, the "routinely becomes feedstock" provision is not accompanied by a scienter requirement. Violations, which may be prosecuted as misdemeanors punishable by up to six months imprisonment, may be established despite the manufacturer's lack of knowledge or reasonable belief regarding the recyclability of its product or package. Cal. Bus. & Prof. Code §§ 17580.5, 17581. Without the mitigating element of a knowledge requirement, the provision's strict liability scheme and threat of criminal penalties requires the Court to undertake a stricter vagueness analysis. Having found that the "routinely becomes feedstock" provision imposes an uncertain threshold requirement and relies substantially on conduct outside of manufacturers' control and about which they may lack reliable information, the Court determines that the provision fails to provide adequate notice to a business of ordinary intelligence to understand what the law prohibits.

Accordingly, Plaintiffs establish that they are likely to succeed on the merits of their vagueness challenge to the "routinely becomes feedstock" provision of SB 343.

ii.    <u>Basel Convention</u>

The "60/60 requirement" of SB 343 provides:

[A] product or packaging is considered recyclable in the state if . . . the product or packaging is of a material type and form that meets both of the following requirements:

(A) [t]he material type and form is collected for recycling by recycling programs for jurisdictions that collectively encompass at least 60 percent of the population of the state; [and]

(B)(i) [t]he material type and form is sorted into defined streams for recycling processes by large volume transfer or processing facilities, as defined in regulations adopted pursuant to Section 43020, that process materials and

24

collectively serve as least 60 percent of recycling programs statewide, **with the defined streams sent to and reclaimed at a reclaiming facility consistent with the requirement of the Basel Convention**.

Exhibit A, ECF No. 14-26 at 9–10; Cal. Pub. Res. Code § 42355.51(d)(2). The U.S. Department of State describes the Basel Convention on the Control of Transboundary Movements of Hazardous Wastes and Their Disposal (the "Basel Convention") as "control[ing] the international trade in hazardous waste." (Exhibit F, ECF No. 14-31 at 2 (screenshots from the website of the U.S. Department of State's Office of Environmental Qualify).) The U.S. Department of State explains that the United States signed the Basel Convention in 1990 and the U.S. Senate provided its advice and consent to ratification in 1992, but the United States has "not ratified the [Basel] Convention because it does not have sufficient domestic statutory authority to implement all of its provisions." *Id.* at 3.

Plaintiffs contend that the Basel Convention provision of the 60/60 requirement is unconstitutionally vague because businesses are given "no clue as to what information [they] must obtain" to determine whether reclaiming facilities are compliant with the Basel Convention. (ECF No. 14-1 at 18.) Plaintiffs also contend that the United States has not ratified the Basel Convention, and that the international agreement does "not supply a clear, incorporated standard that businesses can reliably consult." *Id.* at 19.

Defendant responds that "[t]he Attorney General does not intend to enforce the Basel Convention requirement independently from the 60 percent sorting requirement against plaintiffs during the course of this litigation until the [C]ourt can rule on the merits of their claim." (ECF No. 16 at 16–17.) During the Motion Hearing on June 3, 2026, the Court asked Defendant's counsel whether that statement should be read as a concession that the provision regarding the Basel Convention is vague. (Motion Hearing Transcript, ECF No. 22 at 44.) Defendant's counsel responded: "I think you can read it for a concession for the purposes of this P.I. motion, right now . . ." *Id.*

The record indicates that CalRecycle has not provided and does not intend to provide information that would aid manufacturers' determinations about whether their products and packaging comply with the Basel Convention provision. In its Note on Recyclability

3:26-cv-01675-WQH-BLM

Determinations in the Material Characterization Report, CalRecycle states that its report "provides data only on jurisdiction residential curbside recycling program collection and the sorting behaviors of LVTP facilities in California" relevant to the 60/60 requirement but does not "provide information on the destination or ultimate disposition of materials" as it relates to the Basel Convention provision. (ECF No. 14-30 at 7.) The Material Characterization Report also states that the "Basel Convention elements most relevant to SB 343 are those restricting the export and import of plastic recyclables and waste," but that, "[b]ecause this report does not provide information regarding [the Basel Convention provision], it does not contain all the information necessary to determine the recyclability status for any particular product or packaging. To make such a determination, entities will require additional information." *Id.* at 7–8. In the Frequently Asked Questions document published on August 25, 2025, CalRecycle also states that it was "not directed to investigate . . . whether [facilities'] activities are consistent with the requirement of the Basel Convention." (Exhibit D, ECF No. 14-29 at 5.)

The absence of information from CalRecycle suggests that manufacturers must reach their own determination as to whether their products and packaging will reach reclaiming facilities that comply with the Basel Convention. However, the record indicates that manufacturers lack information about how compliance with the Basel Convention will be determined, including which elements of the Basel Convention are considered in reaching that determination, and which reclaiming facilities are currently in compliance with the Basel Convention. (*See* Pitts Decl., ECF No. 14-3 ¶ 10 (declaring that Plaintiff American Forest & Paper Association's "members have no practical ability to trace packaging after consumer use through downstream reclaiming facilities, many of which operate outside the United States"); Sanders Decl., ECF No. 14-5 ¶ 10 (stating the same).) The lack of guidance as to the elements of the Basel Convention that bear on eligibility and the absence of information regarding which "reclaiming facilit[ies]" comply with the Basel Convention provision leaves manufacturers without a "reasonable opportunity to understand what conduct [SB 343] prohibits." *NetChoice, LLC v. Bonta*, 170 F.4th 744, 764 (9th Cir. 2026)

26

3:26-cv-01675-WQH-BLM

(quoting *Hill*, 530 U.S. at 732). The Basel Convention provision fails to "clearly delineate the conduct it proscribes" because covered parties cannot reasonably assess its requirements nor obtain the information necessary to determine compliance. *Id.* (quoting *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998)). Defendant's position in its briefing and its remarks at the Motion Hearing support the same conclusion.

Accordingly, Plaintiffs establish that they are likely to succeed on the merits of their vagueness challenge to the Basel Convention provision of SB 343.

iii.    APR Design Guide

SB 343 provides, specifically for "plastic packaging," that the packaging must be "designed to not include any components, inks, adhesives, or labels that prevent the recyclability of the packaging according to the APR Design® Guide published by the Association of Plastic Recyclers." (Exhibit A, ECF No. 14-26 at 10; Cal. Pub. Res. Code § 42355.51(d)(3)(A).)

The APR Design Guide® for Plastics Recyclability ("APR Design Guide") is published by the Association of Plastic Recyclers, which describes the document as being developed through a "rigorous, open source, collaborative process" with "packaging and recycling experts" that "test how packaging innovations perform in recycling systems." (Exhibit H, ECF No. 14-33 at 2–3 (screenshots from the Association of Plastic Recyclers' website).) The APR Design Guide is described as "dynamic" and "grow[ing] as the recycling system and packaging technologies evolve." *Id.* at 3. The APR Design Guide includes four Recyclabilty Categories for Design Features: APR Design Preferred, Renders Package Non-Recyclable, Detrimental to Recycling, and Requires Testing. *Id.* at 5–6. The APR Design Guide likewise includes four categories for Whole Packages: Preferred Design for Recycling, Non-Recyclable, Tolerated But Needs Improvement, and Unknown. *Id.* at 6–7.

Plaintiffs contend that the APR Design Guide provision is unconstitutionally vague because manufacturers cannot determine whether its designations—particularly, the Detrimental to Recycling and Tolerated But Needs Improvement categories—comply with

27

the requirements of SB 343. (ECF No. 14-1 at 20.) Plaintiffs contend that the evolving nature of the APR Design Guide also leaves manufacturers unable to determine "which standard controls" at any particular time. *Id.*

Defendant responds that plastic packaging within these purportedly ambiguous categories is compliant with SB 343 because, "[a]rguably[,] the manufacturer will have complied with (d)(3)(A)'s requirement to design packaging to not include any components that *prevent* recycling because recyclers grudgingly allow such features." (ECF No. 16 at 17–18.) Defendant also contends that compliance with the APR Design Guide provision concerns only the time that a manufacturer "designs a product," rather than "incorporating compliance with the APR Design Guide in real-time." *Id.* at 17 (emphasis omitted). In other words, Defendant contends that a package which complies with the APR Design Guide at the time that it is designed cannot run afoul of the provision.

A statute may be "marked by flexibility and reasonable breadth, rather than meticulous specificity," but a court must hold that it is void for vagueness if it remains unclear what the statute prohibits. *Grayned*, 408 U.S. at 110. A court may also "consider the extent to which a more definite law is simply not possible." *Untied States v. Lucero*, 989 F.3d 1088, 1101 (9th Cir. 2021). Here, due process requires that the APR Design Guide provision provide sufficient clarity for a reasonable business to determine whether its design of plastic packaging will "prevent" recyclability within the meaning of its standards. The manner in which the APR Design Guide categorizes materials leaves manufacturers unable to reach that conclusion. Although most of the categories described in the APR Design Guide provide adequate information for a manufacturer to determine whether its product or package is recyclable, the Guide's reference to design features that are "Detrimental to Recycling" creates ambiguity as to all products and packages that fall within that category. The problem recurs, albeit to a lesser extent, for packaging that is "Tolerated But Needs Improvement" because the category suggests that the packaging falls at the limits of the permissible range of the APR Design Guide.

3:26-cv-01675-WQH-BLM

The problem is not merely that the APR Design Guide categorization is "complex." *See Lucero*, 989 F.3d at 1101–02 (holding that regulations defining "waters of the United States" were not unconstitutionally vague because, despite "some imprecision," the language provided "an ascertainable, qualitative standard akin to others found in the law"). Rather, the infirmity of the APR Design Guide provision is that the incorporated standards does not correspond to other language in the statute because a product or package design that is "detrimental to recycling" or "needs improvement" may reasonably be understood as precluding recycling of that material. During the Motion Hearing, the Court asked counsel for Defendant whether its litigation position that products and packaging containing elements within these APR Design Guide categories are "arguably" compliant with SB 343 implies the converse: that the same products or packaging are arguably *not* compliant with SB 343. (Motion Hearing Transcript at 41–43 ("But if its arguable, there's an argument on the other side.")).) Counsel for Defendant agreed, stating: "I think it's right that there probably are situations where it could be vague. But our position is that it's not so vague to where it needs to be enjoined." *Id.* at 43.

Constitutional concerns regarding fair notice and standardless enforcement are heightened here because, under California law, the APR Design Guide provision may be enforced by private individuals and local governmental actors and may result in criminal sanctions. *See* Cal. Bus. & Prof. Code §§ 17203, 17535; *id.* §§ 17580.5, 17581 (providing that violations may qualify as a "misdemeanor punishable by imprisonment in the county jail not to exceed six months. . ."); Cal. Civ. Code. §§ 1770, 1780. At this stage of the proceedings, Defendant's position that products and packaging within the "detrimental to recycling" and "needs improvement" categories are "arguably" compliant with SB 343 has no bearing on how other actors capable of enforcement may understand the category nor how reviewing courts will treat the issue. (ECF No. 16 at 17–18.) The discontinuity between the language of SB 343 and the incorporated standards of the APR Design Guide renders reasonable businesses incapable of assessing whether certain products comply with the provision.

The APR Design Guide also describes itself as "dynamic" and subject to change as "packaging technologies evolve." (Exhibit H, ECF No. 14-33 at 3.) The evolving nature of the APR Design Guide poses additional vagueness concerns. Manufacturers are left without statutory guidance not only as to whether their compliance will be measured at the time of design, manufacture, or sale of their packaging, but also without reliable information regarding which version of the APR Design Guide will apply. The record indicates that the APR Design Guide has been repeatedly revised after the enactment of SB 343. (Norris Decl., ECF No. 14-2 ¶ 40 (identifying a "change log" spreadsheet for updates to the APR Design Guide).) SB 343 does not indicate which version would apply to a particular package or how a manufacturer would make that assessment.

Moreover, assuming that a court or jury were to find that the date of "design" is the key date for determining the version of the APR Design Guide (as posited by Defendant, *see* ECF No. 16 at 17), this does not solve the vagueness problem. For example, if a manufacturer's product is packaged in the style of a classic gallon milk jug, it may be difficult to determine when that jug was "designed" within the meaning of SB 343. Was it designed on the date when the jug was first designed (which presumably predates the first iteration of the APR Design Guide in 1994),[5] or the date when the manufacturer at issue first started using the jug design, or the date when the jug's labeling or coloring or cap was last redesigned? If the answer is the latter, how subtle of a change constitutes a new "design" that will trigger renewed review under the APR Design Guide? Moreover, even if the date of "design" could be reliably determined, there is no evidence in the record that the version of the APR Design Guide in effect years ago can be reliably accessed by a manufacturer to determine compliance. Based upon the information in the record, there appears to be no published versions of the guide, and the online "change log" does not appear to contain information earlier than September 2024. *See* Exhibit BB, ECF No. 14-

---

[5] *See* Exhibit H, ECF No. 14-33 at 2 (indicating that the APR Design Guide was introduced in 1994).

3:26-cv-01675-WQH-BLM

53.[6] The continuing development of the APR Design Guide's categorization system and lack of guidance regarding its application exacerbates the vagueness of the provision.

Accordingly, Plaintiffs establish that they are likely to succeed on their vagueness challenge to the APR Design Guide provision of SB 343.

iv.    <u>Ensures or Prevents Recyclability</u>

SB 343 provides that, specifically for "plastic products and non-plastic products and packaging," the product or packaging must be "designed to **ensure** recyclability and [must] not include any components, inks, adhesives, or labels that **prevent** the recyclability of the product or packaging." (Exhibit A, ECF No. 14-26 at 10 (emphasis added); Cal. Pub. Res. Code § 42355.51(d)(3)(B).)

Plaintiffs contend that SB 343 offers "no guidance" on the meaning of "ensure" and "prevent," including whether changes in "recycling infrastructure" after the time of production might render a product non-recyclable despite a manufacturer's earlier compliance. (ECF No. 14 at 21.) Plaintiffs contend that they cannot determine whether materials will "ensure" or "prevent" recyclability because the "determination of whether a component 'prevents' recyclability' . . . is made downstream by individual [material recovery facilities] applying their own operational standards." *Id.* at 21–22.

Defendant responds that the plain meanings of these terms are reasonably understood as requiring that "a product should be designed without known impediments to recyclability." (ECF No. 16 at 18.) Defendant contends that "alleged difficulty in making [these] factual determination[s]" does not render the law vague, and that manufacturers may "consult industry guidance or work with recycling experts" to determine compliance with this provision. *Id.* at 18–19.

---

[6] *See also* Association of Plastic Recyclers, APR Design Guide Changes Change Log Tracking, available at https://airtable.com/app19A4HepXgEibCY/shrAxsmEZPKlbTRZt?zeXZr=b%3AWzAsWyJHZHloeCIs NixbInNlbHFTdWlsVFRCajdzU215Il1dXQ&zeXZr%3Asort=eyJwZWxHZ2Q4SDViUktjSEdSTiI6eyJ jb2x1bW5JZCI6ImZsZFNrNktOMGZXMDAyMlFZIiwiYXNjZW5kaW5nIjp0cnVlfX0 (last accessed July 2, 2026)

The Supreme Court states that "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what the fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). In *Williams*, the Supreme Court held that a criminal statute prohibiting any person from knowingly soliciting materials "in a manner that reflects the belief" that the solicited materials contain "an obscene visual depiction of a minor engaging in sexually explicit conduct" was not unconstitutionally vague because the requirement that a defendant "make a statement that reflects" his belief that the solicited material is child sexual abuse material represents a "clear question[] of fact." *Id.* at 289–90, 306. Although SB 343 arises in a different context, the Supreme Court's reasoning is instructive. Here, the "ensure/prevent" provision does not invite the question of whether a manufacturer knew or believed that its product or package included components that would prevent recyclability or whether its design choices satisfy particular criteria that may be difficult to prove. *Cf. California Teachers*, 271 F.3d at 1152 (holding that a scienter requirement "may mitigate a law's vagueness"). The "ensure/prevent" provision, instead, considers the fact of whether the product or package has been designed in a manner that "ensures" and does not "prevent" recyclability; however, the bill offers no definition or guidance on what is meant by ensuring or preventing recyclability.

For example, consider a manufacturer whose existing packaging is made of Low Density Polyethylene ("LDPE") multi-use plastic, which is collected by residential curbside recycling programs serving 70% of California's population (and which otherwise satisfies the 60/60 requirement). *See* Material Characterization Report at 23, ECF No. 14-30 at 28. It may be possible for the manufacturer to redesign its packaging to use an entirely different material—such as certain types of cardboard, glass, tin, or alternative plastics— that would result in the packaging being collected by residential curbside recycling programs serving approximately 99% of California's population. *See* Material Characterization Report at 20–22, ECF No. 14-30 at 25–27. Does SB 343 require this manufacturer to redesign its packaging to use a different material that has a greater

3:26-cv-01675-WQH-BLM

acceptance rate to "ensure" recyclability? If so, what difference in percentage triggers the requirement to change packaging materials? The statute provides no guidance and CalRecycle is not empowered to provide guidance; instead, manufacturers are left to guess which reading of the provision a judge or jury will adopt in a subsequent civil or criminal proceeding.

Moreover, the factual question of whether a product or package contains components that "prevent" recyclability requires consideration of not only recycling technologies, but also whether it is "economically feasible" for recycling facilities to ultimately process those materials into feedstock. (Motion Hearing at 48–49 (counsel for Defendant indicating that the provision should be interpreted to include market considerations).) These downstream considerations, which manufacturers must evaluate during the design process, increase the ambiguity of the provision.

In *Hoffman Estates*, the Supreme Court considered a vagueness challenge to a drug paraphernalia ordinance that "requires a business to obtain a license if it sells any items that are *designed or marketed for use with illegal cannabis or drugs*." 455 U.S. at 491 (emphasis added). The Supreme Court stated that the "designed for use" term of the provision was *not* unconstitutionally vague in that context because it was "plain that the standard encompasses at least an item that is principally used with illegal drugs by virtue of its objective features" and, separately, that guidelines prepared by the municipal attorney referred to specific items and criteria, like "colorful design," that indicate a design for the purpose of illegal drug use. *Id.* at 500–01. Here, it is less clear how manufacturers should create a product that complies with the provision. Whereas a product subject to the paraphernalia ordinance would have "objective features" indicating its appropriateness for drug use, the features of a product or package subject to SB 343 are less determinate and require greater speculation as to the downstream market activity that may ultimately render the material incapable of being recycled. And, unlike in *Hoffman Estates*, no state or local agency is empowered to provide guidance as to the meaning of the provision. In light of these ambiguities, the possibility of enforcement by various actors, and the threat of

3:26-cv-01675-WQH-BLM

criminal sanctions under California law, the Court concludes that the "ensure/prevent" provision is unconstitutionally vague.

Accordingly, Plaintiffs establish that they are likely to succeed on their vagueness challenge to the "prevent/ensure" provision of SB 343.

v.   Severability

"Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any 'problematic portions while leaving the remainder intact.'" *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 508 (2010) (quoting *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 328–329 (2006)). "Because the unconstitutionality of a part of [a law] does not necessarily defeat or affect the validity of its remaining provisions, the normal rule is that partial, rather than facial invalidation is the required course." *Id.* (cleaned up). The Ninth Circuit instructs that courts should "avoid 'judicial legislation'—that is, amending, rather than construing, statutory text—out of respect for the separation-of-powers principle that only legislatures ought to make positive law." *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 573 (9th Cir. 2014) (quoting *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 479 (1995)). However, "because of countervailing separation-of-powers principles, courts must respect the laws made by legislatures and, therefore, should avoid nullifying an entire statute when only a portion is invalid." *Id.* at 573–74. "The need for deference and restraint in severing a state or local enactment is all the more acute because of our respect for federalism and local control." *Id.* at 574.

The "[s]everability of a state statute is governed by state law." *Id.* Under California law, a court "look[s] first to any severability clause. The presence of such a clause establishes a presumption in favor of severance." *Cal. Redev. Ass'n v. Matosantos*, 53 Cal. 4th 231, 270 (Cal. 2011). Then, the court considers "three additional criteria": whether the invalid provisions are "grammatically, functionally, and volitionally separable." *Id.* Grammatical separability considers whether the invalid provisions "'can be removed as a whole without affecting the wording' or coherence" of the remaining statute. *Id.* at 271

3:26-cv-01675-WQH-BLM

(quoting *Calfarm Ins. Co. v. Deukmejian*, 48 Cal. 3d 805, 822 (Cal. 1989)). Functional separability considers whether the "remainder of the statute is complete in itself." *Id.* (quotations omitted). Volitional separability considers whether the remainder of the statute "would have been adopted by the legislative body had [it] foreseen the partial invalidation of the statute." *Id.* (quotations omitted).

Plaintiffs contend that the "volitional inquiry alone forecloses severance here" because there is no compelling reason to conclude that the California legislature would have wanted SB 343's "blanket restriction on recyclability claims to operate without every one of the criteria in [Public Resources Code] § 42355.51 that collectively define 'recyclable.'" (ECF No. 14 at 21–22; ECF No. 18 at 10–11.)

Defendant responds that the challenged provisions are grammatically, functionally, and volitionally severable. (ECF No. 16 at 29–30.) Defendant also contends that the Waste Management Division of the Public Resources Code contains "a severability clause applying to all provisions of the division." *Id.* at 29. (citing Cal. Pub. Res. Code § 48500).

The California Public Resources Code states that, "[if] any provisions of this division or the application thereof to any person or circumstances is held invalid, that invalidity shall not affect other provisions or applications of this division which can be given effect without the invalid provision or application thereof, and to this end the provisions of this division are severable." Cal. Pub. Res. Code § 48500. Each of the challenged provisions is located within the California Public Resources Code. (Exhibit A, ECF No. 14-26 at 4–11.) Accordingly, the Court adopts a presumption in favor of severance. *Cal. Redev. Ass'n*, 53 Cal. 4th at 270.

Each of the challenged provisions is grammatically severable from the remainder of the statute and/or its respective provision. The "routinely becomes feedback" provision is a compound clause imposing an independent requirement following the separate requirement that "the product or packaging is considered recyclable in the state pursuant to subdivision (d)," and the remainder of the sentence can be struck without compromising the meaning of the remaining text. Cal. Pub. Res. Code § 42355.51(b)(1); *see Vivid Ent.*,

3:26-cv-01675-WQH-BLM

774 F.3d at 575 ("California courts have long held that parts of a compound clause are grammatically severable from a statute if their omission would not affect the meaning of the remaining text."). The Basel Convention provision is a modifying phrase following the 60/60 requirement and its language, beginning with the words "with the defined streams sent to. . ." can be severed without compromising the remaining text. Cal. Pub. Res. Code § 42355.51(d)(2). The APR Design Guide and "ensure/prevent" provisions are each independent provisions imposing requirements set apart from the remainder of the statute. *Id.* at (d)(3)(A)–(B). Each can be severed in full without compromising the remaining text.

"To be functionally severable, 'the remaining provisions must stand on their own, unaided by the invalid provisions nor rendered vague by their absence nor inextricably connected to them by policy considerations. They must be capable of separate enforcement.'" *Vivid Ent.*, 774 F.3d at 576 (quoting *People's Advocate, Inc. v. Superior Court*, 181 Cal. App. 3d 316, 332 (Cal. Ct. App. 1986)). As above, the challenged provisions are qualifying phrases or independent provisions that do not render the remaining text of SB 343 vague by their absence.

Volitional severability "depends on whether the remainder of the statute is complete in itself and would have been adopted by the legislative body had it foreseen the partial invalidation of the statute." *Id.* (quotation omitted); *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) (describing the inquiry as: "Would the legislature have preferred what is left of its statute to no statute at all?"). Here, the question is whether the California legislature would have passed SB 343 without including the challenged provisions. The inquiry requires the Court to speculate about how the California legislature would act, if it knew that those provisions would be omitted from SB 343. *Fresenius Med. Care Orange Cnty., LLC v. Bonta*, 172 F.4th 718, 735 (9th Cir. 2026) ("[T]he volitional inquiry invites speculation about what the legislature would have done if it was allowed to keep the constitutional provision[s].").

The record indicates that the California legislature passed SB 343 because "it is the public policy of [California] that environmental marketing claims, whether explicit or

implied, should be substantiated by competent and reliable evidence . . . [E]nvironmental marketing claims should adhere to uniform and recognized standards." (Exhibit A, ECF No 14-26 at 2 (Legislative Counsel's Digest).) The challenged provisions provide requirements for manufacturers separate and apart from the 60/60 requirement, which is not subject to a vagueness challenge. During the Motion Hearing, counsel for Defendant stated that "[t]he 60/60 requirement is really the backbone of the law. . . . [T]he legislature put a lot of emphasis on that. . . . Keeping that intact will further the legislative purpose of this law." (Motion Hearing Transcript at 51.) The structure of SB 343, including the centrality of the 60/60 requirement, and the legislative comments regarding the purpose of the law provide a "compelling reason" to find that a California legislator would prefer to retain the text of SB 343, excluding the challenged provisions, to maintain its other, independent effects. *Frensenius*, 172 F.4th at 735; *see also Lungren*, 809 F. Supp. at 762 (holding that there "can be no dispute that the California [l]egislature would have passed" the Environmental Advertising Claims Act "had [it] known that the definition of 'recyclable' was invalid").

Accordingly, the Court concludes that Plaintiffs are likely to succeed on the merits of their vagueness claim to each of the four challenged provisions of SB 343 and that each of the provisions is severable from the remaining text of the bill.

### 2. *Restriction on Commercial Speech*

The free speech protections of the First Amendment extend to commercial speech. *Bigelow v. Virginia*, 421 U.S. 809, 818 (1975). The Supreme Court, however, recognizes the "common-sense distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56 (1978). "Because the degree of protection afforded by the First Amendment depends on whether the activity sought to be regulated constitutes commercial or non-commercial speech," a court must "determine the proper classification" of the regulation at hand. *Bolger v. Younger Drug Prods. Corp.*, 463 U.S. 60, 65 (1983). The "core notion" of commercial speech "does no

more than propose a commercial transaction." *Id.* (citation and quotations omitted). *Bolger* identifies three factors to be considered when determining whether speech is commercial: (1) whether it can be considered an advertisement, (2) whether the speech references a product, and (3) whether the speaker has an economic motivation. *Id.* at 66–67.

SB 343 restricts the circumstances under which a person or business may make "environmental marketing claim[s], whether explicit or implied" related to products and packaging. (ECF No. 14-26 at 6; Cal. Bus. & Prof. Code § 17580.5.) The speech at issue in this action, which includes text stating that a product is "recyclable" or the use of imagery and symbols to the same effect, satisfies the second prong of the *Bolger* test because it describes the qualities of a product, packaging, or related material. Although recyclability claims do not "propose a commercial transaction" in a manner that necessarily constitutes an advertisement or evinces economic motivation within the meaning of the other *Bolger* prongs, representations about the environmental impact of the products or packaging are reasonably likely to be considered by consumers making purchasing decisions. *Bolger*, 463 U.S. at 65; *see Ass'n of Nat. Advertisers, Inc. v. Lungren*, 809 F. Supp. 747, 753 (N.D. Cal. 1992) (holding that manufacturers' claims that their products are "recyclable" qualify as commercial speech); *Ass'n of Nat. Advertisers, Inc. v. Lungren*, 44 F.3d 726, 728–29 (9th Cir. 1994) (holding that the district court in *Lungren* "correctly" determined that those statements are commercial speech). The parties do not dispute that SB 343 regulates commercial speech. (ECF No. 14-1 at 23; *see* Motion Hearing Transcript at 17 (counsel for Plaintiffs agreeing that "intermediate scrutiny is the correct standard").) The Court concludes that SB 343 regulates commercial speech.

Regulations of commercial speech are subject to intermediate scrutiny under the *Central Hudson* factors. The Supreme Court describes the four-part analysis:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly

advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson*, 447 U.S. at 566. "The State's burden is not slight; the 'free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful.'" *Ibanez v. Fla. Dep't of Bus. & Pro. Regul., Bd. of Acct.*, 512 U.S. 136, 143 (1994) (quoting *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 646 (1985)). "Mere speculation or conjecture will not suffice; rather the State must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* (quotations omitted).

In the context of a preliminary injunction seeking to enjoin enforcement of a law based on a First Amendment challenge, a plaintiff bears the "general burden of establishing the elements necessary to obtain injunctive relief," and the government "has the burden of justifying the restriction on speech." *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011) ("[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction."), *overruled on other grounds by Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019). Here, Plaintiffs raise a facial challenge to SB 343 under the First Amendment and, to satisfy their burden, must "show that a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Project Veritas*, 125 F.4th at 940 (quotation omitted); *Moody v. NetChoice, LLC*, 603 U.S. at 723–24 (explaining that, in the First Amendment context, "even a law with a plainly legitimate sweep may be struck down in its entirety . . . only if the law's unconstitutional applications substantially outweigh its constitutional ones") (internal quotation omitted).

3:26-cv-01675-WQH-BLM

The Court considers each prong of the four-part *Central Hudson* test for restrictions on commercial speech.

### i.    Inherently Misleading Speech

The first prong of the *Central Hudson* test considers whether the speech at issue falls within the protections of the First Amendment. 447 U.S. at 566. To satisfy the first prong, a plaintiff must demonstrate that the speech "concern[s] lawful activity" and is not misleading. *Id.* "When 'advertising is inherently likely to deceive or where the record indicates that a particular form of advertising has in fact been deceptive,' the advertising enjoys no First Amendment protections . . . However, if the speech is only 'potentially misleading,' in other words, 'if the information also may be presented in a way that is not deceptive,' the speech regulation must satisfy the remaining three factors specified in *Central Hudson*." *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106–07 (9th Cir. 2004) (quoting *In re R. M. J.*, 455 U.S. 191, 202–03 (1982).

As a general matter, courts are hesitant to determine at this step that the government's definition of a word compels the legal conclusion that non-conforming usage is inherently misleading. In a case concerning California's regulation of the term "butter" as used by a vegan food producer, the district court stated that "justifying governmental speech regulation using the government-issued dictionary is troublingly self-fulfilling." *Miyoko's Kitchen v. Ross*, No. 20-CV-00893-RS, 2020 WL 8361994, at *5 (N.D. Cal. Aug. 21, 2020); *see also Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228, 1238 (11th Cir. 2017) ("It is undoubtedly true that a state can propose a definition for a given term. However, it does not follow that once a state has done so, any use of the term inconsistent with the state's preferred definition is inherently misleading. Such a per se rule would eviscerate *Central Hudson*, rendering all but the threshold question superfluous.").

The Ninth Circuit has provided guidance regarding the first prong of the *Central Hudson* test in the context of regulating recyclability claims. In *Lungren*, discussed above in the context of Plaintiffs' vagueness claims, the district court also considered a First Amendment challenge to the Environmental Advertising Claims Act. 809 F. Supp. 747 at

751. The Ninth Circuit—which did not hear an appeal regarding the vagueness challenge—reviewed the district court's application of intermediate scrutiny to the California law regarding the meaning of the word "recyclable." *Ass'n of Nat. Advertisers, Inc. v. Lungren*, 44 F.3d 726, 727 (9th Cir. 1994).

With respect to the first prong of the *Central Hudson* test, the *Lungren* court affirmed the lower court's determination that the law regulated commercial speech that is only potentially misleading. *Id.* at 731–32. The Ninth Circuit stated:

> Whether the terms regulated by [the law] are misleading or informative as used in representations about consumer products depends in large part on the proximity of recycling facilities, the composting techniques of local landfills, and other circumstantial factors objectively ascertainable, with some difficulty, by the consumer. In locales where consumers have access to facilities and technologies favoring recycling and speedy decomposition, the terms subject to [the law] may accurately inform the consumer that the product is environmentally sound in some measure. In the less favorable circumstances prevailing in many areas of California, use of the same terms could well be misleading. Depending on these contingencies, use of the regulated terms may or may not be deceptive, and is accordingly only "potentially misleading." . . .
>
> [T]he terms regulated [the law] may be imprecise, but they are not altogether fanciful or inherently uninformative. "Recycled," for example, conveys at least a modicum of information informing the consumer that the product consists in some measure of reused resources, even if the source of recapture may be uncertain.

*Id.* Although the Environmental Advertising Claims Act differs from SB 343 in material respects, the Ninth Circuit's discussion regarding whether recyclability claims are inherently misleading provides guidance as to the first prong of the *Central Hudson* test in this action.

Moreover, Defendant "agrees with Plaintiffs that the commercial speech regulated by SB 343 is [only] 'potentially misleading.'" ECF No. 16 at 22 (citing *Lungren*, 44 F.3d at 731–32); *see W. States Med. Ctr. v. Shalala*, 238 F.3d 1090 (9th Cir. 2001), *aff'd sub nom. Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002) (proceeding to the remaining

3:26-cv-01675-WQH-BLM

steps of the *Central Hudson* test when "the government does not contend that the prohibited speech is unlawful or misleading, and there is no indication in the record that Plaintiffs' advertisements are untruthful"). Therefore, Plaintiffs establish that SB 343 regulates potentially misleading rather than inherently misleading speech, and the Court continues to the remaining prongs of the *Central Hudson* test.

ii.    <u>Substantial Government Interests</u>

The second prong of the *Central Hudson* test requires the government to identify a "substantial" interest that may justify speech regulation. 447 U.S. at 566. "Unlike rational-basis review, the *Central Hudson* standard does not permit [a court] to supplant the precise interests put forward by the [s]tate with other suppositions." *Edenfield v. Fane*, 507 U.S. 761, 768 (1993). The Court must "identify with care the interests the [government] itself asserts." *Id.*

Here, Defendant asserts that California has two substantial interests: "ending consumer confusion" and "improving recycling rates." (ECF No. 16 at 22.) Defendant also contends that "California's interests in regulating environmental marketing terms go beyond" those two interests to include: (1) preventing deception of consumers about the environmental impact of plastic products, (2) providing accurate information to consumers, (3) creating uniform standards for environmental claims, (4) reducing contamination of recyclable materials, and (5) lowering waste volume. *Id.* at 22–23; Exhibit DD, ECF No. 14-55 at 7 (report on SB 343 from the California Senate Committee on Environmental Quality) (stating that "SB 343 will end consumer confusion about which material is suitable for the blue bin, reduce contamination, lower waste volume, and improve recycling rates.").

The Legislative Counsel's Digest for SB 343 also states:

Existing law declares that it is the public policy of the state that environmental marketing claims . . . should be substantiated by competent and reliable evidence to prevent deceiving or misleading consumers about the environmental impact of plastic products and, that, for consumers to have accurate and useful information about the environmental impact of plastic products, environmental marketing claims should adhere to uniform and recognized standards.

42

(Exhibit A, ECF No. 14-26 at 2.)

During the Motion Hearing, the Court asked counsel for Defendant about the substantial interests asserted by the government. (Motion Hearing Transcript at 32.) Defendant's counsel stated that reducing consumer confusion and improving recycling rates are "the primary interests that we are relying on here. And that's what the legislature said." *Id.* Defendant's counsel continued: "I think there are other things wrapped up in [] those interests. Like, just general environmental concerns [and] greenwashing [] that sort of relate to the customer confusion in recycling." *Id.* Defendant's counsel stated that reducing consumer confusion and improving recycling rates are the substantial interests that the Court "should focus on." *Id.* Plaintiffs state that they "do not dispute that California has substantial government interests in ending consumer confusion and improving recycling rates." (ECF No. 14-1 at 24.)

In *Lungren*, the parties agreed that California had a substantial governmental interest in ensuring truthful environmental advertising and encouraging recycling. 809 F. Supp. at 756 ("The second part of the *Central Hudson* inquiry requires no discussion for the parties agree that California's governmental interest in ensuring truthful environmental advertising and encouraging recycling and environmentally sound packaging is substantial."), *aff'd,* 44 F.3d 726, 732 (9th Cir. 1994) (holding that the district court "properly concluded" that the second prong of *Central Hudson* required no discussion because the parties agreed on the substantial interests).

Here, the Court recognizes that California has substantial interests in (1) improving recycling rates and (2) reducing consumer confusion. *Cf. Edenfield*, 507 U.S. at 769 ("[T]here is no question that [the state's] interest in ensuring the accuracy of commercial information in the marketplace is substantial.").

### iii.   Advancing Government Interests

The third prong of the *Central Hudson* test considers whether "the regulation directly advances the governmental interest asserted." 447 U.S. at 566. The government bears the burden of identifying an "immediate connection" between the regulation and its asserted

3:26-cv-01675-WQH-BLM

substantial interest. *Id.* at 569. "[T]he regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Id.* at 564. The showing required to "uphold a restriction on commercial speech . . . is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770–71 (quotation omitted).

A court may not "simply defer to legislative and executive judgment" regarding whether a regulation advances the government's interests. *Cal-Almond, Inc. v. U.S. Dep't of Agric.*, 14 F.3d 429, 437 (9th Cir. 1993). "To satisfy its burden, California must provide evidence establishing that the harms it recites are real and that its speech restriction will *significantly* alleviate those harms." *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1117 (9th Cir. 2023) (quotations omitted) (emphasis in original). "[T]he First Amendment requires more than fact-free inferences to justify governmental infringement on speech." *Id.* at 1118.

The Supreme Court has also stated, however, that the third *Central Hudson* prong does not "require that 'empirical data come . . . accompanied by a surfeit of background information . . . We have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and 'simple common sense.'" *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (quoting *Burson v. Freeman*, 504 U.S. 191, 211 (1992))).[7]

---

[7] In *Burson v. Freeman*, the Supreme Court held that a Tennessee law prohibiting the solicitation of votes and distribution of campaign materials within 100 feet of a polling location was a content-based restriction on speech that nonetheless survived strict scrutiny based on "[a] long history, a substantial consensus and *simple common sense* show[ing] that some restricted zone around polling places is necessary to protect that fundamental right [to vote]." 504 U.S. 191, 211 (1992) (emphasis added).

3:26-cv-01675-WQH-BLM

The Ninth Circuit explains the limited circumstances under which "common sense," rather than evidentiary support, may be adequate to justify a law that restricts speech:

> [A] state can invoke 'common sense' only if the connection between the law restricting speech and the government goal is so direct and obvious that offering evidence would seem almost gratuitous. But as the government's justifications for a regulation become more attenuated, bare appeals to common sense quickly veer into impermissible speculation. In such cases, the state needs to provide evidence to substantiate that its law will meaningfully further its stated objectives.

*Junior Sports*, 80 F.4th at 1118.

In *44 Liquormart*, the Supreme Court clarified the degree of deference that a court should afford to a state legislature upon review of a speech-restrictive law. *44 Liquormart v. Rhode Island*, 517 U.S. 484 (1996). In that case, the Supreme Court considered the constitutionality of a state's "prohibitions against advertising the retail price of alcoholic beverages." *Id.* at 489. Justice Stevens, writing for a plurality, distinguished between regulation of "commercial messages to protect consumers from misleading . . . sales practices" and regulation that "entirely prohibits the dissemination of truthful, nonmisleading commercial messages for reasons unrelated to the preservation of a fair bargaining process." *Id.* at 501. Having determined that the price advertising ban at issue concerned "truthful, nonmisleading speech about a lawful product," the Supreme Court reviewed the law with "special care" to determine whether the state satisfied its burden of showing that the "regulation will advance its interest . . . to a material degree." *Id.* at 504–05 (quoting *Central Hudson*, 447 U.S. at 566 n.9; *Edenfield*, 507 U.S. at 771). The Supreme Court concluded that the state failed to present "evidence to suggest that its speech prohibition will *significantly* reduce marketwide consumption" of alcohol. *Id.* at 506 (emphasis in original).

In reaching that conclusion, the Supreme Court reviewed its earlier decision in *Posadas de Puerto Rico Associates*, which adopted a more deferential approach to legislative restrictions on commercial speech. *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, (1986), *abrogated by 44 Liquormart*, 517 U.S. 484

(1996). In *Posadas*, the Supreme Court reviewed the constitutionality of a regulation restricting the "advertising of casino gambling aimed at the residents of Puerto Rico" to reduce the demand for casino gambling among its residents. *Id.* at 330, 340. The *Posadas* court described the third and fourth *Central Hudson* prongs as "basically involv[ing] a consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those ends." *Id.* at 341. The *Posadas* Court held that the third *Central Hudson* prong was "clearly" satisfied because the "Puerto Rico Legislature obviously believed . . . that advertising of casino gambling aimed at the residents of Puerto Rico would serve to increase demand for the product advertised. We think the legislature's belief is a reasonable one . . ." *Id.* at 341–42 (citing *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 509) (1981) (plurality) (holding that the "legislative judgment that billboards are traffic hazards is not manifestly unreasonable and should not be set aside").

Ten years later, a plurality of the Supreme Court described *Posadas* as marking "a sharp break from our prior precedent" and "decline[d] to give force to its highly deferential approach." *44 Liquormart*, 517 U.S. at 510. The *44 Liquormart* Court reasoned that the "casino advertising ban was designed to keep truthful, nonmisleading speech from members of the public," and concluded that "a state legislature does not have the broad discretion to suppress truthful, nonmisleading information for paternalistic purposes that the *Posadas* majority was willing to tolerate." *Id.* at 509–10. This conclusion comes in Section VI of Justice Stevens's plurality opinion, in which only Justices Kennedy, Thomas, and Ginsburg joined. *Id.* at 488–89. However, Justice O'Connor—joined by Chief Justice Rehnquist, Justice Souter, and Justice Breyer—endorsed a similar approach in her concurrence:

> Since *Posadas*, however, this Court has examined more searchingly the State's professed goal, and the speech restriction put into place to further it, before accepting a State's claim that the speech restriction satisfies First Amendment scrutiny. In each of these cases we declined to accept at face value the proffered justification for the State's regulation, but examined carefully the relationship between the asserted goal and the speech restriction used to reach that goal. The closer look that we have required since *Posadas*

comports better with the purpose of the analysis set out in *Central Hudson*, by requiring the State to show that the speech restriction directly advances its interest and is narrowly tailored.

*Id.* at 531–32 (O'Connor, J., concurring) (citations omitted).

With these principles in mind, the Court considers whether Defendant satisfies his burden to demonstrate that SB 343—either construed in its original form by the legislature or as revised in the Court's preceding severability analysis—"directly advances [California's] interest[s] to a material degree." *Junior Sports*, 80 F.4th at 1117.

a. *Improving Recycling Rates*

Plaintiffs contend that SB 343 does not advance the state's interest in improving recycling rates because "[m]any businesses that would otherwise make accurate, qualified recyclability claims will instead strip their packaging of all recycling guidance to avoid the risk of liability."[8] (ECF No. 14-1 at 27.) Plaintiffs contend that this "chilling effect" is a "foreseeable consequence . . . and it is already occurring." *Id.*; *see* LeMay Decl., ECF No. 14-11 ¶ 22 (stating that, "[b]ecause [the California Table Grape Commission's] members cannot practically navigate this compliance framework on a state-by-state basis, SB 343 is prompting members to strip truthful recyclability information from their products nationwide to avoid litigation risks and liability in California"); Verloop Decl., ECF No. 14-12 ¶ 21 (stating the same); Hewitt Decl., ECF No. 14-14 ¶ 19 (stating the same). Plaintiffs contend that, "[b]y leaving consumers less informed about how to dispose of recyclable materials," SB 343 will "undermine[] [California's] recycling and landfill

---

[8] Plaintiffs state, for example: "A business cannot make a qualified statement, like 'Recyclable where facilities exist – check locally,' even where that statement is accurate, because SB 343 permits no middle ground: either a product meets every one of the State's rigid criteria, or any mention of recyclability is deemed a crime." (ECF No. 14-1 at 8.) During the Motion Hearing, counsel for Plaintiffs also discussed "instructions for recyclability" that may violate SB 343, including for "products on the market now that have multiple components; some of which are recyclable, some of which are not," like a recyclable plastic tray of sliced meats that has a non-recyclable plastic film protecting the food from contaminants. (ECF No. 22 at 16.)

3:26-cv-01675-WQH-BLM

diversion interests" because consumers will be denied "accurate disposal guidance." (ECF No. 14-1 at 28.)

Defendant contends that Plaintiffs incorrectly "focus on the rate at which people put items in the recycling bin, rather than the rate at which items are processed into new products . . . which the Legislature found to be the more pressing problem in California." (ECF No. 16 at 23.) Defendant contends that SB 343 reduces "cross-contamination in recycling streams, which makes recycling less effective," and will "eventually increase the number of products that are designed to be recyclable in California." *Id.* at 23–24. Defendant contends that, when Californians place "materials in the blue bin" marked as recyclable that cannot actually be "used as raw material for new products," recycling facilities must attempt to sort the recyclable materials from contaminants. *Id.* at 24. If the facility fails, then "all of the materials end up in . . . the landfill." *Id.* (citing Exhibit DD, ECF No. 14-55 at 8 (Senate Committee on Environmental Quality stating that, "[i]f there is no market, recyclable materials will not be used and will likely end up in a landfill"). Defendant contends that this process "weakens the recyclables market" by increasing the cost to reclaim materials and reducing the value of contaminated "plastic lots." *Id.*

In support of his position, Defendant identifies the Policy Recommendations report published by California's Statewide Commission on Recycling Markets and Curbside Recycling ("Statewide Commission Report") on June 25, 2021. (ECF No. 16 at 23–26 (citing Exhibit 1, ECF No. 16-2 at 4).) The Statewide Commission Report states that the California legislature and governor created the commission to "provide advice to CalRecycle, the Legislature, and other State or Federal agencies as appropriate regarding the state's ambitious recycling and organic materials recovery goals from the perspective of professionals working in many aspects of this complicated industry." (Exhibit 1, ECF No. 16-2 at 9.) The Statewide Commission Report includes data about the statewide recycling rate and the material classes that are disposed of in the state's waste stream, *id.* at 27–28, and consists primarily of proposed policies related to various dimensions of recycling. *See id.* at 7–8. The authors of a proposed policy related to "plastic bag/film

3:26-cv-01675-WQH-BLM

contamination" state that "[m]any flexible plastic bags, films, wraps and pouches have a recycle symbol which causes consumer confusion and contributes to contamination," and that the "benefits of this policy recommendation" include, among other things, "reduction of waste to landfills." *Id.*; *see id.* at 111 (flow chart describing "3,389 mil lb/yrs" of contaminated waste and stating that the curbside "post-consumer collection . . . is pointless because there are almost no buyers for the contaminated plastic film waste").

Defendant also submits a CalRecycle report entitled "The Current State of Processing" published in February 2026. (Exhibit 5 ("Processing Report"), ECF No. 16-2 at 205–309.) The Processing Report states that CalRecycle, in connection with a separate California law entitled "The Plastic Pollution Prevention and Packaging Producer Responsibility Act," was required to "conduct a statewide needs assessment" to "achieve a 65% recycling rate" for plastic covered material by 2032. *Id.* at 213. The Processing Report describes a study conducted by an independent contractor analyzing the "current state and the needed state of collection, processing, and end markets as they pertain to . . . meeting the requirements under [The Plastic Pollution Prevention and Packaging Producer Responsibility Act]." *Id.* Defendant also submits three reports from committees of the California Assembly regarding SB 343, (Exhibits 2–4, ECF No. 16-2 at 179–204; *id.* at 192 (stating that "4.5 million tons of plastic waste enter California landfills" each year)), and two online articles published by the San Francisco Chronicle and NPR describing the difficulty in sorting plastic materials into usable feedstock. (Exhibits 6–7, ECF No. 16-2 at 310–324.)

During the Motion Hearing, the Court asked counsel for Defendant about the anticipated effects of SB 343. (Motion Hearing at 34–38.) The Court asked whether products and packaging containing materials that are currently recycled, but not in a proportion compliant with the 60/60 requirement, will be required to "go to the landfill" once SB 343 takes effect. *Id.* at 36. Counsel for Defendant answered in the affirmative and explained:

[O]ver time – it may be that this law would likely result in a lot fewer things

3:26-cv-01675-WQH-BLM

> going to the recycling bin. . . . The legislature has made the determination that . . . it's reasonable to believe that a lot of companies will [] redesign their packaging to become recyclable. [M]aybe you would see a drop in recycling next year. But maybe, [] two years down the road there's more products coming back on the market that have recycling symbols because they are designed in a way to actually fully be recycled across California.

*Id.* Defense counsel further stated that it is unclear whether the "volume that goes to the landfill will increase or decrease" after SB 343 goes into effect and that "maybe, at the beginning, there will be less recycling . . . [b]ut, over time, [SB 343] will . . . decrease contamination and [] encourage redesign of products to actually be recyclable." *Id*. at 37–38.

Here, the record does not support the government's position that enforcement of SB 343 will improve recycling rates and, in particular, reduce the total amount of material that is deposited into landfills. Defendant identifies evidence supporting the general proposition that California faces serious difficulties in efficiently recycling consumer products and packaging, at least with respect to those made of plastic. *See, e.g.*, Exhibit 3, ECF No. 16-2 at 189 ("In California, less than 15% of single-use plastic is recycled" and the "vast majority of single-use items are used once and then landfilled. . ."). Defendant also identifies evidence to support the more specific proposition that consumers' attempts to recycle materials, especially plastic bags, are detrimental to the recycling process because—as a matter of practice—recycling facilities are unable to process these materials and turn them into feedstock that can become new products and packaging. *See, e.g.*, Exhibit 1, ECF No. 16-2 at 111. With respect to California's interest in improving recycling rates, Defendant cites a proposed "label restriction to stop plastic bag/film contamination in curbside recycling" in the Statewide Commission Report. (Exhibit 1, ECF No. 16-2 at 109.) The authors of the proposal state that "[f]lexible plastic bags, film, wrap and pouches are a top form of contamination in curbside recycling bins" that "have no market reclaim value" and, as a result, "clog[] machinery in material recovery facilities." *Id*. Taken together, this evidence supports the conclusion that the elimination of contaminated

3:26-cv-01675-WQH-BLM

materials from recycling streams would benefit the operations of recycling facilities and result in a greater portion of their collected materials being turned into feedstock. But the evidence in the record indicates that, under SB 343, this benefit to recycling facilities would come at the cost of increasing the amount of materials placed in landfills.

Plaintiffs submit declarations from their members averring that the heightened requirements of SB 343 will require them to omit truthful statements regarding recyclability from their products and packaging, which will result in materials that would otherwise be recycled going to a landfill. *See, e.g.*, LeMay Decl., ECF No. 14-11 ¶ 24. The absence of recyclability claims on packages that would qualify for the state's standards—or may fall short of the 60/60 requirement but are nonetheless capable of being collected and processed by a majority of the state's recycling programs and facilities—would reasonably be expected to increase the amount of material going to landfills. Counsel for Defendant similarly indicated that the likely short-term effect of SB 343 will be a decrease in consumer recycling and an increase in recyclable materials ending up in landfills. (Motion Hearing at 38.) Defense counsel contends that SB 343 will eventually change manufacturers' behaviors by encouraging the design of products and packages that meet SB 343's standards and may be lawfully marked with recyclability claims. *Id.* at 36. This speculative position is belied by manufacturers' declarations, which suggest that the opposite result may occur: recycling claims will be omitted entirely. While these declarations are self-serving, Defendant offers no evidence to counter them. More importantly, Defendant offers no evidence to support the speculative position that SB 343 will cause manufacturers to redesign their products and packaging in a way that complies with SB 343, as opposed to manufacturers simply omitting truthful statements regarding recyclability from their products and packaging.

In evaluating whether there is adequate evidentiary support for a state's regulation at the third *Central Hudson* prong, it is not enough for the state to "demonstrate that the harms it recites are real"; instead, it must also identify evidence that "its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 771–73 (holding that a

Florida rule prohibiting certified public accountants from engaging in personal solicitation did not satisfy the third *Central Hudson* prong because the state "present[ed] no studies that suggest personal solicitation . . . creates the dangers of fraud, overreaching, or compromised independence. . . .").

In *Junior Sports*, the Ninth Circuit considered a commercial speech challenge to a California law prohibiting the advertisement of "any firearm-related product in a manner that is designed, intended, or reasonably appears to be attractive to minors." 80 F.4th at 1114 (quoting Cal. Bus. & Prof. Code § 22949.80(a)(1)). The appellate court reversed the district court's denial of a preliminary injunction because the state "failed to justify its infringement on protected speech under the Supreme Court's *Central Hudson* framework." *Id.* at 1116. In the case, California identified its substantial interests justifying the commercial speech restriction as "preventing unlawful possession of firearms by minors" and "protecting its citizens from gun violence and intimidation," but the Ninth Circuit held that California failed to satisfy its burden to demonstrate that the regulation directly and materially advanced those interests because the state "lack[ed] supporting evidence." *Id.* at 1117. California did not identify any reported instance of a minor unlawfully purchasing a firearm in the state and failed to support with evidence its argument that the likelihood of minors using firearms would increase: "Rather than support this argument with any evidence, California maintains that 'common sense'—which, in reality, is just speculation here—provides all the justification it needs. But the First Amendment requires more than fact-free inferences to justify governmental infringement on speech." *Id.* at 1117–18. The Ninth Circuit described the regulation as suffering from a "similar flaw" as the regulation of alcohol advertising in *44 Liquormart* and held that California failed to demonstrate that the restriction would "'*significantly* reduce' either *unlawful* firearm possession by minors or gun violence.'" *Id.* at 1118 (citing *44 Liquormart*, 517 U.S. at 505) (emphases in original).

Here, there is a similar absence of evidentiary support demonstrating that SB 343 materially and directly advances the state's interest in improving recycling rates. The

record does not indicate that the bill will improve recycling rates because gains in efficiency at recycling facilities may be substantially outweighed by the decreased rate at which recyclable materials reach those facilities. Like in *Junior Sports*, Defendant speculates, without evidentiary support, that heightened recyclability standards will change manufacturers' behavior by incentivizing them to redesign products and packaging to continue making environmental advertising claims. The enforcement of SB 343 may induce this behavior, but the record does not provide adequate support to demonstrate that this inference is more reasonable than the alternative: that manufacturers will abandon their recyclability claims for fear of enforcement.

A similar lack of evidence has proved fatal to other government restrictions on commercial speech. In *Edenfield v. Fane*, for example, the Supreme Court held that a Florida rule prohibiting certified public accountants from engaging in personal solicitation did not satisfy the third *Central Hudson* prong because the state "present[ed] no studies that suggest personal solicitation . . . creates the dangers of fraud, overreaching, or compromised independence. . . ." 507 U.S. at 771–73; *see also W. States Med. Ctr. v. Shalala*, 238 F.3d 1090, 1091, 1094 (9th Cir. 2001) (holding that the government "has not offered evidence" to demonstrate that a federal law prohibiting drug providers from "promoting or advertising particular compounded drugs" would "reduce the type of consumption of compound drugs that is harmful"), *aff'd sub nom. Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002); *Cal-Almond, Inc.*, 14 F.3d at 438 (holding that California's regulatory scheme regarding almond-related marketing did not directly advance the state's goal in "increased almond sales" because the government "presented little or no evidence regarding the effectiveness of the [] promotional efforts"); *Junior Sports*, 80 F.4th at 1118 (explaining that an "appeal to common sense and a chain of inferences" is not sufficient).

By contrast, those cases in which courts have held that a state has satisfied the third *Central Hudson* prong indicate that a greater evidentiary showing is required to demonstrate that the regulation will advance the state's asserted interest. In *Lorillard Tobacco Co. v. Reilly*, for example, the Supreme Court reviewed regulations promulgated

3:26-cv-01675-WQH-BLM

by the Attorney General of Massachusetts regarding the "advertising and sale of cigarettes, smokeless tobacco, and cigars," including a restriction on "outdoor advertising within 1,000 feet of a school or playground." 533 U.S. 525, 532, 539 (2001). The First Circuit had applied intermediate scrutiny under *Central Hudson* and concluded that the regulation "directly advances" the state's interest in "preventing tobacco use by minors." *Id.* at 539. With respect to the third *Central Hudson* prong, the Supreme Court recognized that the Massachusetts Attorney General "cite[d] numerous studies" and "relie[d] in part on evidence gathered by the Food and Drug Administration" to support its position that limiting outdoor advertising of tobacco products near schools and playgrounds would "materially alleviate" the problem of underage tobacco use. *Id.* at 557–61 (discussing "several studies of tobacco advertising" and a "Surgeon General's report" regarding the impact of advertising on a "young person's decision to use cigarettes"). The Supreme Court concluded that the state provided "ample documentation" regarding underage tobacco use and its relationship to advertising and, thereby, satisfied the third *Central Hudson* prong. *Id.* at 561.[9]

In *Florida Bar*, the Supreme Court similarly reviewed the constitutionality of a bar association rule prohibiting direct solicitation by personal injury lawyers during the 30 days after an accident. *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 620 (1995). The Supreme Court described the evidentiary record in that case, which included a "106-page summary of [the Florida Bar's] 2-year study of lawyer advertising and solicitation," including "data—both statistical and anecdotal—supporting [its] contentions that the Florida public views direct-mail solicitations in the immediate wake of accidents as an intrusion of privacy that reflects poorly upon the profession." *Id.* at 626–27 ("The anecdotal record mustered by the Bar is noteworthy for its breadth and detail."). The Supreme Court

---

[9] The Supreme Court concluded, however, at the fourth *Central Hudson* prong, that the state failed to show that the "outdoor advertising regulations for smokeless tobacco and cigars are not more extensive than necessary" to advance its interest in preventing underage tobacco use. *Lorillard Tobacco Co.*, 533 U.S. at 565.

contrasted the record to *Edenfield*, which did not include any studies or anecdotal evidence regarding the CPAs' equivalent solicitations, and held that the Florida Bar rule satisfied the *Central Hudson* test. *Id.* at 626, 635.

These cases demonstrate that—in a case such as this one—the strength of the evidentiary record is determinative under the third *Central Hudson* prong. In cases where the state provides studies and evidence that directly connect its regulation with its asserted interest, courts have refused to enjoin enforcement of the regulation. For those cases where the government identifies a problem but fails to provide evidence that its regulation will directly alleviate the problem, courts have found the restriction on commercial speech to be unjustified. Here, SB 343 falls in the latter category because the record does not demonstrate that enforcement of the bill will improve recycling rates and result in fewer materials being sent to landfills by California consumers.

In *Lungren*—which concerned an earlier California law prohibiting the use of marketing terms, like "biodegradable" and "recyclable," unless the material satisfied statutory requirements or FTC trade rules—the district court reached a different conclusion regarding the third *Central Hudson* prong. *Ass'n of Nat. Advertisers, Inc. v. Lungren*, 809 F. Supp. 747 (N.D. Cal. 1992). In that case, the district court held that the state's interest in "reduc[ing] deceptive environmental advertising" was directly and materially advanced by the statutory definition of "recyclable" because, "[a]s in *Central Hudson*[,] there is an immediate connection . . . between environmental advertising and sales." *Id.* at 756–57. The district court reasoned:

> [T]he *Posadas* Court looked no further than the reasonableness of the legislature's belief that advertising casino gambling increases the demand for gambling.
>
> Similarly, the California legislature's belief that uniform standards for frequently used environmental advertising terms would promote the state's consumer protection goals, is clearly reasonable. Thus, the court finds that the statute under review directly advances the asserted governmental interest.

3:26-cv-01675-WQH-BLM

*Id.* at 757 (citing *Posadas*, 478 U.S. at 342). The Ninth Circuit affirmed the district court's holding. *Ass'n of Nat. Advertisers, Inc. v. Lungren*, 44 F.3d 726, 732 (9th Cir. 1994). The appellate court also cited *Posadas* and held that, "[a]lthough comprehensive economic data are lacking, the record contains abundant support for the proposition that green marketing boosts consumer demand for the allegedly recycled or biodegradable product." *Id.* at 733. With respect to the state's asserted interest in "environmental protection," the Ninth Circuit stated:

> In setting rather modest minimum targets for the recycled content and decomposition periods of consumer products, the statute creates an incentive for manufacturers of noncomplying products to enhance the environmental attributes of their goods in order to capture the benefits of green labelling. This incentive directly furthers California's substantial interest in promoting resource conservation and reducing the burden on its brimming landfills. If producers of ecologically substandard products achieve the statute's minimum thresholds, these improvements translate directly into less waste being dumped and dumped waste decomposing more rapidly. If such producers fail to adapt, a considerable number of ecologically-oriented consumers may reasonably be expected to shift in substantial measure to the products of complying firms and thereby effect the same result, additional landfill capacity and resource conservation, provided consumers can distinguish relatively green products, as [the law] permits.

*Id.* at 735.

The Ninth Circuit's holding in *Lungren* does not compel this Court to reach the same conclusion with respect to SB 343 because the evidentiary records in *Lungren* and the instant case are distinguishable. The Ninth Circuit identified "abundant support" in the record regarding the commercial effects of "green marketing" claims, "numerous instances of advertisers making marketing claims containing misleading or inconsistent uses of the [regulated] terms" and evidence that "most consumers who purchase environmentally-oriented products discovered their alleged ecological attributes from packaging labels." *Lungren*, 44 F.3d at 733 (citing Stephen Gardner, *How Green Were My Values: Regulation of Environmental Marketing Claims*, 23 Univ. Toledo L. Rev. 31 (1991)). The Ninth Circuit stated: "In short, we find sound support for the California legislature's conclusion

that ecological claims boost consumer demand for products that do not always measure up." *Id.* Here, the record is lacking. Defendant identifies evidence indicating that California faces challenges in reaching its recycling goals but cannot point to "sound support" for the proposition that SB 343 will "*significantly* alleviate those harms." *Junior Sports*, 80 F.4th at 1117.

The Supreme Court's intervening decision in *44 Liquormart*, which abrogated *Posasdas*, and the more recent opinions issued by the Ninth Circuit on similar matters also call into question the *Lungren* court's deferential approach to a legislature's judgment of whether speech-restrictive regulation directly advances its stated goal. The Ninth Circuit in *Lungren* quoted the district court's more detailed discussion of *Posadas* and held that, "as in *Posadas*, the nexus between advertising consumer demand and the asserted governmental interests is sufficiently close." *Lungren*, 44 F.3d at 733. The *44 Liquormart* opinion, which issued two years later, stated that "*Posadas* erroneously performed the First Amendment analysis" and concluded that "a state legislature does not have the broad discretion to suppress truthful, nonmisleading information for paternalistic purposes that the *Posadas* majority was willing to tolerate." 517 U.S. at 509–510; *see also Junior Sports*, 80 F.4th at 1117 (citing *44 Liquormart*, 517 U.S. at 505–06). The Ninth Circuit's reasoning in *Lungren*, in addition to being distinguishable based on the record, must be read in concert with its later decisions reviewing restrictions on commercial speech. Here, the Court concludes that Defendant does not identify adequate evidence in the record to satisfy its burden under the third *Central Hudson* prong with respect to its interest in improving recycling rates.

### b. *Reducing Consumer Confusion*

Plaintiffs contend that SB 343 does not advance the government's other asserted interest—reducing consumer confusion—because the law "arbitrarily suppresses truthful recyclability claims" and "deprives consumers of accurate information." (ECF No. 14-1 at 25.) Plaintiffs contend that "chasing arrow symbols and recyclability labels" indicate that the product or package is "*capable* of being recycled," rather than "promis[ing] a likelihood

3:26-cv-01675-WQH-BLM

of the item eventually being recycled [or] anything about the broader infrastructure." *Id.* at 25–26. Plaintiffs contend, as above, that manufacturers will choose to avoid making recyclability claims for fear of liability and that consumers will be deprived of "accurate, qualified recycling instructions" for products and packaging that are capable of being recycled. *Id.* at 27–28 ("Even materials that are widely collected and sorted for recycling— well exceeding the [] 60/60 threshold—would still be left unlabeled if there is a colorable argument that any one of the remaining definitional criteria could not be met."); *see also id.* at 8 ("A business cannot make a qualified statement, like 'Recyclable where facilities exist – check locally,' even where that statement is accurate, because SB 343 permits no middle ground: either a product meets every one of the State's rigid criteria, or any mention of recyclability is deemed a crime.").

Defendant responds that the law requires that "products be labeled accurately" and "also requires that companies selling their products actually have evidence of the environmental claims that they make." (ECF No. 16 at 25–26.) Defendant contends that "[i]t is common sense that holding producers of 'recyclable' products accountable for knowing whether their products can, in practice, be recycled, is a necessary predicate to truthful labeling." *Id.* at 26. Defendant also contends that the law "protect[s] the public from greenwashing" and eliminates the "unfair advantage" that companies making false recyclability claims have over "businesses who spend resources to design and produce products that are known to be recyclable." *Id.*

Defendant, in the Opposition, dedicates only one paragraph to evidentiary support for the consumer protection interest. (ECF No. 16 at 26 (citing Exhibit B, ECF No. 14-27 at 5 (defining "greenwashing")).). The Court, however, incorporates the evidentiary support described in the preceding section and, separately, notes that the record contains evidence that consumers lack adequate information about which products to recycle. (Exhibit 2, ECF No. 16-2 at 182 (citing a 2021 report, which found that "75% of adults surveyed in Spain, Mexico, the United States, and the United Kingdom regularly recycle at home; however, 54% of respondents stated that they find recycling different plastics

difficult to understand.  Of those who don't regularly recycle plastic, 80% stated that they would recycle more if they had better guidance about recycling . . . ."). The Court also assumes—and the parties do not dispute—that consumers read and consider recyclability claims on products and packaging during their purchasing decisions and at the time that they discard the products and packaging.

Taken as a whole, the record contains conflicting information as to whether SB 343 will actually provide consumers with a greater amount of accurate information regarding the recyclability of products and packages. The Court presumes that SB 343's standardized requirements for recyclability claims will facilitate California consumers' ability to trust that, if a product or package is labelled as recyclable, it will be recycled and turned into feedstock if they place it in the appropriate bin. *Lungren*, 44 F.3d at 733 (describing the Environmental Advertising Claims Act as "increas[ing] the flow and purity of information in the marketplace"). The Court also presumes that information about recyclability is difficult for consumers to obtain without relying on manufacturers' representations about the materials used in their products and packaging. *Id.* at 734 (describing the same law as a "surrogate for monitoring functions which consumers cannot easily or comprehensively perform"). If consumers are confident that a recyclability claim is substantiated with competent evidence and satisfies statewide criteria, then those consumers will be able to make more informed purchasing decisions.

The current record indicates, conversely, that SB 343's requirements will result in manufacturers choosing to forgo recyclability claims that would provide consumers with environmental information for fear of enforcement actions. *See, e.g.*, LeMay Decl., ECF No. 14-11 ¶ 22. For those products and packaging that omit any recyclability claims, consumers are left with less information than they would receive in the absence of SB 343's regulatory scheme. Moreover, SB 343 prohibits truthful and genuinely helpful information, such as a listing of which areas accept the product or package for recycling and which do not. For example, if a material is accepted by recyclers in the greater Los Angeles area but nowhere else in California, SB 343 would prohibit manufacturers from placing that

3:26-cv-01675-WQH-BLM

information on their packaging and products because the 60/60 rule would not be satisfied. Meanwhile, SB 343 would still leave consumers in dark about whether a package or product marked as recyclable is genuinely recyclable in the consumers' area—i.e., whether the consumer is in the portion of the state (which can be up to 40%) which does not accept the material for recycling. Likewise, manufacturers may choose to forgo qualified information about components of a package that would, in fact, be recyclable under SB 343's requirements because the entire package or product would not qualify as recyclable. *See* ECF No. 22 at 16 (describing products, like a tray of sliced meats, with packaging that can be separated into recyclable and non-recyclable parts).

Based on the conflicting indications in the record as to whether consumers will, in fact, receive a greater amount of accurate information related to the recyclability of products and packaging after the implementation of SB 343, it is not enough for Defendant to appeal to "common sense." (ECF No. 16 at 26; *Junior Sports*, 80 F.4th at 1119 ("California cannot merely gesture to 'common sense' to meet its burden of showing that the law will 'significantly' advance its goals.").) Defendant must show, as with its interest in improving recycling rates, that SB 343 will significantly advance California's goal of reducing consumer confusion. The record falls short of satisfying that burden. Although the statewide statutory standard would reasonably be expected to provide for greater confidence among purchasers and a more consistent definition of "recyclable," its limitation on truthful claims related to recyclability and the incentive for manufacturers to forgo messages about recyclability entirely demonstrate that the government's position is too speculative to justify its restriction on commercial speech.

Accordingly, Defendant fails to establish that SB 343 directly and materially advances California's substantial interests in improving recycling rates and reducing consumer confusion.

### iv. Narrow Tailoring

The fourth prong of the *Central Hudson* test considers whether the regulation at issue "is not more extensive than is necessary to serve" the government's interest. 447 U.S. at

566. "[I]f the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." *Id.* at 564. The Supreme Court states:

> The fourth part of the test complements the direct-advancement inquiry of the third, asking whether the speech restriction is not more extensive than necessary to serve the interests that support it. The [g]overnment is not required to employ the least restrictive means conceivable, but it must demonstrate narrow tailoring of the challenged regulation to the asserted interest—"a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served."

*Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999) (quoting *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989)); *Project 80's, Inc. v. City of Pocatello*, 942 F.2d 635, 638 (9th Cir. 1991) (concluding, "as did the Supreme Court in *Fox*, that restrictions which disregard far less restrictive and more precise means are not narrowly tailored").

In *Lungren*, the Ninth Circuit held that the challenged provision of the Environmental Marketing Claims Act satisfied the fourth *Central Hudson* prong with respect to both of the state's interests, despite a "degree of arbitrariness in the legislative determination of where along the continuum of recycled content percentages or decomposition timetables a product becomes 'recycled' or 'biodegradable.'" 44 F.3d at 736. The *Lungren* court reasoned that the legislative determinations at issue in the case "do not appear unduly prohibitive and leave considerable room for both more privileged editorial commentary and, in the commercial context, alternative expressions conveying perfectly well information about the modest environmental attributes of products not measuring up under" the law. *Id.* at 736–37 (citing *Ward*, 491 U.S. at 791).

SB 343 fails to leave the same breathing room for manufacturers to provide qualified information about their products and packaging. Its recyclability requirements apply to the following recyclability claims: "a product or packaging that displays a chasing arrows symbol, a chasing arrows symbol surrounding a resin identification code, or any other

symbol or statement indicating the product or packaging is recyclable, or otherwise *directing the consumer to recycle the product or packaging*." (Exhibit A, ECF No. 14-26 at 7; Cal. Pub. Res. Code § 42355.51(b)(1) (emphasis added)). Although Defendant contends that "the law is not a complete ban on discussion of recyclability," the text of the bill indicates that SB 343 applies broadly to preclude any speech that would instruct a consumer to recycle the product or package in any manner. (ECF No. 16 at 26.) In briefing on the Motion for Preliminary Injunction, Defendant represents that a manufacturer could lawfully include qualified claims, like "[n]ot recyclable in most areas; check locally" or include a QR code on the packaging with "details regarding the product's recyclability." *Id.* at 26–27. At oral argument, counsel for Defendant stated that a manufacturer could say "not recyclable in some areas" but could not lawfully say, with respect to the same product, "recyclable in some areas". Motion Hearing at 39. Considering the statutory scheme allowing private actors and local government officials to enforce the requirements of SB 343, and the threat of criminal sanctions, Defendant's representations in this action do not suffice to restrict the plain meaning of SB 343's scope.

SB 343's broad limitations on disseminating recycling information, including qualified recyclability claims, which would otherwise allow consumers to make informed choices about the circumstances under which products and packages should be recycled, run afoul of First Amendment principles. The Supreme Court describes the "presumption favoring disclosure over concealment" in the context of commercial speech regulation. *Peel v. Att'y Registration & Disciplinary Comm'n*, 496 U.S. 91, 109 (1990). In *Yim v. City of Seattle*, for example, the Ninth Circuit held that a municipal ordinance prohibiting, in relevant part, a landlord from inquiring about a prospective tenant's "arrest record, conviction record, or criminal history" failed intermediate scrutiny because the law's "complete ban on any discussion of criminal history" did not satisfy the fourth *Central Hudson* prong. 63 F.4th 783, 796, 798 (9th Cir. 2023). Courts in other circuits have reached similar conclusions in the context of commonly used terms with contested technical definitions in the food industries. In *Ocheesee Creamery*, for example, the Eleventh Circuit

reviewed the application of a Florida law requiring products labeled as "skim milk" to contain vitamin A, to a company selling a milk product that failed to comply with the statutory definition. 851 F.3d at 1229. The appellate court held that the regulation was "clearly more extensive than necessary to achieve its goals" regarding consumer confusion because "more disclosure, rather than less" would suffice to inform consumers about the nutritional content of the company's unfortified "skim milk" product. *Id.* at 1240. In *Turtle Island Foods SPC v. Soman*, a district court similarly held that an Arkansas law prohibiting a company from using words like "meat" and "beef" to describe its plant-based products was "more extensive than necessary" under *Central Hudson* because the state could require disclosures—rather than restrict speech—to identify vegan products for consumers. 424 F. Supp. 3d 552, 563, 576 (E.D. Ark. 2019).

California's asserted interest in preventing consumer confusion and, specifically, facilitating the flow of accurate recycling information to consumers, can be satisfied with less restrictive requirements than SB 343's broad prohibition on recycling words or imagery. Although SB 343 attempts to provide consumers with a single, standardized definition of recyclability, the loss of qualified recycling information and the likelihood that manufacturers may forgo recyclability claims suggests that the law's requirements are "more extensive than necessary to serve" Defendant's stated interest. *Greater New Orleans Broad. Ass'n, Inc.*, 527 U.S. at 188. The bill attempts to reduce consumer confusion, but the record indicates that the opposite result may occur because manufacturers will omit relevant information that consumers might consider in their purchasing decisions. *Peel*, 496 U.S. at 108 (emphasizing "the principle that disclosure of truthful, relevant information is more likely to make a positive contribution to decisionmaking than is concealment of such information"). The Court also notes that, although the availability of less restrictive means does not require the invalidation of a regulation on commercial speech, other provisions of the California Business and Professional Code also provide causes of action based on false or misleading claims made in connection with commercial products, including for claims related to the recyclability of products and packages. *See, e.g.*, Cal.

3:26-cv-01675-WQH-BLM

Bus. & Prof. Code §§ 17500, 17580.5 (making it "unlawful for a person to make an untruthful, deceptive, or misleading environmental marketing claim, whether explicit or implied" but providing that "it shall be a defense" to demonstrate that the environmental marketing claim conforms with the Guides for the Use of Environmental Marketing Claims (the "Green Guides") published by the Federal Trade Commission).

SB 343 is also more extensive than necessary to advance California's interest in improving recycling rates. The law's heightened requirements for recyclability claims may, as discussed above, limit rather than increase the flow of information available to consumers seeking to properly dispose of their products and packaging. SB 343 sweeps broadly with the purported goal of reducing the number of potential contaminants in California's recycling streams but, in doing so, imposes a more significant burden on manufacturers than necessary to provide consumers with the information to make informed choices. Other regulations—including required disclosure of materials that may limit recyclability or disclosure of the portion of statewide recycling programs that, under the Material Characterization Report, are able to recycle the product or packaging—would serve to advance the state's goal in improving recycling rates without imposing so near a "blanket restriction" on qualified recyclability messages. *Junior Sports*, 80 F.4th at 1120.

Accordingly, even if SB 343 directly and materially advanced California's interests in improving recycling rates and reducing consumer confusion, the law is more extensive than necessary to serve those interests. Under both the third and fourth *Central Hudson* prongs, the state's regulation of commercial speech fails to satisfy the intermediate scrutiny standard.

The Court concludes that, even applying the more rigorous standard that accompanies a facial challenge, Plaintiffs establish a likelihood of success on the merits of their challenge under the First Amendment. *Project Veritas*, 125 F.4th at 940. The Court reaches this conclusion with respect to both the version of SB 343 as enacted by the legislature and as altered in the Court's preceding analysis regarding vagueness because

severance of the challenged provisions does not alleviate the evidentiary concerns relevant to the third and fourth *Central Hudson* prongs.

### C.     Irreparable Harm, Balance of the Equities, and the Public Interest

The Court considers the three remaining *Winter* factors: whether Plaintiffs are likely to "suffer irreparable harm in the absence of preliminary relief," whether the "balance of equities tips" in Plaintiffs' favor, and whether "an injunction is in the public interest." 555 U.S. at 20.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quotation omitted). In the First Amendment context, "irreparable harm is relatively easy to establish . . . because the party seeking the injunction need only demonstrate the existence of a colorable First Amendment claim." *Hubbard*, 139 F.4th at 853 (quotation omitted). Here, Plaintiffs establish that they are likely to succeed on the merits of their facial challenge under the First Amendment. A loss of commercial speech rights for any period of time is adequate to establish irreparable harm. The second factor of the *Winter* test weighs in Plaintiffs' favor.

"Where, as here, the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—merge." *Fellowship of Christian Athletes*, 82 F.4th at 695 (quotation omitted). In the First Amendment context, a challenge that raises "serious . . . questions compels a finding that the balance of hardships tips sharply" in the plaintiff's favor." *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (quotation omitted); *see Melendres*, 695 F.3d at 1002 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). As above, Plaintiffs establish a likelihood of success on the merits of the First Amendment claim, and the "public interest favors the exercise of free speech rights." *Cuviello v. City of Vallejo*, 944 F.3d 816, 834 (9th Cir. 2019) (quoting *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014)). The remaining factors of the *Winter* test weigh in Plaintiffs'

favor and compel the Court to issue a preliminary injunction enjoining enforcement of SB 343.

### D.   Security

Federal Rule of Civil Procedure 65 provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A court, however, may "dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906 (9th Cir. 2003) (citing *Barahona–Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)).

Here, the parties do not address the issue of a security bond in their briefing. The Court finds that Defendant Bonta, in his capacity as Attorney General of California, should not be expected to incur "costs and damages" because of the issuance of a preliminary injunction. *See Nat'l Shooting Sports Found. v. Bonta*, 718 F. Supp. 3d 1244, 1258 (S.D. Cal. 2024), *reconsideration denied,* No. 23-CV-0945-AGS-KSC, 2025 WL 1012326 (S.D. Cal. Mar. 31, 2025) (issuing a preliminary injunction against Defendant Bonta without security); *NetChoice, LLC v. Bonta*, 692 F. Supp. 3d 924 (N.D. Cal. 2023), *aff'd in part, vacated in part*, 113 F.4th 1101 (9th Cir. 2024) (finding it "appropriate to issue the preliminary injunction" against Defendant Bonta "without requiring security based on NetChoice's showing that it is likely to prevail on its" First Amendment claim). In light of Plaintiffs' demonstrated likelihood of success on the merits, the absence of any contentions that security is appropriate in this action, and the nature of Defendant Bonta's position as Attorney General, the Court issues the preliminary injunction without requiring Plaintiffs to give a security bond.

### VI.   CONCLUSION

IT IS HEREBY ORDERED that the Motion for Preliminary Injunction (ECF No. 14) is granted. Defendant Rob Bonta, and all those in privity or acting in concert with

3:26-cv-01675-WQH-BLM

Defendant Bonta, are hereby enjoined from enforcing SB 343 until further order of the Court.


Dated:  July 14, 2026

Hon. William Q. Hayes
United States District Court

3:26-cv-01675-WQH-BLM