# EXHIBIT 1

Trenton H. Norris (CA Bar No. 164781)
trent.norris@hlc.com
Alexander Tablan (CA Bar No. 346309)
alexander.tablan@hlc.com
Andrew Muse-Fisher (CA Bar No. 364086)
andrew.muse-fisher@hlc.com
HOGAN LOVELLS CADWALADER US LLP
Four Embarcadero Center, 35th Floor
San Francisco, CA 94111-4024
Telephone: 415.374.2300
Facsimile: 415.374.2499

Attorneys for Plaintiffs listed in caption

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA LEAGUE OF FOOD PRODUCERS, AMERICAN FOREST & PAPER ASSOCIATION, CALIFORNIA APPLE COMMISSION, CALIFORNIA BLUEBERRY COMMISSION, CALIFORNIA GROCERS ASSOCIATION, CALIFORNIA RESTAURANT ASSOCIATION, CALIFORNIA RETAILERS ASSOCIATION, CALIFORNIA STRAWBERRY COMMISSION, CALIFORNIA TABLE GRAPE COMMISSION, CALIFORNIA WALNUT COMMISSION, CALIFORNIANS FOR AFFORDABLE PACKAGING, CONSUMER BRANDS ASSOCIATION, DAIRY INSTITUTE OF CALIFORNIA, FLEXIBLE PACKAGING ASSOCIATION, GROWER SHIPPER ASSOCIATION OF CENTRAL CALIFORNIA, OLIVE OIL COMMISSION OF CALIFORNIA, PERSONAL CARE PRODUCTS COUNCIL, PET FOOD INSTITUTE, PRINT CREATIVE ALLIANCE, SNAC INTERNATIONAL, and WESTERN GROWERS ASSOCIATION,<br>Plaintiffs,<br>v.<br>ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, ZOE HELLER, IN HER OFFICIAL CAPACITY AS DIRECTOR OF THE CALIFORNIA DEPARTMENT OF | Case No. 3:26-cv-01675-WQH-BLM<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

RESOURCES RECYCLING AND RECOVERY, and TRISTA GONZALEZ, IN HER OFFICIAL CAPACITY AS DIRECTOR OF THE CALIFORNIA DEPARTMENT OF TAX AND FEE ADMINISTRATION,

Defendants.

Plaintiffs California League of Food Producers, American Forest & Paper Association, California Apple Commission, California Blueberry Commission, California Grocers Association, California Restaurant Association, California Retailers Association, California Strawberry Commission, California Table Grape Commission, California Walnut Commission, Californians for Affordable Packaging, Consumer Brands Association, Dairy Institute of California, Flexible Packaging Association, Grower Shipper Association of Central California, Olive Oil Commission of California, Personal Care Products Council, Pet Food Institute, Print Creative Alliance, SNAC International, and Western Growers Association (collectively, "Plaintiffs") seek prospective declaratory and injunctive relief against Defendants Rob Bonta, in his official capacity as Attorney General of the State of California ("Attorney General"), Zoe Heller, in her official capacity as Director of the California Department of Resources Recycling and Recovery ("Director Heller"), and Trista Gonzalez, in her official capacity as Director of the California Department of Tax and Fee Administration ("Director Gonzalez") (collectively "Defendants") under the First and Fourteenth Amendments to the United States Constitution, 28 U.S.C. section 2201, and 42 U.S.C. section 1983, and allege as follows:

## PRELIMINARY STATEMENT

1. Recycling requires consumer participation. It does not happen automatically or without the familiar cues that we all rely on when deciding how to dispose of a product or its packaging when we have finished using it.

2. A product is recycled only if a consumer knows to place it in the recycling stream. If a package or product bears no recycling instruction or symbol, consumers will

not place it into the typically blue recycling bin; instead they will throw it in the trash. Once discarded as trash, the product or package will very likely be deposited in a landfill, rather than recycled.

3. To encourage recycling of packaging that has been used, manufacturers of products and packaging have for decades, in California and throughout the United States and around the world, labeled goods with words and symbols that inform consumers that the packaging can be recycled. These words include terms such as "recyclable" and instructions such as "please recycle." They may include more involved instructions for removing caps or labels or for returning the packaging to a store that accepts it ("store drop off") or shipping it to a central location for specialized recycling. Symbols indicating recyclability include the familiar "chasing arrows" in a circle or triangle indicating that the discarded packaging is capable of being recycled, such as this symbol:



4. This lawsuit challenges two laws that change the definition of "recyclable." The first is California Senate Bill 343, Stats. 2021, Ch. 507 ("SB 343"), a law that prohibits businesses from using these words and symbols and otherwise truthfully informing consumers that their products and packaging are recyclable, directing consumers to recycle the products or packaging—or even "indicating" that they can be recycled—unless those products satisfy rigid, statewide criteria that are both vague and burdensome to apply in practice. Cal. Pub. Res. Code § 42355.51(b)(1), (d). SB 343 violates the Free Speech Clause of the First Amendment to the U.S. Constitution.

5. Plaintiffs are trade associations and other entities who themselves and whose members and customers support recycling and have expended significant resources to invent, design, manufacture, and use materials and packaging formats that can be recycled, to communicate to consumers how to recycle their products and

packaging, to encourage recycling, and to use the outputs of recycling operations. They have and continue to advocate for appropriate recycling laws and regulations and have helped create industry standards and business conditions that facilitate recycling. Many of their members and customers have also implemented programs and set goals for increasing the recycling rates of their products and packaging.

6. As of October 4, 2026,[1] SB 343 prohibits a business from displaying on its product or packaging a chasing arrows symbol "or any other symbol or statement indicating the product or packaging is recyclable, or otherwise directing the consumer to recycle the product or packaging," unless the item is "considered recyclable in the state."

7. Among the multiple criteria that must be met to be "considered recyclable in the state," the material must be (i) collected for recycling by recycling programs for jurisdictions that collectively encompass at least 60 percent of California's population; and (ii) sorted into defined recycling streams by at least 60 percent of recycling programs statewide. This is often referred to as the "60/60 threshold."

8. If either metric is not met, or if any of SB 343's other criteria are not satisfied, the law effectively imposes a categorical ban on a business's speech related to the product's recyclability. No qualified statements are permitted. No contextual disclosures are allowed. Even accurate statements such as "Recyclable where facilities exist" or "Please check locally for recycling options" are prohibited.

9. The purported objectives of this law are to "end consumer confusion about which material is suitable for the blue bin, reduce contamination, lower waste volume, and improve recycling rates." Senate Comm. on Env't Quality, *SB 343 Analysis*, Reg. Sess., at 6 (Cal. 2021-2022), available https://senv.senate.ca.gov/sites/senv.senate.ca.gov/files/sb343_pca_v3.pdf. But the

---

[1] The law becomes operative "18 months after the date [CalRecycle] publishes the first material characterization study." Cal. Pub. Res. Code § 42355.51(b)(2)(A). The first material characterization study was published on April 4, 2025. SB 343 therefore became operative on October 4, 2026.

practical effect of SB 343 will be the opposite. Consumers will be confused as to why a package they were instructed to recycle in the past no longer bears that instruction. Waste volume will go up because, by forbidding businesses from informing consumers that a product or packaging can be recycled, the law ensures that it will be discarded in the trash and sent to a landfill. Indeed, the practical effect is that a packaging format that does not meet SB 343's strict requirements today will have no chance of meeting them in the future because SB 343 prohibits the product manufacturer from telling consumers where to place recyclables for collection, the first step in the recycling process. This will obviously not "lower waste volume, and improve recycling rates," as the law intends.

10. In a marketplace with less information, consumers will inevitably end up disposing of recyclable materials in the waste bin where they are destined for landfills. This outcome directly undermines the State's goal of improving recycling rates. By prohibiting lawful speech that is truthful and not misleading, SB 343 impedes recycling efforts, disincentivizes innovation, imposes steep financial burdens on California's business community, and unconstitutionally restricts the speech of businesses that seek to provide consumers with accurate information so that they may play their role in recycling used items and packaging.

11. Years of study by the State show that many materials which do not meet the stringent requirements of SB 343 are nonetheless collected and sorted for recycling throughout California.

12. Instead of restricting speech, the State could exercise any number of alternatives that would improve the marketplace of information. California could raise public awareness around recyclability through state-funded educational campaigns and local programs. California could also allow businesses to make qualified claims of recyclability. By ignoring less restrictive means, the law imposes an unconstitutional restriction on commercial speech.

13. Further, the law is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment. SB 343 contains ambiguous criteria that deprive

businesses of notice as to which materials are considered recyclable or not. Without notice, businesses have no way of knowing whether they face the imminent and costly threat of enforcement under the law.

14. Beyond being unconstitutional, SB 343 harms both businesses and the public. The law forces businesses to make a choice: incur the expense of changing product packaging and forgo supplying consumers with accurate information about how to properly recycle products, or face the very real threat of noncompliance. Meanwhile, Californians will have less accurate recycling information, which in turn will increase consumer confusion and hamper statewide recycling efforts.

15. For these reasons, the Court should declare that the speech restrictions set forth in Public Resources Code sections 18015(d) and 42355.51 are unconstitutional under the First and Fourteenth Amendments and enjoin Defendant Bonta and his officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals from enforcing or threatening to enforce in the future SB 343's prohibition on communicating the recyclability of a product or packaging contained in these provisions.

16. This lawsuit also challenges aspects of California Senate Bill 54, Stats. 2022, Ch. 75 ("SB 54"), a law that prohibits businesses from selling, distributing, or importing into California single-use packaging and plastic single-use food service ware unless the packaging and products meet a complex series of recyclability and recycling requirements set out in the statute, corresponding regulations, and program plan prepared by a private entity selected as the Producer Responsibility Organization ("PRO") to implement many of the law's requirements. Plaintiffs and their members share the Legislature's objectives behind SB 54, which include reducing waste, increasing recycling rates, and building a circular economy. The purpose of this lawsuit is not to undermine these objectives. Indeed, many of Plaintiffs' members are subject to SB 54 and have registered as "producers" under this law, joined the PRO as required, and provided information to the PRO to assist its compliance with SB 54. Instead, the

purpose of this lawsuit is to challenge discrete implementation failures that defeat rather than advance those shared objectives.

17. SB 54 mandates accomplishment of three overarching goals:

- That all covered material be recyclable or compostable by January 1, 2032;
- That all plastic covered material be recycled at incrementally increasing rates;
- And that all plastic covered material be reduced at the source.

Cal. Pub. Res. Code § 42050.

18. The definition of "recyclable" set out in SB 54 uses the same indeterminate provisions used to define "recyclable" under SB 343. As a result, SB 54 deprives businesses of notice of how to assess whether individual products and packaging satisfy the State's definition of "recyclable" before placing them into the stream of commerce and risking civil penalties.

19. Similarly, SB 54 does not establish a clear standard by which businesses can demonstrate compliance with the requirement that products and packaging be recycled at increasing rates. The law sets out a permissive rather than determinative standard by which businesses can show CalRecycle that a product or packaging meets the required recycling rate. However, the law identifies no clear standard to make this showing in matters brought by private enforcers, enabling private enforcers to use recycling data as they see fit to make the most favorable showing. This invites arbitrary enforcement in violation of the due process vagueness doctrine.

20. The third overarching requirement of SB 54, source reduction, mandates that businesses collectively reduce the weight and number of components of plastic covered materials at incrementally increasing rates. Businesses are prohibited from source-reducing products and packaging by transitioning to "nonrecyclable" materials or materials that are "less likely to be recycled." These terms are undefined and fail to provide businesses with notice of which changes they make will be considered source

reduction for purposes of helping to meet the statute's source reduction mandates.

21. Further, the lists of what materials are recyclable or recycled at the requisite rate are subject to change without meaningful notice or a grace period in which businesses may bring their products and packaging into compliance. When a new recyclability threshold or recycling rate is identified based on updated data, it goes into effect immediately. Businesses whose products and packaging that are already in the stream of commerce and are rendered noncompliant by these changes face a practically immediate threat of an enforcement action. Because an enforcement action brought directly under SB 54 by CalRecycle or indirectly under California's Unfair Competition Law carries the risk of civil penalties and restitution, these provisions threaten businesses with the unconstitutional deprivation of property without due process of law.

22. These requirements place enormous logistical burdens on businesses that must remain in a constant state of vigilance lest their products and packaging no longer be compliant with the relevant recyclability and recycling thresholds. Businesses that cannot navigate the unclear and mercurial standards of SB 54 are faced with a choice: risk the credible and onerous threat of civil penalties and other liabilities, or withdraw their products from the California marketplace.

23. This lawsuit also challenges aspects of SB 54's funding regime. In promulgating regulations implementing SB 54, CalRecycle projected that several thousand producers would participate in the program and share the substantial financial burden imposed by the statute. Yet the number of producers that registered with the PRO by the deadline is dramatically below CalRecycle's projections. Nevertheless, Defendants continue to enforce obligations on the PRO that require billions of dollars of funding from producers, including Plaintiffs' members, based on those projections without adequately explaining the discrepancy or addressing the resulting inequities imposed on those producers who have complied with their obligation to register by the deadline. Plaintiffs therefore seek injunctive relief to prevent enforcement of SB 54's obligations on the PRO that require funding from producers until such time as these

obligations may be implemented and funded in a manner consistent with principles of equal protection and due process.

24. SB 54 and its implementing regulations currently face two other legal challenges that cast uncertainty over both the constitutionality of the entire statute and how businesses may comply with its requirements. One of these challenges—brought by the Attorneys General of 17 states and the National Association of Wholesaler-Distributors—seeks to invalidate the PRO structure, which is fundamental to SB 54, jeopardizing the financial viability of the PRO and any funds that are paid into the PRO by producers, including those by Plaintiffs' members. By contrast, this lawsuit seeks much narrower relief intended to make sure that the PRO structure and its program plan rest on a stable and lawful foundation.

25. The second challenges key aspects of SB 54's implementing regulations, the invalidation of which could result in increased costs for the PRO, to be paid by producers, including Plaintiffs' members. Plaintiffs therefore seek injunctive relief staying the requirements of SB 54 that result in funding obligations on registered producers while significant legal challenges to SB 54 and its implementing regulations remain pending.

26. For these reasons, the Court should declare that various requirements in Public Resources Code sections 42040 *et seq.* are unconstitutional under the Fourteenth Amendment and enjoin Defendants Bonta, Heller, and Gonzalez, and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals from enforcing or threatening to enforce SB 54 in the future.

## PARTIES

27. Plaintiffs represent and include as members businesses that meet Californians' demand for a broad range of consumer goods. Plaintiffs and their members share a common interest in increasing recycling rates. To that end, Plaintiffs and their members seek to include truthful, accurate recyclability claims on their products to help consumers play their role in the recycling system. But under SB 343, Plaintiffs and their

members are prevented from doing so.

28. Plaintiffs and their members have already incurred significant costs to comply with SB 343 because the lead time to revise labels and packaging is many months and sometimes over a year due to planning considerations, supply chain constraints, manufacturing sequencing, and inventory management. This is particularly true where recyclability claims are embedded in the package and not just printed on the label, such as chasing arrows symbols around resin identification codes, which a majority of states require to be embedded in plastic containers in order to indicate to recycling facilities which type of plastic the containers are made of so that they can be properly sorted. Even before SB 343 took effect on October 4, 2026, manufacturers of packaging and products were required to revise their packaging and labeling to be compliant with SB 343. Many incurred costs ahead of SB 343's effective date and will continue to incur costs as long as the law is in effect.

29. Furthermore, those members of Plaintiffs who want to continue to make truthful, not misleading, qualified recyclability claims for their products or packaging are prohibited from doing so now that SB 343 is in effect. These include products and packaging that are recyclable only through take-back programs or store drop-off programs, or products and packaging that are widely collected and sorted in some localities in California but do not meet the 60/60 threshold, for which the FTC Green Guides would permit a qualified recyclability claim such as "Recyclable where facilities exist" or "Check to see if recycling facilities exist in your area."

30. Plaintiffs and their members also face significant costs for determining whether their products or packaging may bear recyclability claims because the criteria are complex and in many cases indeterminate. Indeed, in order to use the simple English term "recyclable," a business must determine whether "[t]he material type and form is sorted into defined streams" for processing by large recycling facilities, "with those defined streams sent to and reclaimed at a reclaiming facility consistent with the requirements of the Basel Convention." CalRecycle has not even assessed this Basel

Convention criterion, much less provided guidance on how businesses are supposed to do so. Indeed, the United States is not a party to the Basel Convention, and CalRecycle has noted that assessing this criterion requires information that CalRecycle lacks authority to require.

31. Plaintiffs' members also face the risk of enforcement actions if their analyses and determinations are even alleged to be wrong. Because SB 343 can be enforced not only by the Attorney General but also by local district attorneys, city attorneys, and anyone who claims to have lost money or property as a result of a business's non-compliance, the law may invite overwhelming amounts of litigation against California businesses who will have to defend their labeling decisions.

32. Plaintiffs' members also seek to comply with SB 54 and its requirement that all single-use packaging and single-use plastic food service ware be recyclable or compostable by 2032, meet the identified recycling rates, and be source reduced. Yet the indecipherable provisions of SB 54 make compliance practically impossible for Plaintiffs' members.

33. Plaintiffs' members have already invested significant resources into source-reducing materials and transitioning packaging and food service ware to recyclable and compostable materials. Whereas updating a label can take over a year, updating packaging and food service products to an entirely new material can take significantly more time. Using insufficiently tested materials can compromise the integrity of packaging and products, potentially leading to health and safety risks for the consumer as well as for workers. Safely making the switch to a new packaging material thus requires a substantial amount of time and resources. This is especially true where new materials are not yet available to meet the needs of a specific product or producer.

34. The burden of developing compliant packaging is compounded by the indecipherable requirements of SB 54 and corresponding regulations. Packaging is only deemed recyclable if it is "designed to ensure recyclability" and it does not contain components that prevent its recyclability. These undefined, standardless requirements

deprive businesses of the ability to understand whether their packaging and products are recyclable. Similarly, which materials meet the incrementally increasing recycling rates of SB 54 is opaque and consequently invites discriminatory enforcement by private actors. Moreover, SB 54 prohibits businesses from source reducing by transitioning to "nonrecyclable" materials or materials that are "less likely to be recycled." These undefined terms obfuscate the source reduction process such that businesses are deprived of notice of what conduct is prohibited. As a result, Plaintiffs and their members are endeavoring to comply with the mandates of SB 54 without any assurance that their efforts will bring them into compliance.

35. Plaintiffs and their members must also brace for frequent changes to the lists of material categories that are considered recyclable and meet the required recycling rate. CalRecycle is required to update the lists on an annual and biennial basis, respectively. This is only a floor—CalRecycle is expressly authorized to add or remove material categories from the lists more frequently. There is no notice requirement by which CalRecycle must warn Plaintiffs and their members of changes to the lists, nor is there a grace period before the new lists go into effect. Changes therefore can be sudden and can take effect immediately.

36. Failure to timely comply with these rapid updates presents Plaintiffs' members with significant liabilities. Each violation of SB 54 can entail civil penalties of up to $50,000 per day per violation. Public officials can seek civil penalties beyond this under the Unfair Competition Law. Private enforcers may also bring claims for injunctive relief and collect attorney fees if they are successful. Combined with the cost to comply, indeterminate statutory standards, and threat of frequent changes, these liabilities pose an existential threat to Plaintiffs' members.

37. Plaintiff **The California League of Food Producers** (CLFP) is a nonprofit, statewide trade association representing the food processing industry since 1905. CLFP's membership includes over 400 companies that can, dry, and freeze fresh agricultural products in California, including companies that package, sell, distribute,

and import products into California. These shelf stable products provide an important role in food security in California and across the nation. The first priority of CLFP member companies is to provide a safe, reliable, and affordable food supply.

38. Plaintiff **The American Forest & Paper Association** (AF&PA) serves to advance public policies that foster economic growth, job creation, and global competitiveness for a vital sector that makes the essential paper and packaging products Americans use every day. The U.S. forest products industry employs more than 925,000 people, largely in rural America, and is among the top 10 manufacturing sector employers in 44 states. This industry accounts for approximately 4.7% of the total U.S. manufacturing GDP, manufacturing more than $435 billion in products annually. AF&PA member companies are significant producers and users of renewable biomass energy and are committed to making sustainable products for a sustainable future through the industry's decades-long initiative: Better Practices, Better Planet 2030.

39. Plaintiff **The California Apple Commission** (CAC) is a state commission legislatively established in 1994 by California statute to advertise, promote, and conduct research for the California apple industry. The California apple industry is the second largest exporter of apples in the U.S. and generates over a hundred million dollars in value every year. The CAC has succeeded and continues to succeed in conducting research in vital pre- and post-harvest practices, provides a unified industry voice on apple matters, assists in protecting California apple producers from harmful pests and diseases, and provides key apple industry market information to the industry.

40. Plaintiff **The California Blueberry Commission** (CBC) is an entity of state government, legislatively enacted in 2010, finding that the blueberry industry in California is necessary to assure the public of a continuous supply of blueberries and the maintenance of needed levels of income for those engaged in the blueberry industry of California. The CBC is authorized to carry out programs of pest management, advertising, promotion, food safety, maturity standards, education, marketing and research relating to blueberries, and more. In 2024, California blueberry growers shipped

over 55 million pounds of fresh blueberries, 80 million pounds including frozen with a value of $363 million.

41. Plaintiff **The California Grocers Association** (CGA) is a non-profit, statewide trade association representing the food industry since 1898. CGA represents approximately 500 retail members operating over 6,000 food stores in California and Nevada, and approximately 300 grocery supplier companies. Retail membership includes chain and independent supermarkets, convenience stores, and mass merchandisers. CGA actively promotes and protects the legislative and regulatory interests of the retail food industry before Congress, the California State Legislature, local governments, and state and local regulatory agencies. CGA engages in civil cases of importance to its members, such as this action. CGA members package, sell, distribute, and import products into California under their own brand names and the brand names of other companies.

42. Plaintiff **The California Restaurant Association** (CRA) is the uniting voice of the restaurant and foodservice industry, representing over 18,000 members that range from family-owned neighborhood restaurants to regional chains in California. CRA is a non-profit organization whose mission is to promote and protect the interests of restaurants through legislative advocacy and grassroots campaigns, and by working to ensure that the legal and regulatory environment in which its members operate is fair, transparent, and grounded in practical business reality.

43. Plaintiff **The California Retailers Association** (Cal Retailers) is the voice for the retail industry in California's public policy arena. Cal Retailers advocates on behalf of its members at the California Capitol, local government chambers, and regulatory agencies across the state to promote public policy that is good for California's consumers, economy, and workforce. Cal Retailers' members are retailers who serve all segments of the retail industry, including general merchandise, department stores, online markets, supermarkets and grocery stores, chain drug stores, and specialty retail such as auto, vision, jewelry, hardware, and home stores.

44. Plaintiff **The California Strawberry Commission** (CSC) is a state commission that represents the entirety of the strawberry industry in California, which is comprised of more than 800 farms and 51 shippers and processors. In 2025, California farmers harvested more than 2.5 billion pounds of strawberries, which accounted for 90 percent of the United States' total fresh and frozen strawberry production. The value of the California strawberry crop is approximately $2.9 billion, and strawberries rank fifth in crop value among all crops produced in California. The CSC represents the interests of the California strawberry industry in the areas of production research and information, public policy, product research and information, and public relations.

45. Plaintiff **The California Table Grape Commission** (CTGC) is a state commission that was established in 1967 by legislative act, with the purpose of expanding demand for California table grapes worldwide, strengthening the state's economy, and improving the welfare and health of its citizens. In 2024, California farmers harvested more than 93.2 million boxes of grapes with a crop value of $2.59 billion.

46. Plaintiff **The California Walnut Commission** (CWC) is a state commission that was established in 1987 by legislative act to enhance California's walnut industry through export market development, health and nutrition research, and advocacy work. The CWC represents 3,700 growers, most of which are primarily family farms and over 70 handlers in the state of California. In 2025, the harvested volume of walnuts was 1.6 billion pounds, produced on 380,000 acres with a value of over $1 billion.

47. Plaintiff **Californians for Affordable Packaging** (CAP) is a California-based 501(c)(4) social welfare membership organization. CAP works to advance practical, affordable, safe, and sustainable packaging policy outcomes in California on behalf of a diverse membership of packaging producers, manufacturers, distributors, and related industry stakeholders. CAP's mission is to ensure that California's packaging and recycling policy framework reflects workable compliance pathways, sound science,

and realistic economic and operational constraints, while avoiding unintended consequences that impose disproportionate costs on producers, consumers, and California communities.

48. Plaintiff **The Consumer Brands Association** (CBA) is a 501(c)(6) nonprofit trade association that represents manufacturers of consumer packaged goods, including finished goods manufacturers from across the country. CBA champions an industry whose products Americans depend on every day, spanning a wide variety of food, beverage, personal care, household, pet care, dietary supplement, and over-the-counter drug products. In 2025, CBA's members contributed $2 trillion to the United States GDP and supported more than 20 million American jobs. CBA's members' products are manufactured, distributed, and sold across all 50 states including California. CBA advocates on behalf of its members in support of uniform regulatory frameworks that ensure consumers have access to affordable products and choice in the marketplace while promoting recycling and circularity.

49. Plaintiff **The Dairy Institute of California** (DIC) is a California non-profit trade association representing milk processors and dairy product manufacturers on legislative and regulatory matters at the state and federal levels since 1939. DIC's goal is to support its members' ability to operate sustainably, innovate, and achieve efficiency in their own companies as they provide the highest quality dairy products to domestic and international markets. DIC's membership includes farmer cooperatives, private and family-owned corporations, regional brands, small artisan cheese makers with manufacturing plants in California, and companies that convert, package, sell, distribute, and import dairy products into California.

50. Plaintiff **The Flexible Packaging Association** (FPA) is the voice of and represents users and manufacturers of flexible packaging and their suppliers in the United States. The association's mission is connecting, advancing, and leading the flexible packaging industry. Flexible packaging is the fastest-growing and second largest segment of the U.S. packaging industry, representing $51.5 billion in annual sales and

approximately 98,000 workers in the U.S. The industry has approximately 6,500 employees at flexible packaging manufacturing facilities in California, representing a total economic impact of more than $10 billion.

51. Plaintiff **The Grower Shipper Association of Central California** (GSA) is a regional trade association with a mission to advance families, food, and farming in one of California's most important agricultural regions. Founded in 1930, GSA represents over 300 members, which consist primarily of farmers, shippers, and processors of fruits and vegetables produced in Monterey, Santa Cruz, San Benito, and Santa Clara Counties. As part of its mission, GSA is dedicated to providing solutions-based programs and efforts covering areas such as farm worker health and safety, pest and disease management and prevention, sustainable agriculture, and food safety and security.

52. Plaintiff **The Olive Oil Commission of California** (OOCC) is a state entity that was established and is funded by California olive oil farmers, with oversight from the California Department of Food and Agriculture. The OOCC conducts research to assist farmers in successfully growing a healthy, sustainable crop and has developed and enforced standards for the purity and quality of California olive oil. Under its program, labels on California olive oil must provide a clear statement of quality grade. During the 2025-26 season the California olive oil industry produced 4.2 million gallons of olive oil for a value of $572,292,000.

53. Plaintiff **The Personal Care Products Council** (PCPC) is the leading national trade association representing the cosmetics and personal care products industry. Founded in 1894, PCPC is dedicated to promoting product safety, quality, and innovation, serving as a unifying voice that champions science-based policies and responsible practices to support health, well-being, and economic growth. PCPC's members are some of the beloved and trusted brands in beauty and personal care today, providing millions of consumers with the diverse products they use every day—from sunscreens, toothpaste, and shampoo to moisturizer, makeup, and fragrance.

54. Plaintiff **The Pet Food Institute** (PFI) is the trade association for U.S. cat and dog food and treat manufacturers. PFI's members account for the vast majority of pet food and treats made in the United States, providing complete and balanced nutrition for the dogs and cats in an estimated 94 million U.S. households. The broader U.S. pet food industry generates more than $65 billion in domestic annual dog and cat food and treats sales and annual exports of more than $2.4 billion. PFI's members collectively contribute to rural communities' vibrancy by employing over 35,000 people in 34 states and, as part of the broader U.S. pet food industry, purchasing over $13.2 billion in agricultural inputs from U.S. farmers and ranchers. As the voice of U.S. pet food makers for over 65 years, PFI advocates for a transparent, science-based regulatory environment for its members and provides information about pet food and treat safety, nutrition, and health to pet owners.

55. Plaintiff **Print Creative Alliance** (PCA) is the trade association for printing, graphic arts, and allied industries operating in the 13 Western states. PCA has approximately 450 member companies in California who design, print, and fulfill packaging for a wide range of customers, from governmental entities to manufacturers to service and charitable organizations. Signs, packages, and labels are a critical part of daily life, which relies on printed information for essential instructions, visual cues, important information, and other directions that guide consumer behavior. For many years, PCA and its members have worked with customers in designing and producing sustainable packaging, which relies on labels and symbols like the chasing arrows symbol to inform consumers that a package is recyclable.

56. Plaintiff **SNAC International** is the global trade association for the snack food industry representing snack manufacturers and suppliers. It represents over 400 companies worldwide, including manufacturers of all types of chips, pretzels, popcorn, crackers, cheese snacks, meat snacks, nuts, fruit snacks, snack bars, granola, cookies, and various other snacks. Founded in 1937, SNAC International has been the forefront advocate for the snack industry in the legislative and regulatory process, engaging

policymakers and agencies at all levels of government to advance rules that are science-based, fair, and workable.

57. Plaintiff **Western Growers Association** (WGA) is a trade association founded in 1926 that represents local and regional family farmers growing fresh produce in California, Arizona, Colorado, and New Mexico. WGA's members and their workers produce more than half of the nation's fresh fruits, vegetables, and tree nuts, including roughly half of the country's fresh organic produce.

58. Defendant Rob Bonta is the Attorney General of the State of California and the highest-ranking officer in the California Department of Justice. Attorney General Bonta is sued in his official capacity. He performs his official duties in Sacramento and throughout the State of California. As Attorney General, he is specifically empowered to defend challenges to the constitutionality of all state statutes, including SB 343 and SB 54.

59. Defendant Zoe Heller is the Director of the California Department of Resources Recycling and Recovery ("CalRecycle"). Director Heller is sued in her official capacity. She performs her official duties in Sacramento and throughout the State of California. As Director of CalRecycle, she is specifically empowered to enforce SB 54, including the mandate that all single-use packaging and single-use plastic food service ware be recyclable by January 1, 2032.

60. Defendant Trista Gonzalez is the Director of the California Department of Tax and Fee Administration ("CDTFA"). Director Gonzalez is sued in her official capacity. She performs her official duties in Sacramento and throughout the State of California. As Director of CDTFA, she is responsible for assessing and collecting the annual environmental mitigation surcharge of $500 million into the California Plastic Pollution Mitigation Fund imposed by SB 54, pursuant to Public Resources Code section 42064(e)(1).

## JURISDICTION AND VENUE

61. This Court has jurisdiction over this action under 28 U.S.C. § 1331, which

confers original jurisdiction on federal district courts over actions arising under the Constitution or laws of the United States. Plaintiffs sue state officers in their official capacities for prospective injunctive and declaratory relief to end ongoing violations of federal law. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908).

62. Each Plaintiff has standing to bring this lawsuit because at least one of its members would have standing to sue in their own right, the interests it seeks to protect are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires an individual member to participate in this suit. *Ass'n Gen. Contractors of Am. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013). The injuries of Plaintiffs and their members described below are directly traceable to SB 343's enactment, as well as the enactment of SB 54's recyclability, recycling rate, and source-reduction requirements and funding obligations, and these injuries would be redressed by the declaratory and equitable relief Plaintiffs seek on behalf of their members and those they represent.

63. Many of Plaintiffs' members are registered producers participating in the PRO and therefore subject to substantial funding obligations imposed by SB 54. These funding obligations are estimated in the billions of dollars and are currently being allocated among a number of registered producers that is significantly smaller than the number projected by CalRecycle during the rulemaking process. Further, significant aspects of SB 54 and its regulations are currently being challenged in pending litigation, creating uncertainty regarding the operation of the program. As a result, many of Plaintiffs' members are at risk of making expenditures to enable a program that may be modified, delayed, or invalidated, without any assurance that such expenditures could be recovered. Many of Plaintiffs' members therefore face imminent economic injury directly traceable to Defendants' implementation and enforcement of SB 54.

64. The **California League of Food Producers** (CLFP) brings this action on behalf of its members, who include companies that can, dry, and freeze fresh agricultural products in California, including businesses that package, sell, distribute, and import

products into the state. Many of these products currently bear recyclability claims and will be discouraged or prohibited from doing so by SB 343. The requirements of SB 343 place a heavy burden on the food processing industry that will adversely impact food affordability. The costs for CLFP's members to comply with SB 343 include mass label updates, dual inventory costs, equipment changes, significant investments to reengineer food packaging to meet recycling criteria, higher disposal fees, and legal and compliance risks. CLFP's members also face the immense burden of compliance with SB 54, including the costs of auditing products and packaging for recyclability, identifying new materials that are recyclable, and simultaneously ensuring the integrity of food products. CLFP's members must also brace for iterative compliance as recyclability standards are frequently updated under SB 54 without meaningful notice or grace period.

65. The **American Forest & Paper Association** (AF&PA) brings this action on behalf of its members, who include U.S. pulp, paper packaging, and wood products manufacturers that produce packaging for California customers. Many members routinely manufacture packaging bearing recyclability claims for products placed into the California market and will be discouraged or prohibited from doing so by SB 343. Members work with customers to design and produce sustainable packaging, which relies on recyclability indicators to guide customers on proper disposal. The statute's broad application exposes members to strict liability for providing truthful recycling instructions to consumers. Members face the untenable choice of either refusing to produce packaging bearing recyclability claims or risking strict liability under a law that imposes standards no paper manufacturer can independently verify. Moreover, many members' operations depend on robust recovery of recycled post-consumer fiber as feedstock. SB 343's rigid criteria will suppress recycling instructions on widely recyclable paper-based packaging, reducing recycling rates and lowering product quality. Members are also facing business disruptions as customers look to members for compliance and indemnification. Further business disruptions will result from efforts to comply with SB 54. AF&PA's members will soon be required to ensure all single-use

packaging is recyclable, yet complying with this requirement is practically impossible due to SB 54's ambiguous provisions. The law also places immense burdens on AF&PA's members, who require long lead times to provide packaging to customers at scale. SB 54 threatens mercurial changes in what packaging is considered recyclable, increasing the risk that AF&PA's members' products will become unusable in California.

66. The **California Apple Commission**, the **California Blueberry Commission**, the **California Strawberry Commission**, the **California Table Grape Commission**, the **California Walnut Commission**, the **Grower Shipper Association of Central California**, and the **Olive Oil Commission of California** (collectively, "Agricultural Plaintiffs") bring this action on behalf of their members, who include packers, processors, and handlers of their respective agricultural commodities, whose labeling practices will be materially restricted by SB 343's strict yet vague criteria and broad liability scheme. Packaging is the primary point-of-sale vehicle through which agricultural commodities are marketed and promoted to consumers, and these Agricultural Plaintiffs' missions to conduct marketing and consumer education programs are therefore directly affected by the scope of permissible recyclability representations on that packaging. If SB 343 takes effect, their members face immediate compliance exposure and will be significantly curtailed or discouraged from making truthful recyclability representations that they and their Commissions/Association would otherwise deploy. A ruling striking the statute down would restore labeling flexibility and allow handlers to continue using packaging that satisfies their marketing objectives, consumer expectations, and federal and state food safety obligations. The Agricultural Plaintiffs' members are also investing significant resources in acquiring packaging that can withstand SB 54's frequent updates while also delivering consumers food that is safe to eat. Because SB 54 incorporates many of SB 343's vague standards of recyclability, the Agricultural Plaintiffs' members face a credible threat of enforcement if they continue providing products in California.

67. The **California Grocers Association** (CGA) brings this action on behalf of its members, who include grocery supplier companies and retailers, including chain and independent supermarkets, convenience stores, and mass merchandisers throughout California. Many of its members' products currently bear or will bear recyclability claims that are prohibited or will be discouraged by SB 343. Because the law's criteria for permissible recyclability claims are simultaneously so strict and so vague that CGA's members cannot determine with reasonable certainty whether their existing claims comply, members face an imminent and credible threat of enforcement, including potentially millions of dollars in civil penalties, if they continue to display those claims. This threat has already caused members to incur costs to audit their existing labeling, seek legal counsel, and in some cases suppress truthful statements—intended to increase consumer participation in recycling—just to avoid the risk of litigation exposure. Under SB 54, CGA's members will be considered "producers" of certain products even where they did not actually manufacture the products. As a result, they are burdened with the iterative task of ensuring products on their shelves comply with SB 54's indeterminate recyclability requirements or else face hefty civil penalties.

68. The **California Restaurant Association** (CRA) brings this action on behalf of its members, who include independent family-owned restaurants, small business restaurateurs, and franchised restaurant operators that sell food, beverages, and other consumer goods in California that use packaging and foodservice ware covered under SB 343 and SB 54. Many of these members currently serve or intend to serve customers single-use cups, plates, takeout containers, utensils, and other foodservice ware that truthfully bear recyclability claims that may become unlawful under SB 343. They also serve or intend to serve single-use materials that must comply with the recyclability requirement of SB 54. Because the laws' criteria defining recyclability are simultaneously so strict and so vague that CRA's members cannot determine with reasonable certainty whether their existing products and packaging comply, members face an imminent and credible threat of enforcement, including potentially millions of

dollars in civil penalties, if they continue to use these items. This threat imposes concrete and immediate operational injury that goes well beyond legal exposure. CRA's restaurant members do not independently manufacture or select their foodservice ware on a product-by-product basis; they source through established vendor relationships and distribution agreements, often under multi-year contracts that specify approved suppliers and materials. Complying with SB 343 and SB 54 would require members to identify alternative vendors supplying packaging and foodservice ware that meets the laws' vague and demanding criteria, renegotiate or exit existing supply agreements, and integrate new foodservice ware and packaging formats into operational workflows that depend on consistency and standardization. Because products and packaging that contain or come into contact with food must meet additional safety requirements under state and federal law, acquiring SB 54-compliant materials will require a significant investment of time and resources. Members have already incurred costs auditing their inventory. These costs will be iterative as the list of materials that qualify as "recyclable" under SB 54 changes at least on an annual or biennial basis without meaningful notice or a compliance grace period.

69. The **California Retailers Association** (Cal Retailers) brings this action on behalf of its members, who operate general merchandise, department stores, online markets, supermarkets and grocery stores, chain drug stores, and specialty retail such as auto, vision, jewelry, hardware, and home stores. Many of Cal Retailers' members sell or intend to sell products and packaging with truthful recyclability claims. However, because SB 343 imposes complex, shifting criteria for recyclability claims that members cannot assess with reasonable certainty, they face an imminent and credible threat of enforcement. Cal Retailers' members sell private label goods as well as goods branded by a third-party manufacturer or distributor. Many of Cal Retailers' members do not manufacture or select the goods they sell on a product-by-product basis. Regardless, they face liability under SB 343 as the seller of the goods. As a result, they must incur the expense of reviewing and updating existing vendor agreements, finding new vendors,

entering into new agreements, and implementing quality controls to ensure that products on the shelves comply with SB 343. Despite the best efforts of Cal Retailers' members, the unascertainable criteria of SB 343 heighten the risk of enforcement actions against members, compounding the burden the law imposes. SB 54 poses many of these same burdens and uncertainties. Cal Retailers' members can face liability under SB 54 for products and packaging that are not deemed recyclable, even if the members are not responsible for manufacturing the packaging. This adds another layer of obfuscation to the already onerous task of ascertaining compliance with SB 54's uncertain standards. And as these standards change frequently without any required notice, Cal Retailers' members must iteratively incur the expense of auditing product lines and bringing products and packaging into compliance on impossibly truncated timelines.

70. **Californians for Affordable Packaging** (CAP) brings this action on behalf of its members, who include packaging producers, manufacturers, and distributors, and other members who are directly and materially harmed by SB 343 due to their efforts to make truthful and accurate recyclability representations on packaging placed into the California market. These representations are made in conformance with longstanding federal standards and are material to consumers' purchasing and disposal decisions. SB 343 prohibits the use of recyclability claims on any packaging format unless they independently satisfy dual 60 percent thresholds for collection and sortation and can be traced through reclaimers complying with the Basel Convention—requirements that are functionally impossible to verify and effectively unachievable for the vast majority of packaging formats lawfully sold in California today. CAP members face the imminent choice of either stripping accurate recyclability claims from their packaging—suppressing truthful commercial speech and undermining consumer recycling behavior—or retaining those claims and exposing themselves to enforcement liability under SB 343. Compliance with SB 54 presents CAP members with another untenable choice: either use packaging that seems to meet the ambiguous requirements of SB 54 and risk civil penalties, or forego distributing the product altogether. And

because the list of materials that qualify as "recyclable" under SB 54 is subject to frequent changes, CAP's members face enormous logistical challenges to quickly bring supply chains into compliance or else risk incurring civil penalties.

71. The **Consumer Brands Association** (CBA) brings this action on behalf of its members, who manufacture consumer packaged goods, including food, beverage, personal care, household, pet care, dietary supplement, and over-the-counter drug products. Many CBA members include truthful recyclability claims on their products and packaging sold in California and seek to continue doing so to advance their shared goal of brand-to-consumer dialogue to convey recycling capability. However, the inherent vagueness of SB 343 makes it impossible for CBA's members to reasonably verify whether their products and packaging meet each requirement of the law. As a result, SB 343 forces CBA's members to either refrain from making truthful recyclability claims and incur the onerous costs to redesign packaging and labels and adjust their supply chains, or else continue making truthful recyclability claims and face the credible threat of enforcement. This impossible choice will chill the speech of CBA's members and increase costs for members and their customers. SB 54 similarly requires CBA's members to navigate indefinite recyclability requirements or else risk incurring exorbitant civil penalties. Because the law requires that the list of recyclable materials be reviewed and updated frequently, CBA's members must face the burden of iteratively reviewing product lines for compliance, and redesigning and redeploying products and packaging. This will cause a sustained adverse impact on the affordability of products and brands Californians depend on.

72. The **Dairy Institute of California** (DIC) brings this action on behalf of its members, who include milk processors and dairy product manufacturers who make, package, sell, distribute, and import dairy products into California. Many of these products currently bear recyclability claims and will be prohibited or discouraged from doing so by SB 343. The burdens DIC's members face in complying with SB 343 include mass label updates, dual inventory costs, equipment changes, significant investments to

reengineer dairy packaging to meet recycling criteria, higher disposal fees, and legal and compliance risks. SB 54 requires DIC's members to incur many of these costs, including the cost of redesigning and redeploying packaging iteratively as recyclability criteria change. These lengthy and expensive processes will create operational disruptions across time-sensitive dairy supply chains. The uncertainty of the laws' criteria for recyclability risks the stranding of inventory and spoiling of perishable dairy products. The burdens imposed by SB 343 and SB 54 on the dairy industry will adversely impact access and affordability of dairy products, including milk that is served in school lunch programs.

73. The **Flexible Packaging Association** (FPA) brings this action on behalf of its members, who include manufacturers of a wide variety of flexible packaging products, including bags, pouches, labels, liners, wraps, and rollstock, which play an essential role in preserving the shelf stability, safety, and quality of all kinds of consumer goods and foods, including fresh meat and produce. However, circularity options for flexible packaging presently remain limited. There is no universal solution for collecting, sorting, and processing flexible packaging, as viability depends on local infrastructure, collection methods, material mix, and market demand. The limitations under SB 343 for recyclability labeling will severely impact the current and future success of an already delicate infrastructure system for recycling flexible packaging in California, including through alternative collections systems such as store drop-off programs. FPA's members face an imminent threat of enforcement actions based on truthful recyclability claims they are currently and/or planning to make, and many members will consequently self-censor these claims in the future. Under SB 54, FPA's members must invest significant resources to reengineer flexible packaging to ensure recyclability. Beyond the expense of updating packaging materials, they also face the risk of enforcement actions due to the law's vague standards. For example, each packaging component, ink, adhesive, or label can impact recyclability, but FPA's members do not have meaningful notice of what will in fact prevent recyclability and

how those standards will change over time. Without clarity, many of FPA's members must find a way to withdraw certain packaging from California or else risk onerous civil penalties and other legal liabilities.

74. The **Personal Care Products Council** brings this action on behalf of its members, who manufacture, distribute, and supply cosmetics and personal care products in California and across the country. Many of PCPC's members supply products that include accurate recyclability claims and seek to continue doing so. Members have already incurred significant costs to assess their products for compliance with SB 343 and SB 54. However, the uncertain nature of both laws precludes PCPC's members from determining with reasonable accuracy whether their products and packaging comply with the numerous requirements of the laws. As a result, under SB 343, members must invest additional resources to update products and packaging to remove truthful recycling claims or otherwise brace for the expense of defending against the imminent threat of enforcement by government actors and private enforcers. SB 54 demands that PCPC's members adapt products and packaging to be recyclable, a practically impossible task given the uncertain criteria of the law. Complying with both laws is made even more complicated by state and federal requirements regulating the safety of cosmetics and other personal care items. These oppressive costs will impair California consumers' access to personal care products on which they rely.

75. The **Pet Food Institute** (PFI) brings this action on behalf of its members, who include cat and dog food and treat manufacturers that sell pet food and treats in California. Many of these products currently bear recyclability claims and will be prohibited from doing so by SB 343. The statute imposes complex and shifting criteria for recyclability claims that members cannot apply with reasonable certainty. Members are being forced to spend significant time and resources to conduct comprehensive assessments to determine recyclability and revise labeling and marketing claims as necessary. The pet food supply chain is inherently national, making it logistically impossible to create and manage California-only inventory. As a result, the statute will

effectively compel some members to either strip all recyclability claims from their packaging nationwide or withdraw their products from California markets. Many members are already removing recyclability claims from packaging that is widely recyclable, likely reducing recycling rates, causing consumer backlash, and damaging brand reputation. PFI's members face similar burdens under SB 54. Complying with the law would require PFI's members to audit products and packaging for recyclability and, where necessary, identify and transition to new packaging materials. Any such changes must be balanced against the need to comply with applicable state and federal requirements for pet food packaging and to ensure that packaging continues to protect the safety and integrity of pet food products. These challenges are compounded by recyclability standards that may change without meaningful notice or grace periods. PFI's members may therefore be required to make significant packaging changes across inherently national supply chains in response to changing recyclability standards, while simultaneously satisfying regulatory and food safety requirements, or risk civil penalties.

76. **Print Creative Alliance** (PCA) brings this action on behalf of its members, who include printers, label producers, and packaging manufacturers that design, print, and fulfill packaging orders for California businesses. Many members routinely print recyclability claims on packaging for products placed into the California market and will be prohibited or discouraged from doing so by SB 343. Members work with customers to design and produce sustainable packaging, which relies on recyclability indicators to guide customers on proper disposal. PCA's members also make recyclability claims on the packaging they supply to their customers, who in turn supply the packaging to consumers, and will be discouraged or prohibited from doing so by SB 343. The statute's broad application exposes members to strict liability for providing truthful recycling instructions to consumers. Members face the untenable choice of either refusing to print accurate recyclability claims or risking strict liability under a law that imposes standards no printer can independently verify. Members are also facing business disruptions as

customers look to members for compliance and indemnification. PCA's members who supply packaging must also comply with SB 54. However, the law's indeterminate requirements, including those governing the recyclability of packaging components, inks, adhesives, and labels, effectively preclude members from complying with the law with reasonable certainty. As a result, many of PCA's members are left to choose between continuing to supply packaging in California and risk enforcement actions or forego supplying single-use packaging.

77. **SNAC International** (SNAC) brings this action on behalf of its members, who include snack manufacturers and suppliers that make, package and sell a wide variety of snack foods in California. Many of these products currently bear recyclability claims and will be prohibited or discouraged from doing so by SB 343. The requirements of SB 343 place a heavy burden on the snack food industry that will adversely impact food affordability. The costs for SNAC's members to comply with SB 343 include mass label updates, dual inventory costs, equipment changes, significant investments to reengineer food packaging to meet recycling criteria, higher disposal fees, and legal and compliance risks. These costs are compounded by the burdens and liabilities stemming from SB 54. SNAC's members must audit all of their single-use packaging in an attempt to determine compliance with SB 54's vague criteria. Any effort to redesign packaging must be balanced against the need to comply with state and federal regulations for food packaging and the imperative to provide food that is safe to eat. Moreover, SNAC's members must prepare to review and update packaging iteratively or else face the recurring risk of austere civil penalties.

78. **Western Growers Association** (WGA) brings this action on behalf of its members, who grow, pack, and sell fresh produce in California. Many fresh produce packaging materials use recycling symbols and will be prohibited from doing so by SB 343. In recent years, many WGA members have invested substantial resources to transition their packaging in order to participate in take-back recycling programs and encourage consumer recycling. WGA members face the imminent choice of either

removing accurate recycling instructions from packaging or retaining those claims and exposing themselves to enforcement liability under SB 343. The law therefore undermines prior packaging investments, restricts members' ability to provide accurate recycling information to consumers, and imposes new compliance and labeling burdens that disrupt the market for fresh produce packaging. WGA's members have made similar investments to update packaging to comply with SB 54. Members depend on specialized packaging to prevent contamination and physical damage, manage ventilation and moisture, withstand refrigerated transportation, and preserve shelf life. Alternative materials must meet these commodity-specific needs and be commercially available and compatible with packing equipment. Unsuitable substitutions can compromise food safety and increase spoilage and food waste. SB 54 imposes significant compliance and sourcing burdens, including costs, on WGA members under extreme time constraints. WGA seeks relief from these burdens and uncertainty affecting members' ability to source packaging that safely delivers fresh produce to consumers.

79. Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2), because the Attorney General is located within this district and a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## FACTUAL BACKGROUND

### A. Overview of California SB 343

80. Signed into law on October 5, 2021, SB 343 amended sections of the Public Resources Code and Business and Professions Code to restrict a commercial speaker's ability to label or market a product as "recyclable." Previously, a business could lawfully claim a product was recyclable unless such a claim was "untruthful, deceptive, or misleading . . . , whether explicit or implied." *See* Cal. Bus. & Prof. Code § 17580.5(a) (Stats. 1990, Ch. 1413, Sec. 2). Furthermore, it was a defense to any enforcement of this provision that the claims "conform to the standards or are consistent with the examples contained in the 'Guides for the Use of Environmental Marketing Claims' published by the Federal Trade Commission." *Id.* § 17580.5(b). Those "FTC Green Guides" expressly

permit businesses to make qualified recyclable claims where recycling facilities are available to less than 60 percent of consumers or communities where the item is sold. 16 C.F.R. § 260.12. But in 2021, SB 343 eliminated the defense of compliance with the Green Guides for any recyclable claim, including use of the chasing arrows symbol. Cal. Bus. & Prof. Code § 17580.5(b)(2).

81. SB 343 replaced the flexible approach of the Green Guides with California's unique, rigid, and complex definition of the term "recyclable." That term cannot be qualified with language that makes it truthful and not misleading to reasonable consumers, such as "Facilities may not be available in your area" or "Return to store where purchased" or "Recyclable through our take-back program. Visit [website for details]." Instead, California restricts the term "recyclable" (and the chasing arrows symbol) to a small subset of products and packages that meet precise criteria. If a product or package does not meet these criteria, there can be no indication that it is recyclable. This term, and indeed any symbols and instructions conveying even the concept of recyclability, is illegal to use on all other products or packages. The only exceptions are a "not recyclable" symbol of the chasing arrows with a slash through it, items required by federal law to be labeled with a chasing arrows symbol, directions for composting ("organics recycling"), and resin identification codes without a chasing arrows symbol. Cal. Pub. Res. Code § 42355.51(c).

82. The core of the law—found at Public Resources Code section 42355.51—states that "a product or packaging is recyclable" only if it meets all of the following criteria:

(i) It "is of a material type and form that routinely becomes feedstock used in the production of new products or packaging,"

(ii) "The material type and form is collected for recycling by recycling programs for jurisdictions that collectively encompass at least 60 percent of the population of the state,"

(iii) "The material type and form is sorted into defined streams for

recycling processes by large volume transfer or processing facilities . . . that process materials and collectively serve at least 60 percent of recycling programs statewide, with the defined streams sent to and reclaimed at a reclaiming facility consistent with the requirements of the Basel Convention," and,

(iv) The product or packaging meets several additional design and composition requirements.

Cal. Pub. Res. Code §§ 42355.51(b)(1), (d)(2), (d)(3).

83. A product that does not meet all of these criteria but that "displays a chasing arrows symbol, a chasing arrows symbol surrounding a resin identification code, or any other symbol or statement indicating the product or packaging is recyclable, or otherwise directing the consumer to recycle the product or packaging" is a "deceptive or misleading claim" under Public Resources Code section 42355.51 and Business & Professions Code section 17580.5.

84. To help businesses identify which materials meet these requirements, including the "60/60 threshold," the law requires the Department of Resources Recycling and Recovery ("CalRecycle") to conduct and publish a "characterization study of material types and forms that are collected, sorted, sold, or transferred by solid waste facilities." Cal. Pub. Res. Code § 42355.51(d)(1)(B)(i).

85. The law does not empower CalRecycle to make final or formal determinations as to which materials are or are not "recyclable," but only to provide information to assist businesses in making these determinations on their own. As a result, in order to convey to consumers that their product or package is recyclable, businesses must undertake extensive analysis of the materials used in it, combing through complex data published by CalRecycle and attempting to find and analyze information that is not widely available. Furthermore, because the CalRecycle characterization study only applies to products and packaging sorted by solid waste facilities, it necessarily excludes those recycled via alternative collection systems and provides no guidance as to this portion of the recycling stream.

86. The first Material Characterization Study was published on April 4, 2025. CalRecycle, SB 343 Material Characterization Study Final Findings 2023/2024 (2025) (the "2025 MCS"). It was amended on August 8, 2025, *see* CalRecycle, August 8, 2025 Update Letter, available https://www2.calrecycle.ca.gov/Docs/Web/131064 (the "August MCS Update Letter"), and then again on December 22, 2025. *See* CalRecycle, December 22, 2025 Update Letter, available https://www2.calrecycle.ca.gov/Docs/Web/137764 (the "December MCS Update Letter").

87. A product or packaging is considered "recyclable in the state" if, and only if, based on the latest Material Characterization Study, the product or packaging meets the 60/60 threshold, as well as the other listed criteria. CalRecycle is obligated to update its Material Characterization Study every five years. Cal. Pub. Res. Code § 42355.51(d)(1)(B)(ii). Notwithstanding this five-year cycle, SB 343 allows CalRecycle to update its findings more frequently as new information becomes available. *See id.* § 42355.51(d)(1)(B)(iii).

88. The 2025 MCS gathered data from 34 of California's 58 counties, which encompass 93 percent of California's population. The data disclose whether materials are collected for recycling and whether the material is sorted for recycling by large volume transfer or processing ("LVTP") facilities. (It therefore does not include data on materials that do not need to be sorted and/or do not pass through LVTP facilities, such as packaging collected through store drop off or mail back programs.)

89. The 2025 MCS does not include any "information on the destination or ultimate disposition of materials sorted and sold by LVTP facilities," whether they are sent to a reclaimer that complies with the Basel Convention, or information about the composition and design of specific products. In other words, it is missing "the information necessary to determine the recyclability status for any particular product or packaging," *see* 2025 MCS at 3, the determination of which is itself necessary for regulated businesses to express any recyclability claim without fear of public or private

enforcement.

90. Based on the latest Material Characterization Study, businesses are expected to determine whether their product or packaging meets the 60/60 threshold and ultimately decide which products they can label as recyclable based on the other criteria. The 2025 MCS also demonstrates that many materials that do not meet the 60/60 threshold can be and are recycled across the state.

91. SB 343 further states that "[a] product or packaging shall not be considered recyclable in the state unless . . . designed to ensure recyclability" and provided it "does not include any components, inks, adhesives, or labels that prevent the recyclability of the product or packaging." Cal. Pub. Res. Code § 42355.51(d)(3). SB 343 does not require the Material Characterization Study or any other guidance from CalRecycle to identify what types of components, inks, adhesives, or labels prevent recyclability. In contrast, the Green Guides allow businesses to label a product as recyclable even if it includes "minor" or "incidental" components that are not recyclable. 16 C.F.R. § 260.3. And even if an "incidental component significantly limits the ability to recycle the product," the business can include an accurate, qualified claim about the limited recyclability of the product under the Green Guides. *See id.*

92. SB 343 also requires CalRecycle to promulgate regulations to gather data from waste processors on how materials are collected and processed, and what material types are actively recovered. Cal. Pub. Res. Code § 42355.51(d)(A). These regulations were approved on January 23, 2024. *See* Cal. Code Regs. tit. 14, §§ 18815.1-18815.9, 18815.11-18815.12, 18794.2. CalRecycle began gathering data relevant to the law in the second quarter of 2024. *See* CalRecycle, Recycling and Disposal Reporting: Reports List, https://www2.calrecycle.ca.gov/RecyclingDisposalReporting/Reports [hereinafter Recycling and Disposal Reports].

93. However, the Recycling and Disposal Reports do not contain all the information required for businesses to determine whether their products are recyclable under the law. For example, the Recycling and Disposal Reports do not indicate whether

the materials are "sent to and reclaimed at a reclaiming facility consistent with the requirements of the Basel Convention."

94. Indeed, Defendant Bonta even acknowledged that "CalRecycle does not have any statutory authority to assess whether particular products meet the collection- and process-related thresholds" in SB 343. *See* Real Party in Interest California Department of Resources Recycling and Recovery's Statement in Response to Defendants' Demurrers at 3, *Last Beach Cleanup v. Stater Bros. Mkts.*, No. 22STCV18252 (L.A. Super. Ct. Oct. 5, 2023).

95. SB 343 also prohibits placing a resin identification code (RIC) within a chasing arrows symbol on a product unless that product meets the requirements set out in the law. Cal. Pub. Res. Code § 18015(d). This prohibition directly conflicts with the laws of approximately 29 other states that ***require*** the RIC to be placed within a chasing arrows symbol on certain types of plastics, regardless of other criteria regarding the product's recyclability. *See, e.g.*, Fla. Stat. § 403.708; 415 Ill. Comp. Stat. 15/10; Tex. Health & Safety Code § 369.002. Such symbols look like these:




As a result, a product that does not meet the recyclability requirements set out in section 42355.51 cannot include the chasing arrows symbol if sold in California, but *must* have the chasing arrows symbol if sold in one of these other states.

96. Because almost all goods, and particularly consumer products, sold in the United States travel in interstate commerce, and because major retailers usually insist that goods supplied to them be legal for sale throughout the United States, it is difficult, if not impossible, for manufacturers to label products specifically for one state versus another. As a practical matter, they face a choice of which laws to comply with. SB 343 therefore places a heavy burden on businesses who wish to make truthful recyclability claims outside of California. Furthermore, because enforcement of SB 343 is anticipated

to be far more aggressive than enforcement of the conflicting laws in other states, as a practical matter, chasing arrows symbols will be removed from many products. SB 343 therefore is likely to reduce recycling rates not only in California but throughout the United States. For Plaintiffs' members that set goals for the recycling rates for their products and packaging on a nationwide basis, SB 343 impedes those goals.

97. The law places separate restrictions on non-curbside recycling programs. Cal. Pub. Res. Code § 42355.51(d)(5). Products and packaging that are not collected via a curbside program but that are collected in other programs are not considered recyclable unless they are collected at a rate of at least 60 percent and have sufficient commercial value to be marketed, transported, and sorted for recycling. After January 1, 2030, the rate increases to 75 percent. Such products may include high value items like electronics or printer cartridges or items such as coffee pods or other special containers that require specialized collection systems for recycling. Under SB 343, if the collection rate for such products in California is not yet at 60 percent, businesses are not permitted to tell consumers about the availability of recycling services or instruct them on how to return the items for recycling. SB 343 will therefore halt such programs, and the products and packaging they cover will end up in landfills, contrary to the stated intent of SB 343.

98. SB 343 became operative on October 4, 2026, and applies to all products and packaging manufactured after that date. As of the date of this Second Amended Complaint, businesses are required to compare their products against the Material Characterization Study, perform outside research, determine whether they need to make changes to their marketing claims, redesign their labels, products, and packaging, and produce and distribute the redesigned product or packaging. Furthermore, because goods routinely travel in interstate commerce, and the California market cannot reasonably or practically be segregated from the rest of the United States, Plaintiffs' members are having to make these changes on a nationwide basis in order to ensure compliance with California SB 343.

**B. SB 343 Exposes Businesses to Onerous Criminal and Civil Penalties.**

99. California's False Advertising Law ("FAL") creates criminal penalties for false recyclability claims: failure to comply with the law is a "misdemeanor punishable by imprisonment in the county jail not to exceed six months, or by a fine not to exceed two thousand five hundred dollars ($2,500), or by both." Cal. Bus. & Prof. Code § 17581.

100. Businesses also face "civil liability in the amount of five hundred dollars ($500) for the first violation of this chapter, one thousand dollars ($1,000) for the second violation, and two thousand dollars ($2,000) for the third and any subsequent violation." Cal. Pub. Res. Code § 42358. These penalties are in addition to those authorized by California's Unfair Competition Law ("UCL"), which authorizes a civil penalty of up to $2,500 for *each violation*. Cal. Bus. & Prof. Code § 17206.

101. The law does not stop at criminal and civil penalties. Businesses face the risk of injunctions issued against them along with attorney's fees and costs that necessarily accompany an enforcement action. Specifically, under the FAL, "any person who has suffered injury in fact and has lost money or property as a result of violation of this chapter" may seek injunctive relief and restitution. Cal. Bus. & Prof. Code § 17535. The UCL similarly authorizes injunctive relief and restitution. Cal. Bus. & Prof. Code § 17203.

102. Private parties are also empowered to enforce the law under the FAL as class actions. Cal. Bus. & Prof. Code § 17535. They can also enforce the law under the UCL, which authorizes suits based on violations of any other laws. Cal. Bus. & Prof. Code § 17200. Private plaintiffs in such actions routinely seek their attorney's fees for actions that they claim result "in the enforcement of an important right affecting the public interest …." Cal. Civ. Proc. Code § 1021.5.

103. Because the law creates several theories of liability for false claims of recyclability that can be brought by both public and private enforcers and lead to steep criminal and civil penalties, the law places an immense burden on businesses who wish

to label their products and packaging as recyclable, whether using words, symbols, or both, but cannot determine whether they meet the strict and intricate criteria of SB 343.

104. Indeed, when SB 343 was being considered by the Legislature, the author candidly declared that "violations of this bill . . . serve as predicate offenses" for other laws like the UCL and FAL, enabling "[c]onsumers and public entities [to] thus enforce the provisions of this bill where persons [] deploy the chasing arrows symbol or otherwise convey a product is recyclable when it fails to meet the criteria of statewide recyclability pursuant to Section 42355.51." Senate Judiciary Comm., *SB 343 Analysis*, Reg. Sess., at 9 (Cal. 2021-2022), https://sjud.senate.ca.gov/sites/sjud.senate.ca.gov/files/sb_343_allen_senate_judiciary_committee_analysis.pdf.

105. Notably, in a separate action, Defendant Bonta argued before the court that "the express purpose of section 42355.51 is to bolster . . . preexisting laws against deceptive marketing by adding a *per se rule* for applying them." *See* Real Party in Interest California Department of Resources Recycling and Recovery's Statement in Response to Defendants' Demurrers at 3, *Last Beach Cleanup v. Stater Bros. Mkts.*, No. 22STCV18252 (L.A. Super. Ct. Oct. 5, 2023) (emphasis added).

**C. Enforcement of SB 343 by Public and Private Actors is Imminent.**

106. Although the law just recently took effect, prior product recyclability challenges by public officials and private plaintiffs indicate an imminent threat of enforcement.

107. Since 2022, lawyers representing private plaintiffs have brought no fewer than 30 actions alleging that a business has deceptively labeled a product or packaging as recyclable. The Attorney General has also brought at least three such actions. *See infra* ¶ 112. These suits, without regard to their merit or lack thereof, drain businesses of resources as they are forced to litigate or to settle.

108. For example, private individuals and their attorneys have already aggressively used the UCL and FAL to challenge businesses' recyclability claims. *See*,

*e.g.*, Compl. at 10, *Losey v. Califia Farms, LLC*, No. 25STCV17229 (L.A. Super. Ct. June 13, 2025) (bringing false advertising and unfair business practice claims for labeling products as recyclable); Compl. at 12, *Heavey v. WinCup, Inc.*, No. 25CU014781C (S.D. Super. Ct. Mar. 21, 2025) (same).

109. Private individuals and their attorneys also rely on the Consumers Legal Remedies Act ("CLRA"), California Civil Code section 1750 *et seq.*, to challenge recyclability claims with the ability to recover attorney's fees and legal damages. *See, e.g.*, First Am. Compl. at 13-15, *Castillo v. Safeway, Inc.*, No. ECU004383 (Imperial Super. Ct. Dec. 11, 2025) (bringing claims under the FAL, UCL, and CLRA for allegedly listing non-recyclable products as recyclable); First Am. Compl. at 11-14, *Blagoyevic v. Grocery Outlet Inc.*, No. 25CU050184C (S.D. Super. Ct. Nov. 20, 2025) (same); Second Am. Compl. at 10-12, *Lee v. Sutter Home Winery, Inc.*, No. 25CU019972C (S.D. Super. Ct. Aug. 18, 2025) (same); First Am. Compl. at 11-13, *Fraser v. Peet's Coffee Inc.*, No. 25CU019511C (S.D. Super. Ct. July 10, 2025) (same); First Am. Compl. at 10-13, *Banta v. Delicato Vineyards, LLC*, No. STK-CV-UBT-2025-0005347 (San Joaquin Super. Ct. June 3, 2025) (same); Second Am. Compl. at 11-14, *Garcia v. Safeway, Inc.*, No. 37-2024-00016265-CU-BT-CTL (S.D. Super. Ct. Mar. 5, 2025) (same); First Am. Compl. at 17-19, *McCullough v. Taco Bell Corp.*, No. CVRI2500069 (Riverside Super. Ct. Feb. 3, 2025) (same). In these cases, attorney's fees are available under the CLRA. Cal. Civ. Code § 1780(e).

110. Indeed, even before SB 343 took effect, private individuals and their attorneys started to expressly use SB 343 to bring claims against businesses for allegedly misleading recyclability claims. Appellant's Opening Brief at 16, *Planet Green Cartridges, Inc. v. Amazon.com, Inc.*, No. 23-4434 (9th Cir. Mar. 8, 2024) (conceding that "[p]laintiff's UCL claims aris[e] from violations of Cal. Pub. Res. Code § 42355.51"); First Am. Compl., ¶ 238, *Bhotiwihok v. Fairlife, LLC*, No. 2:25-cv-01650-ODW (AGRx) (C.D. Cal. May 29, 2025) ("Defendants' recyclability claims are deceptive under . . . PRC § 42355.51"); Compl. at 18, *Woolard v. Glad Products Co.*,

No. 3:24-cv-00504-JO-BLM (S.D. Cal. Mar. 15, 2024) (citing Public Resources Code section 42355.51's definition of recyclable in consumer fraud suit); Third Am. Compl. at 23, *Last Beach Cleanup v. Stater Bros. Mkts.*, No. 22STCV18252 (L.A. Super. Ct. Mar. 15, 2024) (same); Second Am. Compl. at 22, *Last Beach Cleanup v. Gelson's Mkts.*, No. 22STCV18216 (L.A. Super. Ct. June 28, 2023) (same); First Am. Compl., ¶ 86, *Peterson v. The Glad Products Co.*, No. 3:23-cv-00491-TSH (N.D. Cal. Apr. 19, 2023) ("Defendants' use of the 'Recycling' representation [and] 'chasing arrows' symbol on the Products' labels . . . violates California Public Resources Code Section 42355.51").

111. Without even citing SB 343 directly, private litigants have still used the law's 60/60 threshold to bring deceptive labeling claims. As one notable example, a plaintiff sued one producer for falsely advertising its aseptic oat milk cartons as recyclable packaging. Compl., ¶¶ 14-17, *Losey v. Califia Farms, LLC*, No. 25STCV17229 (L.A. Super. Ct. June 13, 2025). Citing CalRecycle's April 2025 MCS report to claim that aseptic cartons "do not meet the legal standard required to be able to [be] legally [called] . . . 'recyclable,'" *id.*, ¶ 22, this plaintiff alleged that the producer's use of the "chasing arrows" symbol and "Please Recycle" instruction violated the FAL and UCL. *Id.*, ¶¶ 40-56. *See also* First Am. Compl., ¶ 21, *Banta v. Delicato Vineyards, LLC*, No. STK-CV-UBT-2025-0005347 (San Joaquin Super. Ct. June 3, 2025) (same).[2]

112. Similarly, even before it went into effect, Defendant Bonta (the Attorney General) already applied SB 343 in litigation to challenge businesses' current recyclability claims. *See* Compl., ¶ 56, *State v. Novolex Holdings, LLC*, No. CGC-25-630237 (S.F. Super. Ct. Oct. 17, 2025) (citing to Public Resources Code section 42355.51 and the Material Characterization Study in arguing that defendants falsely

---

[2] Had one extra month passed before this defendant was sued, these cartons would have met the 60/60 criteria for a "recyclable" claim thanks to CalRecycle's determination that facilities sorting these cartons served 68 percent of counties statewide, based on the August MCS Update Letter. That partial defense would have proved short-lived, however, because just four months later, CalRecycle amended this estimate of counties served to 53 percent. *See* December MCS Update Letter.

claimed their plastic carryout bags are recyclable); Compl., ¶ 51, *State v. Revolution Consumer Sols. (CA), LLC*, No. CGC-25-630238 (S.F. Super. Ct. Oct. 17, 2025) (same); Compl., ¶ 277, *State v. Exxon Mobil Corp.*, No. CGC-24-618323 (S.F. Super. Ct. Sept. 23, 2024) (alleging that defendant falsely claimed the recyclability of plastics and citing to Public Resources Code section 42355.51 for the definition of "recyclable").

113. This litany of enforcement actions – before SB 343 came into effect – portends further and more aggressive litigation that will overwhelm Plaintiffs' members and is already chilling their exercise of their free speech rights under the First Amendment.

**D. SB 343 Unduly Burdens Businesses.**

114. Aside from the real threat of criminal and civil litigation for failure to comply with the law, businesses face undue burdens under SB 343.

115. A burden placed on every business by SB 343 is to investigate whether their products meet the law's strict definition of "recyclable." This involves a meticulous study of the materials in each product and its packaging, and a comparison against the Material Characterization Study. This is a practically impossible task. For example, neither the Characterization Study nor any other information provided by the State provides sufficient information for a business to determine whether a material complies with the part of the law related to the Basel Convention. In many cases, the material categories are ambiguously defined, with several potentially applicable categories for a given material, and no ability to seek further guidance from CalRecycle as to which category applies.

116. Businesses who decide to or are required to change their messaging about product recyclability must incur the costs of redesigning their product, reproducing the product, and redistributing it to consumers. This will require an immense amount of time and resources for even the smallest changes.

117. Furthermore, businesses must incur these costs iteratively as CalRecycle continues to update recyclability criteria. For example, CalRecycle changed the criteria

for aseptic and gable-top cartons three times in 2025. First, CalRecycle established in the April 4, 2025, Material Characterization Study Final Findings that these cartons did *not* meet the 60 percent sortation rate required by Public Resources Code section 42355.51(d)(2)(B). Then, in August 2025, CalRecycle found that these cartons *did* meet the 60 percent sortation requirement based on new data about the availability of technology to sort cartons and end markets that recycle cartons. August MCS Update Letter at 2. In December 2025, CalRecycle issued another update stating that *one* recycling facility would no longer accept aseptic and gable-top cartons for recycling, bringing the sortation rate below 60 percent again. December MCS Update Letter at 2. And then in June 2026, CalRecycle issued yet another update indicating that gable-top cartons are collected and sorted at a rate of more than 60 percent. CalRecycle, June 24, 2026 Update Letter, available https://calrecycle.ca.gov/wcs/recyclinglabels/ (the "June 2026 MCS Update Letter"). Although gable-top cartons currently comply with the 60/60 threshold, these updates underline how businesses must be prepared to react to frequent changes, which are arbitrary and beyond their control.

118. CalRecycle has indicated that it "does not anticipate publishing a new version of the complete report until the required update in 2027." December MCS Update Letter at 2; *see also* Cal. Pub. Res. Code § 42355.51(d)(1)(B)(ii) (mandating updates to the Material Characterization Study every five years beginning in 2027). However, this means businesses can expect an update just months after the law went into effect. Moreover, CalRecycle retains the authority to "publish additional information that was not available at the time of the most recent periodic material characterization study" as that information becomes available. Cal. Pub. Res. Code § 42355.51(d)(1)(B)(iii). Thus, businesses can expect new recyclability standards at a minimum of every five years, with the possibility of additional sporadic updates that may occur at any time. Considering the time and resources businesses must expend to bring new products and packaging to market, SB 343 places recurring burdens on businesses who may have to redesign their products or else risk noncompliance.

119. Furthermore, although SB 343 initially had a lead time of years before its effective date, it has no provisions for advance notice of changing requirements occasioned by changing data. Notably, the Material Characterization Study is not the final word on whether a particular package even meets the 60/60 threshold; instead, a business may not make a recyclability claim unless it can substantiate, with its own factual investigation, that it meets the 60/60 threshold at the time the product is sold, offered for sale, distributed, or imported into the state. But those facts may change in an instant, as the recent experience with aseptic and gable-top cartons shows, due to factors completely out of the control and likely out of the knowledge of an individual business using this form of packaging. If one LVTP changes its policies, or goes out of business, or if a large community's curbside collection program changes its policies, a product or packaging that previously met the criteria for a recyclable claim will instantly be illegal to sell in California. That characteristic of the law, combined with other laws that make it enforceable by attorneys for individual consumers as well as by the Attorney General, 58 district attorneys, and several city attorneys, with potentially devastating civil and criminal penalties, makes SB 343 a severe restriction on the free speech rights of businesses.

120. In addition, those businesses that sell products both in California and in the many states that require RICs to be placed within a chasing arrows symbol face heightened burdens. As discussed above, several states *require* placing the chasing arrows symbol around the RIC, whereas SB 343 forbids doing so for materials that do not meet all of the requirements of the law. This means that a business whose product or packaging does not meet the requirements of SB 343 is potentially prohibited from simultaneously distributing the product or packaging in California and these other states.

121. Businesses that want to communicate that their product is recyclable through alternative collection programs also face high burdens and restrictions on their speech. A product that is collected through a non-curbside program must be recovered at a rate of at least 60 percent before January 1, 2030, and at least 75 percent after

January 1, 2030, in order to be labeled as recyclable. Cal. Pub. Res. Code § 42355.51(d)(5). This is an incredibly high rate, particularly considering consumers must take an affirmative step to recycle these items beyond simply placing them in their curbside container. The products must also have "sufficient commercial value to be marketed for recycling and be transported at the end of its useful life to a transfer, processing, or recycling facility to be sorted and aggregated into defined streams by material type and form." Cal. Pub. Res. Code § 42355.51(d)(5)(A), (B). Neither the law nor the regulations defines the term "sufficient commercial value." Furthermore, the MCS conducted by CalRecycle does not even consider alternative collection programs in which the products or packaging are not sorted, i.e., programs in which the materials are collected without a need to be sorted and are transported directly to the reprocessor. They thus cannot satisfy the 60/60 criteria assessed in the MCS. In short, these requirements place an enormous burden on businesses whose products are recycled in alternative collection systems to measure the rate of recycling and determine the commercial value of each product in the recycling stream.

### E. Overview of SB 54 and the Recyclability Requirement

122. SB 54, signed into law on June 30, 2022, regulates producers of single-use packaging and plastic single-use food service ware ("producer" or "producers"). Through a complex, far-reaching legislative scheme, SB 54 requires producers to associate with a Producer Responsibility Organization ("PRO") in order to create and implement a plan to achieve statutorily mandated recycling goals for single-use products and packaging. Among these goals is the 2032 Mandate: all covered single-use packaging and plastic single-use food service ware ("covered material") that is "offered for sale, distributed, or imported in or into the state on or after January 1, 2032" must be "recyclable in the state or eligible for being labeled 'compostable.'" Cal. Pub. Res. Code § 42050(b). To qualify as "recyclable," a material must meet the requirements of SB 343. *See id.*; Cal. Pub. Res. Code § 42061(e); *see also* Cal. Code Regs., tit. 14, § 18980.3(b). Failure to comply can result in hefty civil penalties and other liabilities.

123. The 2032 Mandate applies to "producers of covered material." Cal. Pub. Res. Code § 42050. Covered material generally includes "[s]ingle-use packaging that is routinely recycled, disposed of, or discarded after its contents have been used or unpackaged, and typically not refilled or otherwise reused by the producer" and "[p]lastic single-use food service ware." *Id.* § 42041(e). A producer is not necessarily the party that manufactured the product in question. Instead, a producer can include:

- The party that manufactures the product and "who owns or is the licensee of the brand or trademark under which the product" is used, sold, or distributed;
- The owner or "the exclusive licensee of a brand or trademark under which the product" is used, sold, or distributed; or
- The party that "sells, offers for sale, or distributes the product" in the state.

*Id.* § 42041(w).

124. To identify which materials are "recyclable" under the 2032 Mandate, CalRecycle must create a list of covered material categories ("CMC") deemed recyclable ("SB 54 CMC List"). Cal. Pub. Res. Code § 42061(c). A CMC must be listed on the SB 54 CMC List if it is considered recyclable under Public Resources Code section 42355.51(d), the core of SB 343. Cal. Pub. Res. Code § 42061(c). CalRecycle must update the SB 54 CMC List "at least annually until January 1, 2032." *Id.* § 42061(e). After January 1, 2032, CalRecycle must update the list "regularly, but no less than once every two years." *Id.* A CMC included on the SB 54 CMC List is considered compliant with the 2032 Mandate until CalRecycle determines that the CMC is not recyclable. *Id.*

125. A determination that a CMC is recyclable is not determinative of whether an individual product within that CMC is recyclable. The regulations promulgated by CalRecycle and effective as of May 1, 2026, state that for a covered material item to be considered recyclable under the 2032 Mandate, the item must either:

(1) Be listed on the SB 54 CMC List, comply with the requirements of Public Resources Code section 42355.51(d)(3), and, for food packaging and service ware, meet requirements concerning heavy metals and PFAS; or

(2) "[B]e excepted from the requirements of paragraphs (2) and (3) of subdivision (c) of section 42355.51 of the Public Resources Code pursuant to paragraphs (4), (5) or (6) of subdivision (d) of section 42355.51 of the Public Resources Code."

Cal. Code Regs., tit. 14, § 18980.3(b).

126. A product or packaging complies with Public Resources Code section 42355.51(d)(3) if:

(1) "For plastic packaging, the plastic packaging is designed to not include any components, inks, adhesives, or labels that prevent the recyclability of the packaging according to the APR Design® Guide published by the Association of Plastic Recyclers";

(2) "For plastic products and non-plastic products and packaging, the product or packaging is designed to ensure recyclability and does not include any components, inks, adhesives, or labels that prevent the recyclability of the product or packaging";

(3) It does not contain certain intentionally added chemicals; and

(4) It does not contain PFAS.

Cal. Pub. Res. Code § 42355.51(d)(3).

127. The definition of "recyclable" in the 2032 Mandate of SB 54 is therefore inextricably tied to the requirements of SB 343. While the mandate has not yet taken effect, Plaintiffs' members require a lead time of years to audit products and packaging for recyclability, identify or develop replacement materials, adjust supply chains accordingly, and deploy newly packaged products.

128. Failure to comply with the 2032 Mandate is a violation of SB 54 subject to civil penalties. *Id.* § 42081(a)(2); Cal. Code Regs., tit. 14, § 18980.13(g).

**F. Overview of SB 54's Recycling Rate Requirement**

129. SB 54 also mandates that plastic single-use packaging and food service ware sold, distributed, or imported in California be recycled at incrementally increasing rates: 30 percent by 2028, 40 percent by 2030, and 65 percent by 2032 ("Recycling Rate Requirement"). Cal. Pub. Res. Code § 42050(c).

130. CalRecycle was required to begin publishing a list of recycling rates ("Recycling Rate List") by January 1, 2026. Cal. Pub. Res. Code § 42061(b)(1); CalRecycle, Update to Covered Material Category (CMC) List (Dec. 31, 2025), available https://www2.calrecycle.ca.gov/Docs/Publications/Details/1764. CalRecycle must update the Recycling Rate List "*at least* every two years." Cal. Pub. Res. Code § 42061(f)(1) (emphasis added).

131. The recycling rate on a particular date "shall be calculated over the latest twelve-month period before such date for which sufficient data to make the calculation exists." Cal. Code Regs. tit. 14, § 18980.3.2(b)(1). In calculating the recycling rate, CalRecycle must consider a number of different data sources, including data from facilities that process different types of waste and local jurisdictions. *Id.* § 18980.3.2(b)(4); *see also* Cal. Pub. Res. Code § 42061(b)(2).

132. A producer may demonstrate its compliance with the relevant recycling rate by submitting to CalRecycle "evidence that the particular type of covered material meets the applicable recycling rate by reference to a recycling rate" on the current Recycling Rate List. Cal. Pub. Res. Code § 42061(f)(2).

133. Neither SB 54 nor the corresponding regulations contain a notice requirement before CalRecycle updates the Recycling Rate List. In fact, SB 54 expressly excludes updates to the Recycling Rate List from the requirements of the Administrative Procedure Act, which includes notice and comment provisions that necessarily entail a delay on the order of at least months. *Id.* § 42061(f)(4).

134. CalRecycle is also authorized to change the overarching recycling rates. If CalRecycle determines that "unforeseen and anomalous market conditions . . . warrant

an adjustment to the recycling rates," the department may increase the recycling rate by up to 10 percent. *Id.* § 42062(b). There is no express notice requirement for an increase in the recycling rates. All that CalRecycle is obligated to provide is "its determination and rationale." *Id.* § 42062(a).

135. Failure to comply with the Recycling Rate Requirement is a violation of SB 54 subject to civil penalties. Cal. Pub. Res. Code § 42081(a)(2); Cal. Code Regs., tit. 14, § 18980.13(g).

**G. Overview of Source Reduction Requirements Under SB 54.**

136. A third overarching requirement of SB 54 is that producers and the PRO source reduce all plastic covered materials. Cal. Pub. Res. Code §§ 42050(a), 42057. Source reduction is defined as "the reduction in the amount of covered material created by a producer relative to a baseline established" under Public Resources Code section 42057(b). *Id.* § 42041(aj).

137. The PRO, acting on behalf of and in conjunction with participant producers, is responsible for meeting incremental source reduction goals. *Id.* § 42057(a). Ten percent of plastic covered material must be source reduced by January 1, 2027, and 20 percent of plastic covered material must be source reduced by January 1, 2030. *Id.* By January 1, 2032, the PRO must "achieve the 25-percent reduction by weight and 25 percent by plastic component source reduction requirement." *Id.* The baseline against which compliance with these requirements will be measured is determined based on the amount of plastic covered material that was sold, offered for sale, or distributed in California in 2023. *Id.* § 42057(b).

138. To achieve the source reduction goals, the PRO must enter into enforceable agreements with each participant producer. *Id.* Producers participating in a PRO must submit to the PRO individual source reduction plans indicating the amount of covered material the producer plans to source reduce by 2027, 2030, and 2032, and how the producer will meet its source reduction targets. *Id.* § 42057(d). The PRO must then compile this information into the source reduction plan, a required component of the

PRO plan. *Id.* § 42057(f).

139. SB 54 identifies several methods of source-reducing covered materials, including "shifting covered material to reusable or refillable packaging or a reusable product or eliminating unnecessary packaging." *Id.* § 42041(aj) The statute further defines source reduction to include converting a single-use material to a refillable or reusable material, eliminating plastic components, concentrating, right-sizing, lightweighting, shifting to bulk or large format packaging used in conjunction with refillable containers, or shifting from plastic to a non-plastic material. *Id.* §§ 42057(a)(2)(A)-(B). In still other corners of the law, source reduction includes "optimization," which is defined as "limiting the amount of covered material used in packaging by meeting product or packaging needs with minimal material . . . ." by, for example, "eliminating unnecessary components, right-sizing, concentrating, and using bulk or large format packaging." *Id.* § 42041(r).

140. However, SB 54 expressly excludes from the definition of source reduction "[r]eplacing a recyclable or compostable covered material with a nonrecyclable or noncompostable covered material or a covered material that is less likely to be recycled or composted." *Id.* § 42041(aj)(1). The definition of lightweighting similarly excludes changes that cause covered material to become "nonrecyclable or noncompostable or less likely to be recycled or composted." *Id.* § 42041(*l*). Yet nowhere in the statute or regulations are the terms "nonrecyclable" or "less likely to be recycled" defined. These are not obvious terms and require producers to guess at their meanings.

141. Although SB 54 states that, "[t]o be considered recycled, covered material shall be sent to a responsible end market," *id.* § 42041(aa)(3), this fails to provide any clarity. A "responsible end market" is defined as "a materials market in which the recycling and recovery of materials or the disposal of contaminants is conducted in a way that benefits the environment and minimizes risks to public health and worker health and safety." *Id.* § 42041(ad); *see also* Cal. Code Regs., tit. 14, § 18980.1(a)(23). CalRecycle is authorized to create regulations to identify responsible end markets along

with criteria related to "benefits to the environment" and "risks to public health and worker health and safety." Cal. Pub. Res. Code § 42041(ad). These criteria are enumerated in California Code of Regulations, title 14, section 18980.4. Among these criteria is the requirement that a responsible end market achieve the "recycling yield" threshold identified by the PRO. Cal. Code Regs., tit. 14, § 18980.4(a)(4). The recycling yield is a calculation of the weight of material recycled against the total amount of material accepted by the end market and not sent to a responsible end market for further processing. *Id.* § 18980.4(a)(4)(A)(i).

142. The regulations further require that the PRO identify responsible end markets and describe in the PRO plan how responsible end markets are to be identified. Cal. Code Regs., tit. 14, § 18980.4.1(a). If, after a mandatory annual audit, CalRecycle "determines that an end market identified by a PRO or Independent Producer no longer meets the standards specified in section 18980.4, the end market is no longer a responsible end market and any covered material sent to that end market thereafter shall not be considered recycled for purposes of compliance with the Act." *Id.* § 18980.4.2(e).

143. The program plan issued by Circular Action Alliance ("CAA"), the only PRO operating under SB 54, sets out the general criteria with which the PRO will identify end markets and verify responsible end markets. CAA, California Extended Producer Responsibility (EPR) Program Plan (June 15, 2026) at 187-95, available https://static1.squarespace.com/static/64260ed078c36925b1cf3385/t/6a345461f20d065cf5c09fff/1781814369959/CAA_California_Program_Plan_REVISED_20260618.pdf ("CAA Program Plan"). The CAA Program Plan also proposes recycling yield thresholds by material category. *Id.* at 194-95. However, as of the date of filing this Second Amended Complaint, no responsible end markets have been identified. Additionally, the SB 54 CMC List issued by CalRecycle on December 31, 2025 states that "[t]he amount recycled does not consider whether material reaches responsible end markets given that responsible end markets have not yet been identified for the purposes of the Act." SB 54 CMC List at 2.

144. Failure to meet the source reduction requirements of SB 54 is a violation of the act that can be placed on the PRO or possibly on an individual producer. *See* Cal. Code Regs. tit. 14, § 18980.13(g) ("For requirements of the Act or this chapter that apply generally to participants in a PRO plan, such as the requirement to ensure that covered material sold, offered for sale, imported, or distributed in the state achieves the requirements set forth in section[] 42050 . . . of the Public Resources Code, the failure to meet such requirements is a violation by the PRO for each plan participant that is a producer of the covered material at issue, except those to which the Department has issued an individual notice of violation for such failure."); *see also id.* § 18980.13(d)(2) ("For continuous violations based on the persistence of a particular condition or course of action, such as an ongoing failure to satisfy . . . source reduction, or other obligations under the Act, the violation shall be deemed to occur each day such conditions or courses of action persist after the thirtieth day after the Department issues a notice of violation.").

**H. Overview of Producers' Funding Obligations Under SB 54.**

145. SB 54 imposes funding obligations on producers, payable to CDTFA and CalRecycle through participation in the PRO. Among other fees, SB 54 requires a payment of $500 million each year into the California Plastic Pollution Mitigation Fund (the "Fund"). Cal. Pub. Res. Code § 42064(e)(1); *see* CAA Program Plan at 295-96 ("To raise fees for the PPMF, CAA California will charge PPMF fees to producers that supply plastic packaging based on each producer's share of weight of plastic materials and share of number of plastic components supplied into California."). The payment is fixed, regardless of the number of producers participating in the PRO. Other provisions of SB 54 impose fees funding the implementation of various other aspects of the program, including but not limited to source reduction, infrastructure enhancements, and consumer outreach. Cal. Pub. Res. Code §§ 42051.1, 42053; *see* CAA Program Plan at 281-82 ("Producers are responsible for paying their fair share of fees to fund collection, transporting, recycling and safe disposal of eligible materials, and investments to improve recycling outcomes.").

146. Specifically, Public Resources Code section 42053 authorizes CAA to collect fees from producers "to implement the [PRO] plan and fund the budget." Cal. Pub. Res. Code § 42053(g). Such fees enable the reimbursement of "local jurisdictions, recycling service providers, alternative collection service providers and other entities . . . for projects to support the goals of SB 54," pursuant to section 42051.1. CAA Program Plan at 22, 29 (citing Cal. Pub. Res. Code § 42051.1(g)). The amount of the fees is to be assessed "to generate sufficient funding for the PRO to meet regulatory obligations, increase recycling and achieve source reduction," CAA Program Plan at 281, in particular SB 54's source reduction requirements (Cal. Pub. Res. Code §§ 42050(a), 42057), recyclability requirements (*id.* §§ 42050(b), 42061), and Recycling Rate Requirement (*id.* §§ 42050(c), 42061, 42062). CAA Program Plan at 282 ("Base Fees may cover new and additional costs . . . [t]o implement the program plan and achieve the source reduction, recyclability and compostability, and recycling rate goals, and other program plan requirements."); *see also id.* at 291-93 (listing in Table 3 "statutory requirements . . . to implement EPR base fees"). These fees are dependent on the implementation costs of the statute.

147. CAA estimates those costs to be substantial, totaling $1,257,000,000 to $1,874,000,000 in 2027, growing to $2,553,000,000 to $5,037,000,000 in 2032. CAA Program Plan at 273. CAA's total costs from 2027 through 2032, all of which will be assessed in fees on producers, including Plaintiffs' members, are estimated at $9,350,000,000 to $17,243,000,000. *Id.*

148. SB 54's implementing regulations require producers to apply to become a participant of the PRO (or an "Independent Producer" subject to a unique set of requirements) within 30 days after May 1, 2026. *See* Cal. Code Regs. tit. 14, § 18980.5. Producers with gross sales of less than $1 million ("small producers") may qualify for an exemption from funding obligations, among other requirements, but are still required to register. *Id.* § 18980.5.2. During the rulemaking process, CalRecycle estimated that 5,741 producers with annual revenues exceeding $1 million ("large producers") would

be fully regulated by the PRO, and that another 7,874 small producers would qualify for the exemption, totaling an estimated 13,615 covered producers required to register with the PRO. *See* CalRecycle, SB 54 Standardized Regulatory Impact Assessment (SRIA) (June 2025) at 4, 38, 44, available https://dof.ca.gov/media/docs/forecasting/economics/major-regulations/major-regulations-table/2025-SB-54-Standardized-Regulatory-Impact-Assessment-063025-1.pdf ("SB 54 SRIA").

149. CalRecycle relied upon these numbers in estimating "annual compliance costs of approximately $457,114" per large producer and "an average of $155 per year" per small producer. *See* SB 54 SRIA at 38. CalRecycle cited these estimates through the end of the rulemaking process, including in its Request for Approval of SB 54 in March 2026. CalRecycle, SB 54 Request for Approval (Mar. 13, 2026) at 3-4, available https://www2.calrecycle.ca.gov/Docs/Web/138883 ("SB 54 RFA").

150. In contrast to CalRecycle's projections, as of June 2026, only approximately 3,400 producers had registered with CAA, the PRO approved by CalRecycle. *See* CAA Program Plan at 2. To date, CAA has not updated this estimate.

151. During the rulemaking process, in response to a public comment that asked "how CalRecycle will deal with obligated producer entities that fail to register with a PRO or act as an Independent Producer, thereby avoiding financial and compliance obligations ('free riders')," CalRecycle rejected the comment and its recommendation to "develop a methodology to identify [such] producers" and "state in the regulations that any entity found to have avoided registration . . . will . . . be obligated to compensate a PRO and the Department for the fees and penalties it would have paid if it had complied with its obligation in a timely manner." CalRecycle, SB 54 Plastic Pollution Prevention and Packaging Producer Responsibility Act Regulations: 45-Day Comment Matrix (Oct. 2025) at Comment O-82-79, available https://www2.calrecycle.ca.gov/Docs/Web/138874 ("45-Day Comment Matrix"). CalRecycle merely stated: "CalRecycle will conduct any investigations and audits as

necessary to determine whether a producer is in compliance with the requirements." *Id.* at Response O-82-79.

152. The discrepancy between CalRecycle's projections (13,615 producers subject to the statute) and actual registrations with the PRO as of the deadline (3,400 registered producers) is significant. CalRecycle has not acknowledged the discrepancy. Nor has it indicated that it has initiated "any investigations and audits as necessary" in response to the discrepancy, as it represented during the public comment period. *See* 45-Day Comment Matrix at Response O-82-79. The State lacks an incentive to enforce against businesses who have not registered because the $500 million payment is the same regardless of the number of producers, as is the overall funding provided to the PRO to implement other aspects of SB 54.

153. Further, CalRecycle necessarily contemplated participation by numerous out-of-state and foreign producers in estimating the number of covered producers, yet has not explained how such non-resident producers would be identified and brought into compliance with SB 54, further underscoring the uncertainty surrounding CalRecycle's projections and the resulting allocation of SB 54's funding obligations.

**I. Businesses Face Inordinate Civil Penalties Under SB 54.**

154. Failure to comply with the requirements of SB 54, including the 2032 Mandate and Recycling Rate Requirement, is punishable by civil penalties of up to $50,000 per day per violation. Cal. Pub. Res. Code § 42081(a). A violation is defined based on the specific package or product line deemed not in compliance. *Id.* § 42081(b). As a result, producers face penalties of $50,000 per day per product allegedly in violation of SB 54.

155. Although the statute authorizes CalRecycle to bring an enforcement action, other public officials and private entities can enforce SB 54 through the UCL. The UCL authorizes the Attorney General, district attorneys, county counsel, and city attorneys to seek civil penalties and injunctive relief for engaging in unfair competition, which is broadly defined to include "any unlawful, unfair or fraudulent business act or practice."

Cal. Bus. & Prof. Code §§ 17200, 17204. Because noncompliance with the 2032 Mandate is ostensibly an unlawful business act, these public enforcers can pursue alleged SB 54 violations through the UCL. The UCL authorizes civil penalties of up to $2,500 per violation when brought by a public entity. *Id.* § 17206. These penalties are cumulative to the penalties authorized directly by SB 54. *See id.* § 17205.

156. Further, "a person who has suffered injury in fact and has lost money or property as a result of" unfair competition may bring a claim for injunctive relief. *Id.* § 17204. A successful private enforcer who demonstrates that their suit is in the public interest can also seek attorney fees. Cal. Civ. Proc. Code § 1021.5. Allegation of a single violation of SB 54 can thus quickly cascade into claims for hundreds of thousands—if not millions—of dollars in civil penalties, attorney fees, and legal expenses.

### J. The 2032 Mandate, Recycling Rate Requirement, and Source Reduction Requirement of SB 54 Place Impossible Compliance Burdens on Producers.

157. Producers face undue compliance burdens above and beyond the immense civil liabilities imposed by SB 54.

158. As with compliance with SB 343, SB 54 necessitates that producers carefully audit covered products and packaging to make a recyclability assessment. Where the many requirements of SB 343 are indeterminate as encapsulated by the 2032 Mandate of SB 54, a producer must make a choice: forego placing the product in the stream of commerce or risk violating SB 54 and incurring the resulting penalties.

159. A threshold inquiry every producer must make is which CMC applies to a given product or packaging. Whether a covered material is recyclable depends on which CMC that material falls into. As a result, producers must first attempt to identify the material type and form of each individual product and packaging to accurately audit their product lines for compliance. This task is especially difficult where CMC definitions are imprecise.

160. If a product or packaging does not qualify as recyclable, producers must

forego distributing the product or else violate SB 54. The producer must also decide whether the product can or should be redesigned to be recyclable or compostable in order for the producer to remain economically competitive. Identifying a replacement material can be exceedingly resource-intensive, especially for packaging for food, personal care products, and other products that must meet additional state and federal requirements.

161. If a producer decides to redesign the product, they must then incur the cost of reproducing and redistributing the product to customers.

162. Producers will incur these costs on a recurring basis. Leading up to January 1, 2032, CalRecycle must update the SB 54 CMC List "*at least* annually." Cal. Pub. Res. Code § 42061(e) (emphasis added). After January 1, 2032, CalRecycle must update the SB 54 CMC List "regularly, but *no less than* once every two years." *Id.* (emphasis added). The law thus demands frequent updates of the SB 54 CMC List and expressly allows for frequent, unscheduled updates. With each change, producers face the threat that a product previously in compliance will no longer comply after the SB 54 CMC List is updated. Such changes will trigger a renewed effort to ensure each product complies with the law.

163. Because what is considered recyclable is subject to frequent changes, producers will have to make predictions about what products and packaging will be considered recyclable by the time products are ready for market. Even if a producer uses materials that are on the SB 54 CMC List, there is no guarantee that the material will be deemed recyclable—and thus compliant—by the time the product is fully developed and distributed for sale. What is deemed recyclable is based on numerous factors and decisions of downstream actors that are beyond the control of any one producer. *See, e.g.*, *supra* ¶ 117 (explaining how gable-top and aseptic cartons have fluctuated between recyclable and non-recyclable under the standards of SB 343 several times). Consequently, a producer's good-faith effort to comply with the 2032 Mandate may nevertheless be undermined by market forces beyond their control or ability to predict.

164. With each update of the SB 54 CMC List, producers will have truncated

timelines in which to come into compliance with the 2032 Mandate. SB 54 does not include an express notice requirement prior to updates to the SB 54 CMC List or grace period before changes go into effect. As a result, producers will have only a short window, if any time at all, in which to comply with changes. For producers that have invested months or years developing new SB 54-compliant products, an unexpected update in the SB 54 CMC List can render the product non-compliant before it is released. This undermines the substantial investments producers put into compliance and threatens to disrupt supply chains for products that consumers depend on.

165. In some cases, products with packaging subject to a change in the SB 54 CMC List may already be in the stream of commerce or on shelves. Producers will have to act rapidly to recall the products or else risk an enforcement action and the resulting penalties. Producers will then have to hastily update their products to align with the new SB 54 CMC List to continue meeting consumer demand. These instantaneous changes to the SB 54 CMC List will place additional burdens on businesses that operate in national or international markets—in order to comply, producers will have to identify which of their products were distributed to California, pull the products off of the shelves, and then redeploy new, compliant products where feasible.

166. A producer attempting to comply with the Recycling Rate Requirement faces similar burdens. Compliance with the requirement begins with an audit of product lines to determine whether plastic products and packaging use covered material that is recycled at the requisite rate. This process is especially tedious, and in some cases, practically impossible where a product could fit within multiple CMCs. Any products and packaging not in compliance will either need to be redesigned where possible, or else withdrawn from California. Because the required recycling rate will increase incrementally, and the Recycling Rate List will be updated "regularly, but no less than once every two years," these burdens must be borne by producers repeatedly. A producer attempting to stay ahead of future changes must engage in the impossible task of predicting what materials will be recycled at the required rate based on decisions of

downstream actors. Thus, as with the 2032 Mandate, producers trying to comply with the Recycling Rate must repeatedly incur the expense of reviewing and updating products and packaging—without any certainty that the end result will comply with the requirement.

167. The Recycling Rate Requirement also places impossible compliance timelines on producers. SB 54 does not contain an express notice provision before the Recycling Rate List is updated. In fact, the Recycling Rate List is explicitly exempted from the Administrative Procedure Act and its related notice and comment requirements. Cal. Pub. Res. Code § 42061(b)(1). The Recycling Rate Requirement also does not require a grace period before updates to the Recycling Rate List take effect. Without any advance warning or time to bring product lines into compliance, producers face the risk of immediately being in violation of the requirement and subject to an enforcement action.

168. Finally, the source reduction requirement creates imminent compliance burdens but lacks navigable criteria. The first source reduction deadline takes effect on January 1, 2027—just months away. Preparing to meet this requirement involves extensive review of product and packaging lines to determine the extent to which businesses must source reduce their wares in order to meet the baseline set by CalRecycle and to identify which materials can feasibly be source reduced. *See* Cal. Pub. Res. Code § 42057(b). However, the SB 54 regulations were not finalized until May 1, 2026. CalRecycle, [Archives] SB 54 Plastic Pollution Prevention and Packaging Producer Responsibility Act Permanent Regulations, available https://calrecycle.ca.gov/laws/rulemaking/sb54regulations/. The draft CAA Program Plan was not released until June 15, 2026. *See generally* CAA Program Plan. Both of these documents provide essential guidance to properly source reduce materials. As a result, publication of these documents mere months before the first source reduction deadline has necessarily impeded producers' ability to source reduce materials with enough time for the PRO to comply with the 2027 deadline.

169. Source-reducing products and packaging without compromising product integrity or risking negative health and safety effects will require immense investment by each producer. Where materials and designs required to properly source reduce a product or packaging do not currently exist, a business must innovate a solution, an especially daunting feat when considering the variety of single-use product and packaging lines.

170. Further, where businesses have grown since 2023—the baseline year—there is no exception or flexibility. They are required to source reduce based on the amount of covered material they sold in 2023. As a result, the source reduction requirement for such businesses exceeds the statutorily mandated percentages. Take for example a producer who sold 100,000 units in 2023 of a product with a plastic package weighing 10 grams each, or a million grams total. Due to economic growth, the product reaches sales of 200,000 units by the end of 2026, i.e., 2 million grams. However, because the baseline is set at the 2023 level, the producer must source reduce to achieve only 900,000 grams. This necessitates source reducing by at least 55 percent, not the ten percent listed in the statute. As a result, the producer must drastically redesign its products, likely with unintended consequences for product functionality and integrity, or else artificially cap sales in California. The inflexibility of the source reduction requirement thus creates unintended consequences that place a disproportionate burden on certain producers, while impairing consumers' ability to access reliable products.

171. Even where substitute materials, designs, and components exist or can be invented, businesses must nevertheless navigate what does and does not qualify as source reduction under SB 54. For example, a business must avoid replacing a recyclable or compostable covered material with a "nonrecyclable or noncompostable covered material or a covered material that is less likely to be recycled or composted." Cal. Pub. Res. Code § 42041(aj). Without definitions of these terms, businesses are left to guess at whether their good faith efforts to source reduce were successful.

172. Source reduction is an ongoing requirement. After a producer source

reduces its current plastic covered material levels to no more than 90 percent of its 2023 levels by 2027, it must then cut that down to 80 percent by 2030 and 75 percent by 2032. *See id.* § 42057(a). SB 54 permits even "greater source reduction" mandates after 2032. *Id.* § 42057(h).

173. Failure to comply with the source reduction requirements exposes businesses to numerous financial and legal consequences. The PRO may charge a producer higher PRO fees, or "malus fees," for failing to properly source reduce. *Id.* § 42053(e). Failure to source reduce could also be grounds for a producer's dismissal from the PRO. *See* Cal. Code Regs. tit. 14, § 18980.6(b)(1) ("A PRO may dismiss producers only for good cause . . . . Good cause for dismissal must be based on substantial noncompliance with the Act or requirements of the PRO plan. Noncompliance is substantial if it causes the PRO to incur financial harm or creates the risk that the PRO or other producers will violate the Act.").

174. Improper or insufficient source reduction also invites an enforcement action brought by CalRecycle pursuant to Public Resources Code section 42081. *See* Cal. Code Regs., tit. 14, § 18980.13(d)(2) (providing that a violation occurs each day during an ongoing failure to satisfy source reduction obligations). An enforcement action may also be brought by private enforcers under the California Unfair Competition Law. Cal. Bus. & Prof. Code §§ 17200 *et seq.*

175. The 2032 Mandate, Recycling Rate Requirement, and source reduction requirement therefore place immense burdens on producers who, despite good-faith efforts to comply, may nonetheless not be able to meet the impossibly short compliance timelines.

**K. SB 54 Imposes Other Financial Burdens.**

176. Producers' funding obligations enable the PRO's implementation of key aspects of SB 54 and thus are largely fixed, including the $500 million annual payment into the Fund. Under SB 54's funding regime, costs cannot be meaningfully adjusted based on the number of producers that fulfill their funding obligations. Accordingly,

participation levels in the PRO directly impact the financial burden imposed on individual registered producers. If the number of registered producers is lower, the share of costs borne by each registered producer is necessarily higher. The resulting financial burden on registered producers is materially greater than it would be if participation levels reached those relied upon by CalRecycle during the rulemaking process.

177. The financial burden on registered producers is further exacerbated by uncertainty around future registrations and the lack of a mechanism for reimbursement. Funding obligations may be assessed and invoiced based on the number of registered producers at that time, but if additional producers subsequently register with the PRO and reduce the allocable shares of all producers, neither SB 54 nor its regulations provide a mechanism for reimbursing payments previously remitted. Therefore, currently registered producers may bear disproportionate financial burdens even if participation levels increase in the future.

178. Although SB 54 authorizes CalRecycle and CDTFA to assess an environmental mitigation surcharge to be paid by producers not participating in the PRO, Cal. Pub. Res. Code § 42064(h), CalRecycle has not explained how such authority will be exercised, how such producers will be identified, or how such assessments will address the inequities between the financial burdens of registered and non-registered producers.

179. Registered producers have begun receiving invoices for early program startup costs. *See* CAA Program Plan at 277. Those costs are necessarily based on current participation levels, which are materially lower than CalRecycle anticipated, imposing disproportionate financial burdens on registered producers. Therefore, registered producers, including many of Plaintiffs' members, face imminent economic injury due to Defendants' inequitable implementation and enforcement of SB 54.

**L. Required PRO Fees Under SB 54**

180. A producer that participates in a PRO must pay a fee to the PRO "to ensure the requirements of [SB 54] are met by the PRO and the [PRO] plan is fully

implemented." Cal. Pub. Res. Code § 42053(a)(1). The fee must be set by the PRO and included in the PRO plan approved by CalRecycle. *Id.*; *id.* § 42051.1(d)(1). The fees must be based on several identified factors and expected costs. *Id.* § 42053(c). The fees can be increased using malus fees and decreased with credits depending on the characteristics of individual products and packaging. *Id.* § 42053(e).

181. Although every producer participating in a PRO is required to pay PRO fees, SB 54 prohibits producers from passing the fees "on to consumers as a separate item on a receipt or invoice." *Id.* § 42053(a)(1).

182. CAA, the only current PRO, plans to begin invoicing PRO fees in 2027 after the PRO plan is approved by CalRecycle. CAA Program Plan at 294-95 (updated June 18, 2026). As soon as producers must pay PRO fees, they will be prohibited under SB 54's surcharge ban from directly communicating to consumers the portion of the price of a product that is attributable to PRO fees.

**M. Pending Litigation Creates Uncertainty Over SB 54.**

183. Multiple lawsuits challenging SB 54 and its implementing regulations are currently pending. In *Nebraska et al. v. Heller*, No. 2:26-cv-02214-CKD (E.D. Cal. June 22, 2026), a coalition of 17 state Attorneys General is challenging the constitutionality of important aspects of SB 54 and the PRO established to implement the statute. A similar challenge was previously tried in Oregon. *See Nat'l Ass'n of Wholesaler-Distribs. v. Or. Dep't of Env't Quality*, No. 3:25-cv-01334-SI (D. Or. July 30, 2025). In *Natural Resources Defense Council et al. v. CalRecycle*, S.F. Sup. Ct. Case No. CPF-26-519769 (filed June 25, 2026), plaintiff environmental organizations are challenging key provisions of the implementing regulations adopted by CalRecycle. That case remains ongoing and includes intervenors directly affected by SB 54.

184. The pending litigation creates significant uncertainty regarding the ultimate viability and implementation of SB 54, including the funding obligations of registered producers. Nevertheless, the funding obligations remain in effect and are expected to be assessed and collected in part before those legal challenges are resolved. CalRecycle has

not provided a mechanism to reimburse payments previously remitted if portions of the statutory or regulatory framework are materially altered.

## LEGAL BACKGROUND

### A. SB 343 Is a Content-Based Regulation of Speech.

185. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.*

186. Content-based restrictions on commercial speech are subject to a heightened standard of review akin to strict scrutiny, the same demanding standard that applies to non-commercial speech. *See, e.g.*, *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 618 (2020); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011); *Int'l Outdoor, Inc. v. City of Troy, Mich.*, 974 F.3d 690, 707-08 (6th Cir. 2020).

187. SB 343 is a content-based regulation of speech. It targets a particular message about the recyclability attributes of a product or packaging—whether expressed in words or in symbols, in declaratory statements or in directions—and it suppresses that message unless it conforms to the State's definition. The law therefore regulates speech based on the "topic discussed" and "message expressed."

188. As a content-based restriction on commercial speech, SB 343 is subject to strict scrutiny, where "it is the rare case . . . that a law survives." *See Burson v. Freeman*, 504 U.S. 191, 211 (1992) (plurality opinion).

189. The consumer confusion that SB 343 spawns means the law is anything but "narrowly tailored." Consumers use on-package instructions and familiar recycling symbols as cues for whether an item belongs in the recycling bin. When those cues are forcibly removed, consumers reasonably infer that the item is not recyclable and should be discarded as waste. But that inference will often be incorrect. Under SB 343, materials

that are recyclable and accepted in a consumer's locale must still be left unlabeled because they fail statewide thresholds unrelated to that consumer's local recycling options.

190. In this way, the law not only removes accurate information from the market, it affirmatively induces a false consumer impression that a product or package without a recyclability label means it is not recyclable.

191. The law also creates the possibility that identical packaging will be labeled "recyclable" in many states but unlabeled in California. Consumers traveling, relocating, or encountering nationally marketed products will observe inconsistent messaging, fostering doubt about what can and cannot be recycled. Such inconsistency increases confusion rather than alleviating it.

192. Another cause for confusion under SB 343 is that the eligibility for being labeled "recyclable" under the statute is a moving target. Statewide collection and sorting practices, for example, can shift over time without any change to the physical product or packaging itself. As statewide recycling infrastructure responds to municipal and county-level changes in curbside collection, sorting, and recycling programs, a product's ability to bear recyclability labeling may shift solely because aggregate metrics rise above or fall below statutory thresholds.

193. Although SB 343 obligates CalRecycle to update the Material Characterization Study every five years, the law authorizes publication of a new report as frequently as CalRecycle finds "additional information that was not available at the time of the most recent . . . study." Cal. Pub. Res. Code § 42355.51(d)(1)(B)(iii). Indeed, since publishing the first Material Characterization Study on April 4, 2025, CalRecycle has updated its findings two more times in less than nine months.

194. A product that consumers have long associated with a chasing arrows symbol could be stripped of that cue upon CalRecycle's publication of a new Material Characterization Study or updated findings. Consumers who encounter different labeling over time for the same product—despite no change in the material or form—

are left uncertain about what "recyclable" means and whether prior disposal instructions remain accurate. As a result, consumer confidence in recyclability messaging is undermined, and with it their willingness to invest the time necessary to participate in the circular economy.

195. When a product's ability to bear recyclability labeling depends not on its material composition but on shifting statewide metrics beyond any individual company's control (or even knowledge), speech becomes contingent and fragile. In this environment, businesses must anticipate not only how those metrics will change, but how they will be interpreted and enforced as well. This creates a situation that is fraught with uncertainty, especially when businesses face the risk of lawsuits and possibly criminal enforcement over allegedly improper recyclability labeling. Some businesses will defensively withdraw all recyclability claims, while others will proceed cautiously by labeling just a select number of eligible recyclable products. The outcome is fragmented and inconsistent recyclability messaging across identical materials, which fuels consumer confusion and hinders California's public policy behind recycling initiatives.

196. Thus, while California may have an interest in providing consumers with accurate information and alleviating confusion "related to how to properly handle the end of life of a product or packaging," Cal. Pub. Res. Code § 42355, the law is certainly not narrowly tailored to that interest.

197. SB 343 also fails strict scrutiny because it is not "the least restrictive means" of achieving California's interest. *See McCullen v. Coakley*, 573 U.S. 464, 478 (2014). To address consumer confusion and improve recycling rates, California could have chosen from any number of less restrictive means than a categorical prohibition on recyclability claims.

198. For instance, the State could have allowed qualified statements about a product's recyclability in certain jurisdictions or additional language advising consumers to consult local recycling guidelines or to recycle the item through a take-

back program, much as the FTC Green Guides instruct. The State could even have required clarifying disclosures rather than banning recyclability statements altogether.

199. The State could have also elected to focus on enforcement of existing laws prohibiting false or misleading advertising on a case-by-case basis, targeting demonstrably deceptive claims without suppressing truthful speech.

200. Undertaking public education campaigns to improve consumer understanding of California's recycling systems is yet another alternative available to the State that does not suppress speech. Such campaigns would help consumers learn whether a product is recyclable without imposing such a broad restriction on speech.

201. For these reasons, SB 343 fails strict scrutiny.

**B. SB 343 Is an Unlawful Restriction of Commercial Speech.**

202. If SB 343 were analyzed under the framework applicable to restrictions on commercial speech, rather than as a content-based restriction on speech, such that the standard of review is intermediate scrutiny, the law still violates the First Amendment.

203. Commercial speech is entitled to First Amendment protection. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976). This protection stems from the understanding that the "free flow of commercial information is indispensable . . . to the formation of intelligent opinions as to how [the free enterprise] system ought to be regulated." *Id.* at 765. Thus, "even speech that does no more than propose a commercial transaction is protected by the First Amendment." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 421 (1993) (citation omitted).

204. In assessing the constitutionality of commercial speech restrictions, courts apply a four-part analysis, which the Supreme Court first articulated in *Cent. Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). Under this test, a restraint on commercial speech that is neither misleading nor related to unlawful activity is subject to an intermediate level of scrutiny, and the restriction is permitted only when it "directly advances" a "substantial" governmental interest and is "not more

extensive than is necessary to serve that interest." *Id.*

205. SB 343 is an unconstitutional restriction on commercial speech under *Central Hudson*.

206. The law's restriction on speech does not concern unlawful activity. The speech at issue does not propose unlawful activity, nor does any law prohibit recycling of products or packaging covered under SB 343.

207. The law does not regulate misleading speech either, contrary to the built-in premise that any recyclability statement is automatically deemed "deceptive or misleading" unless the product or packaging meets the State's complex, rigid, and unverifiable criteria.

208. In defining the commercial speech doctrine, the U.S. Supreme Court distinguishes between "inherently misleading" speech and "potentially misleading" speech. *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106-07 (9th Cir. 2004) (citing *In re R.M.J.*, 455 U.S. 191, 202-03 (1982)). When the speech is "inherently likely to deceive or where the record indicates that a particular form or method of advertising has in fact been deceptive," it enjoys no First Amendment protection. *Id.* at 1107 (quoting *R.M.J.*, 455 U.S. at 202-03). But if the speech is only potentially misleading—that is, "if the information also may be presented in a way that is not deceptive"—the speech regulation must satisfy the three remaining *Central Hudson* factors. *Id.* (quoting *R.M.J.*, 455 U.S. at 203).

209. Recyclability claims for products that do not meet the 60/60 threshold or other criteria imposed by the State are not inherently misleading. In jurisdictions where consumers have access to recycling facilities, statements subject to SB 343 accurately inform the consumer that the product is recyclable. Meanwhile, in locales with less recycling infrastructure, use of the same terms could be misleading. As a result, use of the regulated terms is only potentially misleading.

210. Take the current state of "Non-CRV Gable-top Cartons," for example. These are the classic cartons with pointy, peaked tops, often used to contain milk or

juice, which are not subject to the State's "California Redemption Value" deposit program. Seventy-four percent of California's population has access to curbside recycling programs that collect Non-CRV Gable-top Cartons. 2025 MCS at 20. Gable-top Cartons are sorted by LVTP facilities in 53 percent of counties. December MCS Update Letter at 2. Based on CalRecycle's studies, therefore, these cartons are collected and sorted for recycling in a majority of the state according to the parameters of SB 343. Claiming that they are recyclable in any of these municipalities would "accurately inform the consumer" that the product is recyclable. Such a claim is therefore only potentially misleading because it may be made in an area where Gable-top Cartons are not sorted at that time, though they may be sorted in those areas in the near future.

211. At worst, SB 343 regulates speech that is only *potentially* misleading. All of the identifiable materials surveyed by CalRecycle in the Material Characterization Study are collected in curbside recycling programs. 2025 MCS at 19-24. The majority of these materials are sorted for recycling by LVTP facilities. *Id.* at 25-29. However, the law prohibits *any form* of recyclability claim for any material that does not meet each requirement of the law. This prohibition precludes any sort of disclaimer that would indicate that the product is recyclable depending on the jurisdiction. For example, the law arguably may prevent businesses from using How2Recycle labels. *See* How2Recycle, A Smarter Labeling System, https://how2recycle.info/. These labels help the consumer understand that a product may not be recyclable in their jurisdiction while providing them with information like the product material and a website to learn more about their jurisdiction's recycling rules. These labels are perfectly accurate statements of a material's recyclability, even for materials that do not meet the 60/60 threshold or other criteria required by SB 343.

212. Accordingly, because the term "recyclable" and related terms are at worst "merely potentially misleading," intermediate scrutiny is appropriate.[3] *See Am. Acad. of*

---

[3] Plaintiffs contend that SB 343 is a content-based restriction on commercial speech and thus subject to heightened scrutiny. If the Court decides that SB 343 is content-neutral, then Plaintiffs contend in the alternative that the Court should apply

*Pain Mgmt.*, 353 F.3d at 1108. "[W]here, as with the blanket ban involved here, truthful and nonmisleading expression will be snared along with . . . deceptive commercial speech, the State must satisfy the remainder of the *Central Hudson* test." *Edenfield v. Fane*, 507 U.S. 761, 768-69 (1993).

213. Although California identified a substantial government interest when passing SB 343, the law fails the remaining two prongs of *Central Hudson*. "California's burden under this test is heavy, . . . and the Attorney General cannot satisfy it by mere speculation or conjecture." *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1176 (9th Cir. 2018) (citation modified). Defendant Bonta "must demonstrate that the harms [he] recites are real and that [the speech] restriction will in fact alleviate them to a material degree." *Id.* at 1177 (quoting *Edenfield*, 507 U.S. at 770-71).

214. Under the third *Central Hudson* factor, as shown by the examples above, SB 343 does not directly advance California's interest in providing consumers with "accurate and useful information related to how to properly handle the end of life of a product or packaging." *See* Cal. Pub. Res. Code § 42355.5. At best, the law provides "only ineffective or remote support" for the State's objective. *Central Hudson*, 447 U.S. at 564. It will often result in consumers having less accurate and useful information. Thus, it does not "directly advance the state interest involved." *Id.*

215. Nor does the law directly or materially improve landfill diversion. Because recycling requires informed consumer participation, SB 343's erasure of familiar recycling guidance from large swaths of packaging cannot logically increase the rate at which material is diverted from landfills. To the contrary, the law only increases the risk that recyclable materials will be discarded as waste, where they will be "landfilled, incinerated, or dumped into the environment." Senate Comm. on Env't Quality, *SB 343 Analysis*, Reg. Sess., at 6 (Cal. 2021-2022), available https://senv.senate.ca.gov/sites/senv.senate.ca.gov/files/sb343_pca_v3.pdf.

216. Similarly, non-curbside recycling programs will face diminishing recycling

---

intermediate scrutiny, which SB 343 would fail.

rates. Materials collected through non-curbside programs—such as take-back and store drop-off programs—are not considered recyclable unless 60 percent of the relevant product is collected by the program. Cal. Pub. Res. Code § 42355.51(d)(5)(A). This threshold jumps to 75 percent after January 1, 2030. *Id.* § 42355.51(d)(5)(B). Non-curbside programs fill notable gaps in curbside recycling programs, even when these programs do not collect and sort covered materials above the legally mandated threshold. But because of SB 343, many non-curbside programs will no longer be able to communicate to consumers that covered products are recyclable. This precludes a statement like "Store Drop-off" accompanied by a chasing arrows symbol. This in turn will suppress consumer participation in non-curbside programs and reduce recycling rates, contrary to the goals of the law. In more practical terms, it will become virtually impossible for these items to reach the 60 percent threshold, let alone the 75 percent threshold, if businesses must initially remove all "recyclable" claims and recycling instructions.

217. And under the fourth *Central Hudson* factor, the law is "more extensive than is necessary to serve [California's] interest." *Italian Colors*, 878 F.3d at 1176. Proof of this is in the availability of "numerous and obvious less-burdensome alternatives" to the law's categorical ban on speech, *id.* at 1178, including allowing qualified statements, requiring certain disclosures, and carrying out a government-funded public awareness campaign. The availability of these options "renders [the] speech restriction overinclusive," and thus more extensive than necessary. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 825 (9th Cir. 2013). After all, "restricting speech should be the government's tool of last resort." *Id.* at 826. If the State can achieve its interests "in a manner that does not restrict speech, or that restricts less speech, [it] must do so." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371 (2002) (citation omitted).

218. For these reasons, SB 343 fails intermediate scrutiny.

**C. SB 343 Is Void for Vagueness.**

219. The Due Process Clause of the Fourteenth Amendment "requires the

invalidation of laws that are impermissibly vague." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citation omitted).

220. When speech is concerned, "rigorous adherence" to vagueness principles "is necessary to ensure that ambiguity does not chill protected speech." *Fox Television*, 567 U.S. at 253-54.

221. The definition of "recyclable" as set out in the law is unconstitutionally vague.

222. A material is only recyclable if it meets the 60/60 threshold and "is of a material type and form that routinely becomes feedstock used in the production of new products or packaging." Cal. Pub. Res. Code § 42355.51(b). To identify what materials are routinely used in new products and packaging, the law requires CalRecycle to promulgate regulations to gather data about materials that are collected and recovered. *Id.* § 42355.51(d)(1)(A). The data is publicly available in the Recycling and Disposal Reports. The law also requires CalRecycle to undertake the Material Characterization Study to achieve this goal. *Id.* § 42355.51(d)(1)(B). However, the required regulations only gather data on how much feedstock is sent to end-users, but provide no information on whether the feedstock is used to produce new products or packaging. *See, e.g.*, Cal. Code Regs. tit. 14, § 18815.7. They also do not gather data on alternative collection systems. Similarly, the Characterization Study does not provide data on what happens to materials after they are sorted at LVTP facilities. *See* 2025 MCS at 2 ("[This report] does not provide information on the destination or ultimate disposition of materials sorted and sold by LVTP facilities."). Without this information, businesses have no way of knowing what materials "routinely become[] feedstock used in the production of new products or packaging." They are given an incomplete set of data and left to guess at what is missing in hopes of complying with the law.

223. SB 343's prohibition on recyclability claims unless the material meets the Basel Convention criterion in section 42355.51(d)(2)(B)(i) of the Public Resources Code is also unconstitutionally vague. This criterion requires the product or packaging be "sent to and reclaimed at a reclaiming facility consistent with the requirements of the Basel Convention." Cal. Pub. Res. Code § 42355.51(d)(2)(B) ("Basel Criterion").

224. However, neither the law's text nor subsequent implementing regulations explain what it means to be "consistent with" the Basel Convention, the requirements of which are embedded in a highly complex and evolving body of international law—one that does not even apply to the United States, which has not ratified the Basel Convention.[4]

225. CalRecycle's latest Material Characterization Study "does not provide information on the destination or ultimate disposition of materials sorted and sold by LVTP facilities," as needed for the Basel Criterion. *See* 2025 MCS at 2. Indeed, the study expressly states that, because it "does not provide information regarding [the Basel Criterion], it does not contain all the information necessary to determine the recyclability status for any particular product or packaging." *Id.* at 3. "To make such a determination," the State tells regulated businesses, "entities will require additional information." *Id.* Precisely what additional information is needed and how businesses can obtain it is left a mystery.

226. CalRecycle again acknowledged the lack of information about the Basel Convention and end markets in an FAQ released in 2025. CalRecycle, SB 343: Frequently Asked Questions, at 4 (August 2025) ("SB 343 FAQ"), available https://calrecycle.ca.gov/wcs/recyclinglabels/. The FAQ promises that CalRecycle "will publish additional information when sufficient data relevant to characterizing the

---

[4] According to the U.S. State Department: "The United States signed the Basel Convention in 1990. The U.S. Senate provided its advice and consent to ratification in 1992. The United States, however, has not ratified the Convention because it does not have sufficient domestic statutory authority to implement all of its provisions." U.S. Dep't of State, Basel Convention on Hazardous Wastes, https://www.state.gov/key-topics-office-of-environmental-quality-and-transboundary-issues/basel-convention-on-hazardous-wastes.

ultimate destination of different material types and forms becomes available." CalRecycle admits that it does not have this information. If CalRecycle, with the resources of the State of California, does not know, businesses cannot be expected to learn this information, let alone comply with the requirements under SB 343 regarding the Basel Convention and end markets.

227. SB 343 dictates assessments of recyclability based on a product or packaging's "material type and form," yet not all materials fall neatly within a specific material type and form. CalRecycle created a list of material types and forms that categorizes materials by class, code, name, definition, and examples of products or packaging that ostensibly fit that type and form. CalRecycle, SB 343 Material Characterization Study Final Findings – 2023/2024 Appendix 1 – Methodological Details & Data Tables, 42 (2025) (the "2025 MCS Appendix"), available https://www2.calrecycle.ca.gov/Docs/Publications/Details/1751. However, not all materials cleanly fit within these categories. A material may fit the description of one material type and form, but better align with the example provided for a separate material type and form. Other material type and form categories include undefined terms or are defined according to how the product is used. For example, the 2025 MCS Appendix explains that the category Aluminum Foil Molded Containers includes "molded trays that are relatively free of food and other contamination." *Id.* at 51. But SB 343 does not define the phrase "relatively free of food and other contamination." *Id.* This explanation also hinges the categorization of the material on how the product is handled by the consumer, which is outside of the control of any business. A business, having no way of determining the correct material type and form, must instead guess or, more likely, avoid the risk of claiming the product or packaging is recyclable.

228. Additionally, many materials are defined by size, but the law offers inconsistent standards by which to measure materials. CalRecycle "recommends that manufacturers consider industry standards when determining the appropriate material type and form, including the Association of Plastic Recyclers [APR] Design Guide's

'Evaluation of the Size Sorting Potential for Articles with at Least 2 Dimensions Less than 2 Inches.'" SB 343 FAQ at 4. However, certain material categories are defined by size apart from the APR guidelines. If a product is too small for sorting according to the definitions in the 2025 MCS Appendix, but is sortable according to the APR guidelines, it is unclear whether the product may be considered sortable. For example, "Remainder/Composite Plastic" is a defined material type and form that "[i]ncludes plastic fragments smaller than two inches if easily identifiable as plastic." 2025 MCS Appendix at 84. If a plastic product is smaller than two inches but is sortable according to the guidelines, it is unclear whether the product may be considered in a category other than Remainder/Composite Plastic. Remainder/Composite Plastic does not meet the 60/60 threshold, and so is not considered recyclable under SB 343. 2025 MCS at 23, 28. This categorization can thus be determinative of whether a product is recyclable. Once again, businesses are forced to choose between communicating recyclability to consumers, or otherwise guessing and risking litigation. Fundamentally, businesses are left to guess at how to comply with this provision of SB 343.

229. Finally, businesses that use non-plastic products and packaging have no way to know which components would prevent recyclability of a product. SB 343 requires that "[f]or plastic products and non-plastic products and packaging, the product or packaging is designed to ensure recyclability and does not include any components, inks, adhesives, or labels that prevent the recyclability of the product or packaging." Cal. Pub. Res. Code § 42355.51(d)(3)(B). The law separately clarifies that plastic packaging should be designed "according to the APR Design® Guide published by the Association of Plastic Recyclers." *Id.* § 42355.51(d)(3)(A). However, the law omits any practicable standard businesses can follow in designing recyclable plastic products and non-plastic products and packaging. This information is also not accessible to businesses; whether a component renders a product non-recyclable is determined at individual facilities that collect, sort, and transfer materials. Once again, businesses are forced to choose between communicating recyclability to consumers, or otherwise guessing and risking litigation.

230. Without this information, businesses have no notice of what materials are recyclable under the law. Without this information, businesses are left to guess whether their recyclable packaging that bears a chasing arrows symbol will invite lawsuits. This is the hallmark of an unconstitutionally vague law. *Fox Television*, 567 U.S. at 253-54.

231. Given the civil and criminal punishments businesses face for guessing wrong, many of them will have no option but to scrub their products of any hint of recyclability messaging and stay silent, even if the products are in fact recyclable. This is exactly the chilling effect that the vagueness doctrine seeks to avoid. It also shows, in stark relief, how SB 343 does not further its own stated goals.

232. Commercial speakers "cannot be made to wait" in limbo "before being able to speak with a measure of security." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 793-94 (1988). With each enforcement action against a business that ventured to truthfully inform its customers that their product can be recycled, they "must bear the costs of litigation and the risk of a mistaken adverse finding . . . even if the [business] . . . believe[s] that the [product] was in fact [recyclable]." *See id.* Not only does "[t]his scheme [] necessarily chill speech in direct contravention of the First Amendment's dictates," it is also unconstitutional under the Due Process Clause of the Fourteenth Amendment. *Id.*

### D. The 2032 Mandate and Recycling Rate Requirement of SB 54 Are Void for Vagueness.

233. As previously stated, a law that "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement" is void for vagueness. *Williams*, 553 U.S. at 304. This is true even for an economic regulation that does not directly regulate speech. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.*, Inc., 455 U.S. 489, 498 (1982).

234. The definition of "recyclable" in the 2032 Mandate is unconstitutionally vague.

235. Producers have no notice of what products and packaging are recyclable. CalRecycle released an updated SB 54 CMC List on December 31, 2025. CalRecycle, Update to Covered Material Category (CMC) List (Dec. 31, 2025), available https://www2.calrecycle.ca.gov/Docs/Publications/Details/1764. Embedded in the SB 54 CMC List is a determination of categories of materials CalRecycle considers recyclable pursuant to Public Resources Code section 42061(c). *Id.* at 3. However, the SB 54 CMC List expressly acknowledges that the List does not "consider PRC Sections 42355.51(d)(3) through (d)(6), which apply only to specific products, not categories of materials." *Id.* Businesses are therefore left to make an independent, product-by-product determination of recyclability. *See id.* at 12 n.4 ("Inclusion on this list reflects category-based evaluations of recyclability and compostability and does not constitute a product-specific determination of recyclability or compostability.").

236. Neither the text of SB 54 nor the corresponding regulations set out sufficiently clear standards to allow businesses to determine which products are recyclable. For example, SB 54 requires that plastic products and non-plastic products and packaging are "designed to ensure recyclability." *See* Cal. Pub. Res. Code § 42355.51(d)(3)(B). This requirement is pulled verbatim from SB 343 without further refinement in the text of SB 54 or regulations. What "designed to ensure recyclability" means, without more, will leave producers to guess at compliance.

237. Similarly, SB 343 requires that non-plastic products and packaging not "include any components, inks, adhesives, or labels that prevent the recyclability of the product or packaging." *Id.* § 42355.51(d)(3)(B). While the regulations provide some clarification for how to determine whether a component, ink, adhesive, or label prevents the recyclability of *plastic* products and packaging, *see* Cal. Code Regs., tit. 14, § 18980.3(c), no such guidance is provided for non-plastic products or packaging. This requirement of SB 54 is therefore unconstitutionally vague for the same reasons it is vague under SB 343.

238. Even where the SB 54 regulations provide some modest clarification about

how to apply the APR Design® Guide to plastic products and packaging, they do not include additional guidance to resolve the inconsistent size requirements for recyclable materials discussed previously. Properly measuring the size of a material can be outcome-determinative for the recyclability of a product. Yet CalRecycle provides different standards that do not produce consistent size determinations. As a result, producers are left without guidance on how to assess a product's recyclability.

239. Producers also lack notice of changes in recyclability rates of CMCs. CalRecycle must update the SB 54 CMC List "*at least* annually until January 1, 2032." Cal. Pub. Res. Code § 42061(e) (emphasis added). After January 1, 2032, CalRecycle must update the SB 54 CMC List "regularly, but *no less than* once every two years." *Id.* (emphasis added). Not only does the statute require frequent updates to the SB 54 CMC List, it also expressly allows for additional updates beyond what is required. Neither the text of SB 54 nor the regulations require that CalRecycle provide notice of when the SB 54 CMC List will be updated or when the updated SB 54 CMC List will take effect. Because the SB 54 CMC List is subject to frequent updates without advance notice, producers face the recurring threat of products suddenly being rendered non-recyclable. Producers will then have an impossibly short timeline on which to remove noncompliant items from the shelves or else face civil penalties.

240. Producers of materials collected through non-curbside programs also lack notice of what is required to comply with the 2032 Mandate. The SB 54 regulations consider an item recyclable for the purposes of the 2032 Mandate if the product meets the requirements of Public Resources Code section 42355.51(d)(5), *see* Cal. Code Regs., tit. 14, § 18980.3(b)(2), which requires that a material recovered through a non-curbside program be recovered at a rate of at least 75 percent and have "sufficient commercial value to be marketed for recycling and be transported at the end of its useful life to a transfer, processing, or recycling facility." Cal. Pub. Res. Code § 42355.51(d)(5). As discussed previously, "sufficient commercial value" is an undefined phrase that gives producers no notice of the threshold at which materials are in compliance. As such,

producers that seek to comply with the 2032 Mandate via alternative methods face similar unascertainable requirements.

241. The covered material categories as defined are ambiguous such that a producer has no notice of what is required to comply with the 2032 Mandate and Recycling Rate Requirement.

242. Before determining whether a product is recyclable for the purposes of the 2032 Mandate, or recycled at the rate required by the Recycling Rate Requirement, a producer must first identify the CMC of the product or packaging at issue. However, the CMCs as currently defined by CalRecycle are not sufficiently clear to allow producers to make that determination. In some cases, the CMC definitions and examples are contradictory. In other cases, more than one CMC could apply to a single product or packaging. The difference between one CMC and another can be decisive in determining compliance.

243. Because many of the CMCs are prohibitively imprecise, producers are unable to make the threshold determination necessary to identify whether their products and packaging are recyclable and recycled at the required rate. They are thus left to guess whether their products and packaging are compliant. Yet guessing comes with the risk of enforcement actions by CalRecycle and private enforcers, along with the threat of hefty civil penalties. The CMCs and requirements of SB 54 that depend on them are therefore void for vagueness.

244. Producers must comply with the 2032 Mandate despite the complete lack of measurable standards by which they can ascertain compliance. Yet failure to comply with SB 54 threatens the imposition of civil penalties of up to $50,000, accruing daily. SB 54 also does not require that violations of the 2032 Mandate or Recycling Rate Requirement be intentional or knowing, making it effectively a strict liability violation. *Cf. Colautti v. Franklin*, 439 U.S. 379, 395 (1979) (observing that the "Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*") (collecting cases)

*abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). In sum, producers must forego selling products with covered materials or else guess at the meaning of the indeterminate provisions of SB 54 described above and risk inordinate civil penalties. The 2032 Mandate and Recycling Rate Requirement in SB 54 are therefore void for vagueness.

### E. The Recycling Rate Requirement Invites Arbitrary Private Enforcement.

245. A law is vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304 (citation omitted). A law invites discriminatory enforcement when it "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). Vagueness concerns are also implicated when a law allows for private enforcement of an ambiguous law. *See Brown v. Kemp*, 86 F.4th 745, 775 (7th Cir. 2023) ("If the uncertainty and threat of arbitrary enforcement by public officials were not enough, plaintiffs are also subject to arbitrary enforcement at the hands of [private parties].").

246. The Recycling Rate Requirement of SB 54 invites private enforcement actions without clear standards, and is therefore void for vagueness.

247. SB 54 permits a producer to demonstrate compliance with the Recycling Rate Requirement "by submitting to the department evidence that the particular type of covered material meets the applicable recycling rate by reference to a recycling rate on the department's list." Cal. Pub. Res. Code § 42061(f)(2). However, this method of demonstrating compliance appears to only apply in enforcement actions brought by CalRecycle. This open-ended provision stands in sharp contrast to Public Resources Code section 42061(e), which states that a CMC listed on the SB 54 CMC List "shall be deemed to be compliant" with the 2032 Mandate. This strong statement necessarily covers all enforcement actions under the 2032 Mandate. From this comparison, SB 54

provides a permissive means of demonstrating compliance with the Recycling Rate Requirement in actions in which CalRecycle is involved, but provides no clear means of demonstrating compliance in an action brought by a private enforcer.

248. Without a clear method of demonstrating compliance with the Recycling Rate Requirement, producers face the threat of private enforcement actions based on subjective calculations of the recycling rate for a given material. SB 54 empowers CalRecycle to determine recycling rates in consideration of a number of different sources of data. *Id.* § 42061(b)(2); Cal. Code Regs., tit. 14, § 18980.3.2(b)(4). No such guidelines are provided for establishing recycling rates to determine compliance in a private enforcement action. This leaves private enforcers with unbridled discretion to produce a recycling rate favorable to their position.

249. Even if a court required private enforcers to use the data sources identified in the statute and regulations, private enforcers would still have the discretion to use the data points that yield the lowest recycling rate for a given product or packaging. And unlike in enforcement actions brought by CalRecycle, producers will not have even the slightest notice of the recycling rate deemed appropriate by a private enforcer. Private enforcers are therefore left with immense discretion to allege a violation of the Recycling Rate Requirement. As a result, producers are left to guess at the various data points that will be used against them by private enforcers claiming civil penalties.

250. The Recycling Rate Requirement fails to describe how producers can demonstrate compliance with the requirement in private enforcement actions, inviting arbitrary enforcement. The provision is therefore unconstitutionally vague.

**F. The Source Reduction Requirement Is Void for Vagueness.**

251. The source reduction requirement is void for vagueness because the undefined terms "nonrecyclable" and "less likely to be recycled" are indeterminate and fail to provide businesses with notice of what conduct is prohibited. *See Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily

guess at its meaning and differ as to its application violates the first essential of due process of law.")

252. Under SB 54, each producer is required to source reduce plastic covered materials. Cal. Pub. Res. Code §§ 42050(a), 42057(a). The law expressly prohibits producers from source reducing or lightweighting by "[r]eplacing a recyclable or compostable covered material with a nonrecyclable or noncompostable covered material or a covered material that is less likely to be recycled or composted." *Id.* §§ 42041(aj)(1); *see also id.* § 42041(*l*).

253. However, "nonrecyclable" is not defined in the statute or the corresponding regulations. Producers are left to assume that nonrecyclable for the purposes of source reduction means any covered material that is not "recyclable" as defined in SB 54. But "recyclable" is defined in different ways in SB 54 and the regulations. For example, SB 54 states that a "[c]overed material is deemed recyclable if it meets the requirements of Section 17989.2 of Title 14 of the California Code of Regulations, as that section existed on January 1, 2023, and Section 42355.51." *Id.* § 42061(c). The regulations provide that "a covered material category shall be considered recyclable only if all covered material items within the category necessarily satisfy the categorical requirements for being considered recyclable as set forth in" Public Resources Code section 42355.51(d)(2). Cal. Code Regs., tit. 14, § 18980.3(a). The regulations also say how the APR Design® Guide should be applied to determinations of what components, inks, adhesives, or labels of plastic covered materials "prevent recyclability." *Id.* § 18980.3(c).[5]

254. If what is nonrecyclable depends on the definition of recyclable set out in Public Resources Code section 42061(c), a business must be able to interpret this definition of recyclable to source reduce lawfully. But for reasons stated above and throughout this complaint, this definition of "recyclable" is unconstitutionally vague, and by extension, so is the term nonrecyclable.

[5] For the limited purposes of ascertaining compliance with the 2032 Mandate, SB 343 more narrowly defines "recyclable." *See* Cal. Pub. Res. Code § 42061(e); Cal. Code Regs., tit. 14, § 18980.3(b).

255. What is recyclable in the context of source reduction depends on what is recyclable under SB 343. Cal. Pub. Res. Code § 42061(c). Although CalRecycle is required to continue updating the SB 54 CMC List indicating which CMCs are deemed recyclable, SB 54 does not state that what is on this list is determinative of whether a CMC is recyclable.[6] And despite the statutory requirement that the SB 54 CMC List include CMCs "identified by the department and considered recyclable pursuant to" Public Resources Code section 42355.51(d), the SB 54 CMC List is incomplete. *See* Cal. Pub. Res. Code § 42061(c). Indeed, the SB 54 CMC List issued on December 31, 2025, admits that "[t]his evaluation does not address the destination or ultimate disposition of materials sorted and sold by large volume transfer/processing facilities," which necessarily means the SB 54 CMC List does not account for compliance with the Basel Convention. SB 54 CMC List at 3. The SB 54 CMC List also does not "consider PRC Sections 42355.51(d)(3) through (d)(6)." *Id.* at 3. A key requirement for an item to be deemed recyclable under SB 343 and SB 54 is that it "is designed to ensure recyclability," yet the regulations do not indicate how producers can ensure recyclability. Cal. Code Regs., tit. 14, § 18980.3(c).

256. As a result, businesses will have to determine whether a material complies with various provisions of SB 343, including the Basel Convention and "ensure recyclability" provisions. However, a business is no better positioned to assess compliance with the Basel Convention in the context of SB 54 than under SB 343. *See supra* ¶¶ 223-226. Because businesses have no guidance on what must be done to comply with the Basel Convention or ensure that components, inks, adhesives, or labels of a product or packaging are recyclable, what is recyclable under SB 54 is vague. Producers attempting to meet their source reduction targets are thus left to ascertain compliance with one eye shut.

---

[6] In contrast, what is recyclable for the purposes of the 2032 Mandate appears to start with a consideration of what is on the SB 54 CMC List rather than an independent evaluation of compliance with the provisions under Public Resources Code section 42355.51(d).

257. Additionally, the SB 54 CMC List "shall include covered material categories identified by the department and considered recyclable pursuant to subdivision (d) of Section 42355.51," but the "routinely" requirement is set out in section 42355.51(b). Cal. Pub. Res. Code § 42061(c). This leaves producers guessing at what materials "routinely become[] feedstock used in the production of new products or packaging" without any guidance from CalRecycle. *Id.* § 42355.51(d)(1). CalRecycle even concedes that its SB 54 CMC List "does not address the destination or ultimate disposition of materials sorted and sold by large volume transfer/processing facilities." SB 54 CMC List at 3. Thus, the indecipherable "routinely" requirement of SB 343 renders the definition of recyclable in SB 54 vague. *See supra* ¶ 222. And where producers have no notice of what is recyclable under SB 54, they consequently have no notice of what is nonrecyclable for the purposes of source reduction. The source reduction requirement, which prohibits lightweighting covered material by moving to "nonrecyclable" materials, is therefore void for vagueness.

258. Just as producers have no notice of what is "nonrecyclable," they also have no means of discerning what materials are "less likely to be recycled" for the purposes of source reduction and lightweighting. Does this refer to a comparison of recycling rates? Sortation rates? Collection rates? Producers are left to guess at what materials may or may not be appropriate for source reduction.

259. Although the term "recycled" is defined in the statute, it hinges entirely on what covered materials are sent to responsible end markets. Cal. Pub. Res. Code § 42041(aa)(3) ("To be considered recycled, covered material shall be sent to a responsible end market."). Determining how responsible end markets will be identified is the responsibility of the PRO. *Id.* § 42041(ad); Cal. Code Regs., tit. 14, § 18980.4.1(a). The PRO has outlined its process to identify responsible end markets, but has not yet identified any responsible end markets that comply with SB 54 and the regulations. *See* CAA Program Plan at 187-95. CalRecycle has also previously affirmed that responsible end markets have not yet been identified. SB 54 CMC List at 2, 4 ("The amount recycled

does not consider whether material reaches responsible end markets given that responsible end markets have not yet been identified for the purposes of the Act.”). As a result, the recycling rates published by CalRecycle do not indicate which CMCs are “recycled” as defined by SB 54. This deprives producers of a means to assess whether a material is “less likely to be recycled,” hindering their ability to source reduce products and packaging.

260. Similarly, an end market is only considered a *responsible* end market if the end market achieves the recycling yield identified by the PRO. Cal. Code Regs., tit. 14, § 18980.4(a)(4). However, “the methodology for measuring yield is not standardized, and yield can vary significantly across different recycling processes, even when the same material is being handled.” CAA Program Plan at 194. As a result, the recycling rate for a single material can vary depending on which end market the material reaches and how the material is thereafter used. These downstream events are beyond the knowledge of any producer at the time a product is placed on the market. This precludes producers from understanding the recycling yield of a given material, and ultimately, whether the material is likely to be recycled. And because the PRO has yet to identify responsible end markets, the various methodologies available to calculate the recycling yield for a given material invite arbitrary enforcement by CalRecycle and private enforcers.

261. Even if responsible end markets were identified, producers still lack notice of what actions are prohibited when trying to source reduce. Whether a product is or is not recycled depends on a lot more than its material and design. Numerous intervening factors can hinder recycling, including how a product or packaging is handled by distributors and retailers, treated, disassembled, and cleaned by consumers before disposal, and collected, sorted, processed, and transported by waste processors. Additionally, even if the covered material used in the product or packaging qualifies as “recycled,” it may nonetheless contain components for which the recycling rate is unknown or unknowable.

262. What is recycled also varies depending on where the product is collected

and ultimately processed. Producers, like the PRO, lack the ability to verify whether an end market, which may be based in other states or countries, qualifies as a *responsible* end market. CAA Program Plan at 188. Thus, innumerable downstream events await a product after its sale or distribution that can prevent the product from reaching a responsible end market.

263. Further, through CalRecycle's audit process, an end market can suddenly lose its "responsible" end market status, such that "any covered material sent to that end market thereafter shall not be considered recycled for purposes of compliance with the Act." Cal. Code Regs., tit. 14, § 18980.4.2(e). Yet if a producer source reduces a product or packaging in a way that uses a material that is eventually delisted through the audit process, the producer has failed to properly source reduce the product or packaging. For example, it is possible that a producer's only viable option to source reduce is to shift a plastic covered material to a nonplastic material such as a metal or paper material. Despite the producer's best effort to ensure the new material is not less likely to be recycled, market forces may cause the material to be delisted as recycled by a responsible end market in the intervening period. In such a case, the failure to properly source reduce may not be known until after the product is distributed or sold in California, but before it is sent to a delisted end market. Despite this unpredictability, the producer would have failed to source reduce, increasing the likelihood that they are in violation of SB 54.

264. By defining source reduction to exclude use of materials that are "less likely to be recycled," SB 54 places a series of indeterminate, undefined requirements on producers. Yet the first source reduction deadline is rapidly approaching. By January 1, 2027, producers and the PRO are responsible for source reducing by 10 percent. Cal. Pub. Res. Code §§ 42050, 42057. Failure to comply with the source reduction requirement can result in breach of a producer's binding agreement with the PRO, imposition of malus fees, dismissal from the PRO, and civil penalties under SB 54 or the UCL. *See* Cal. Pub. Res. Code §§ 42057(a), (e); *id.* § 42081; Cal. Code Regs., tit. 14, § 18980.6(b). Without sufficient clarity of what exactly is forbidden in the source

reduction process, producers are blindly creating source reduction goals in individual source reduction plans and reconfiguring entire lines of products and packaging with the hope that once responsible end markets are identified, they will not be deemed to have inadvertently replaced a recyclable plastic covered material with a nonplastic covered material that is less likely to be recycled. Producers must also make these changes without knowing how downstream events may influence whether a product or packaging is recycled, and how changing recycling rates can affect whether an item is deemed recycled well after it is designed and produced at scale. Without a sufficiently clear standard, producers "must necessarily guess at" the meaning of this prohibition, which will likely lead producers, CalRecycle, and private enforcers to different applications of the law. The requirement therefore fails to provide notice of what is prohibited and is void for vagueness.

**G. The 2032 Mandate of SB 54 Violates Procedural Due Process.**

265. Under the Due Process Clause of the Fourteenth Amendment, no state shall deprive any person of property without due process of law. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950).

266. A law does not provide adequate process if it does not afford "those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements." *See United States v. Locke*, 471 U.S. 84, 108 (1985).

267. The 2032 Mandate does not provide producers with adequate notice, nor does it allow producers a reasonable opportunity to comply. Yet failure to comply can result in civil penalties. The 2032 Mandate therefore deprives producers of property without due process.

268. Whether a product or packaging is recyclable under the 2032 Mandate depends in part on whether it is of a material included on the SB 54 CMC List maintained by CalRecycle. Cal. Pub. Res. Code §§ 42061(c), (e). However, a material category is no longer recyclable under the 2032 Mandate if CalRecycle removes that covered

material category from the SB 54 CMC List. *Id.* § 42061(e). Thus, changes to the SB 54 CMC List directly impact whether products and packaging are "recyclable" for the purposes of the 2032 Mandate.

269. The SB 54 CMC List is subject to frequent changes. CalRecycle must re-evaluate the SB 54 CMC List "regularly, but no less than once every two years" after January 1, 2032. *Id.* § 42061(e). With each change, the recyclability of a given material category is in jeopardy.

270. Despite the frequent changes to the SB 54 CMC List required by SB 54, there is no express notice provision before CalRecycle may update the list. Further, there is no grace period during which a producer may update its existing products and packaging before being deemed out of compliance with the 2032 requirement. Once a covered material category is removed from the list, all products and packaging made of that material are no longer recyclable. Updating products and packaging to use only "recyclable" materials is a feat that takes producers months or years. If producers have already placed products into the stream of commerce, updating them to align with changes to the SB 54 CMC List is a practical impossibility.

271. Yet because there is no grace period, a producer whose non-recyclable products are already being sold, distributed, or imported into California is in violation of the 2032 Mandate. At that point, the producer is subject to an enforcement action brought by CalRecycle or an action brought under the UCL by a private enforcer. Once CalRecycle provides a producer of notice of an enforcement action, the producer has only 30 days until hefty civil penalties begin accruing. *Id.* § 42081(a)(3). There is no similar delay in UCL claims. In both types of actions, producers face the threat of steep, compounding civil penalties.

272. As a result, producers face the threat of significant civil penalties despite being provided with no notice or time to comply with the 2032 Mandate. SB 54 will thus result in deprivations of property without due process of law.

**H. The Recycling Rate Requirement of SB 54 Violates Procedural Due Process.**

273. As stated above, the Due Process Clause of the Fourteenth Amendment protects against deprivations of property without due process of law.

274. The Recycling Rate Requirement does not provide producers with "a reasonable opportunity to familiarize [themselves] with [SB 54's] terms and to comply." *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982).

275. A producer can demonstrate compliance with the Recycling Rate Requirement by showing that its plastic products or packaging meet the relevant recycling rate according to CalRecycle's Recycling Rate List. Cal. Pub. Res. Code § 42061(f)(2).

276. However, the Recycling Rate List is subject to frequent changes—CalRecycle must update the List "*at least* every two years." Cal. Pub. Res. Code § 42061(f)(1) (emphasis added). SB 54 does not require CalRecycle to provide notice of when the Recycling Rate List will be updated or take effect. Rather, the statute expressly exempts the Recycling Rate List from the Administrative Procedure Act, which includes notice and comment provisions. Producers can therefore expect changes to the Recycling Rate List to occur unannounced. And once that happens, a producer becomes subject to an enforcement action for any product that does not meet the relevant recycling rate, even if the product is already within the stream of commerce.

277. Not only must producers worry about frequent changes to the Recycling Rate List, but they must also brace for the possibility that the mandated recycling rates in Public Resources Code section 42050(c) will change. CalRecycle is empowered to increase the recycling rates based on "unforeseen and anomalous market conditions." Cal. Pub. Res. Code § 42062(b). SB 54 does not expressly require notice before any such increase. At most, producers can expect an after-the-fact explanation of CalRecycle's "determination and rationale." *Id.* § 42062(a).

278. Products and packaging can take months if not years to develop and

introduce to the market. Without adequate notice or a grace period, it is practically impossible for producers to update products and packaging to reflect recent changes to the Recycling Rate List. This is especially true for producers whose goods are already in the stream of commerce in California. Further, producers cannot reasonably be expected to anticipate changes to the Recycling Rate List. What is recycled depends largely on the decisions of downstream actors over whom producers have little to no control. *See* Cal. Code Regs., tit. 14, § 18980.3.2(b)(4); Cal. Pub. Res. Code § 42061(b)(2) (requiring CalRecycle to consider data from waste processing facilities and municipalities when updating the Recycling Rate List). As a result, producers already operating in California have no way of complying with the Recycling Rate Requirement before changes to the Recycling Rate List take effect.

279. A producer whose plastic products and packaging do not meet the Recycling Rate Requirement is deemed in violation of SB 54 and risks civil penalties in an action brought by CalRecycle or a private enforcer under the UCL. Consequently, the Recycling Rate Requirement threatens to deprive producers of property without adequate notice or time to comply. The provision is therefore unconstitutional under the Fourteenth Amendment.

**I. The Surcharge Ban in SB 54 Is an Unconstitutional Restriction of Commercial Speech.**

280. SB 54's forbidding producers, including Plaintiffs' members, from communicating that the prices consumers pay reflect PRO-related fees is an unconstitutional restriction of commercial speech under *Central Hudson*.

281. As stated above, commercial speech is protected by the First Amendment. *Cent. Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980). Under *Central Hudson*, a restraint on commercial speech that is neither misleading nor related to unlawful activity is subject to an intermediate level of scrutiny, and the restriction is permitted only when it "directly advances" a "substantial" governmental interest and is "not more extensive than is necessary to serve that interest."

*Id.*

282. As a threshold matter, communicating fees on a receipt or invoice is commercial speech that merits protection under the First Amendment. *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017). SB 54 does not regulate the prices at which producers can sell products containing covered material. Cal. Pub. Res. Code § 42053(a)(1). Instead, it controls how producers may communicate the amount of the price that is attributable to PRO fees. *Id.* The surcharge ban is therefore a prohibition on speech, not conduct. *Expressions Hair Design*, 581 U.S. at 47 ("The law tells merchants nothing about the amount they are allowed to collect. . . . What the law does regulate is how sellers may communicate their prices."). The surcharge ban must meet intermediate scrutiny under *Central Hudson*. For the reasons discussed below, it cannot meet this standard.

283. The surcharge ban does not regulate misleading speech. Rather, denoting the proportion of PRO fees for a product accurately informs consumers of an economic factor influencing the price of products.

284. The surcharge ban also does not regulate speech concerning illegal conduct. Neither SB 54 nor any other law or regulation prohibits producers from including PRO fees in the actual price of the regulated product.

285. It is not clear under the second prong of *Central Hudson* what interest the State may have in prohibiting communication of PRO fees on receipts.

286. To the extent the Legislature's goal in including the surcharge ban was to obscure the costs of implementing SB 54, that is an improper purpose that cannot serve as the basis for a restriction of speech. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) (plurality opinion) ("The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good."). If the State's purpose is to limit the flow of accurate information to consumers, the surcharge ban is not supported by a substantial interest and therefore fails intermediate scrutiny.

287. Finally, there are less restrictive alternatives available. Instead of providing consumers with relevant information about SB 54 and PRO fees, the Legislature decided to withhold that information from consumers. The surcharge ban of SB 54 is therefore more extensive than necessary and fails intermediate scrutiny. *See also Italian Colors*, 878 F.3d at 1176-79 (holding that another surcharge ban in California violates the First Amendment for these reasons).

**J. SB 54's Eco-Modulation Fee-Setting Regime Lacks Sufficient State Oversight and Deprives Plaintiffs of Due Process.**

288. To comply with SB 54, producers of covered material were required to "form and join a PRO" by January 1, 2024. Cal. Pub. Res. Code § 42051(a). CAA is currently the only PRO approved by CalRecycle to administer the California program. As a condition of selling covered material in California, producers must be participating members in CAA. *Id.* § 42051(b)(1).

289. Pursuant to section 42053(a), CAA must "establish a fee for its participants sufficient to ensure the requirements of [SB 54] are met by the PRO and the plan is fully implemented." These fees must be based on a "fee schedule to be developed by the PRO." *Id.* CAA must adjust that fee schedule at least annually, but may do so more frequently if needed to cover expenses in the approved budget. *Id.* CAA has proposed a detailed fee schedule. CAA Program Plan at 297-310. This is subject to approval by CalRecycle on or before January 1, 2027.

290. In a process known as "eco-modulation," pursuant to section 42053(c)(2) and (e), CAA must adjust the base fees "using malus fees or credits for participant producers" based on nine factors, including postconsumer recycled content, source reduction, standardization, hazardous materials, labeling, reuse and refill, renewable materials, certified compostable materials, and toxic heavy metals, pathogens, or additives. Cal. Pub. Res. Code § 42053(e)(1)–(9).

291. CAA has proposed how it intends to apply these factors, but has not proposed a fee schedule or any quantification of malus fees or credits that will result in

the eco-modulated fees. CAA Program Plan at 314-22. The credits could reduce a producer's final eco-modulated fee to zero, or the malus fees could increase a producer's eco-modulated fee by a multiple.

292. SB 54 also allows CAA to shift costs among participant producers. Cal. Pub. Res. Code § 42053(e)(6) ("The PRO may create a mechanism to allow producers to receive a credit for achieving source reduction beyond what producers of similar covered material are achieving. The revenue for that credit shall be paid for by charging producers not achieving source reduction for similar products a malus fee.").

293. The regulations permit CAA to set and charge producers an alternative reduced base fee rate for a selected covered material category based on "[m]easurable performance factors" selected by CAA for the alternative collection program. Cal. Code Regs., tit. 14, § 18980.6.7(e)(1).

294. CalRecycle's implementing regulations permit CAA to set and charge producers for any eco-modulation adjustments pursuant to section 42053(c)(2), including "malus fees charged to a producer and credits awarded to a producer" so long as CAA "include[s] a justification." Cal. Code Regs., tit. 14, § 18980.6.7(f). The justification is expressly permitted to contradict the results of the most recent needs assessment or material characterization studies so long as CAA provides "an explanation of the discrepancy" with "supporting documentation and any data to justify the discrepancy." *Id.* § 18980.6.7(f)(2).

295. Neither SB 54 nor its implementing regulations provide for any review, much less approval, by CalRecycle or any governmental authority of CAA's eco-modulated fee schedule before CAA charges the final, eco-modulated fees to individual producers.

296. Furthermore, neither SB 54 nor its implementing regulations provide for an administrative hearing or judicial review if a producer wishes to challenge the eco-modulated fee that CAA charges it.

297. Because neither CalRecycle nor any other governmental entity exercises

sufficient oversight over the ultimate fees charged by CAA to individual producers, SB 54 violates Plaintiffs' members right to due process. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (holding that "a statute which attempts to confer [legislative] power" to a private entity "undertakes an intolerable and unconstitutional interference with personal liberty and private property"). Only when that private entity "function[s] subordinately to" a public agency and remains subject to its "authority and surveillance" is such delegation permissible. *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940).

### K. SB 54's Funding Obligations Violate Equal Protection and Due Process.

298. Under basic economic principles, "economic actors suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them." *Int'l Bhd. of Teamsters v. U.S. Dep't of Transportation*, 861 F.3d 944, 950 (9th Cir. 2017) (quoting *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010)) (cleaned up). Here, where producers subject to SB 54 are often competitors, and where the costs of implementing SB 54 (including the $500 million annual fee) are fixed by CAA's determination of the costs of implementing its obligations under SB 54, Defendants' imposition of SB 54's funding obligations despite inequities across the population of covered producers threatens Plaintiffs with significant economic injury and violates constitutional principles of equal protection and due process.

299. The Equal Protection Clause of the Fourteenth Amendment prohibits states from imposing materially unequal burdens on similarly situated members of the same regulated class. *See Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n of Webster Cnty., W. Va.*, 488 U.S. 336, 343 (1989). The Constitution requires at least "the seasonable attainment of a rough equality" in the allocation of burdens imposed by governmental action. *Id.* at 343-44; *cf. Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944) ("It is not theory but the impact . . . which counts.").

300. In the tax context, the Equal Protection Clause "protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class." *Hillsborough Tp., Somerset Cnty., N.J. v. Cromwell*, 326 U.S. 620, 623 (1946). Accordingly, relieving one individual's share of a collective burden necessarily increases the burden borne by others similarly situated and denies those members of a regulated class the equal protection of the law. *See Allegheny*, 488 U.S. at 346 ("[T]he fairness of one's allocable share of the total property tax burden can only be meaningfully evaluated by comparison with the share of others similarly situated[.]"). Nothing about this principle suggests it does not apply to regulatory fees as well as taxes.

301. The Due Process Clause of the Fourteenth Amendment likewise embodies principles of fundamental fairness, prohibiting governmental action that arbitrarily imposes disproportionate burdens without adequate justification. *E. Enters. v. Apfel*, 524 U.S. 498, 523 (1998). To comport with substantive due process requirements, evaluating the constitutionality of a law "involves an examination of the 'justice and fairness' of the governmental action." *Id.* (citing *Andrus v. Allard*, 444 U.S. 51, 65 (1979)). Courts have contemplated that justice and fairness may "require that economic injuries caused by public action [must] be compensated by the government, rather than remain disproportionately concentrated on a few persons," depending on the impact and character of the law. *Id.* at 523-24 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979)) (cleaned up).

302. Plaintiffs challenge the State's decision to impose fixed substantial funding obligations on a number of producers materially smaller than the population of covered producers relied upon by CalRecycle in developing, justifying, and implementing SB 54, without adequately explaining the discrepancy or identifying a plan to address it. The Equal Protection and Due Process Clauses do not permit the State to establish a fixed amount of funding to be collected from a class of regulated businesses and impose proportionally higher funding obligations on a subset of those regulated businesses while

their similarly situated competitors do not bear comparable financial burdens.

303. Despite CalRecycle's initial estimate that the $500 million financial obligation to the Fund and other funding obligations under SB 54 would be assessed on an eligible subset of 13,615 producers, only approximately 3,400 producers have registered as required by SB 54. Based on CalRecycle's own data and analysis, approximately 10,000 businesses—75 percent of those CalRecycle estimated—have not registered. Only the subset of producers who registered will be assessed shares of the collective billions in funding required for the $500 million PPMF payment and the implementation funds required by the PRO. CalRecycle has not indicated how it will address this disparity. Indeed, Defendants lack the usual financial incentive of governments to enforce funding obligations because, regardless of the number of producers actually paying fees, the total amount collected (of which $500 million per year is forwarded to the State) must be the same. In the meantime, registered producers are obligated not only to pay into the Fund, but also to do so in amounts that compensate for those that did not register and therefore will not be paying into the Fund. Compliant producers have received no guarantee that their overpayments will be refunded by the State if and when non-compliant producers register and pay into the Fund.

304. The actions of Defendants therefore divide the population of producers into the compliant and the non-compliant. Both groups include substantially similarly situated businesses, but they are assessed fees disproportionately. Additionally, both groups continue to do business in California, but those not in compliance maintain a significant financial and competitive advantage over compliant producers, including many of Plaintiffs' members. This is not "seasonable attainment of a rough equality," but discriminatory treatment prohibited by the Equal Protection Clause.

305. Further, Defendants have not acknowledged or rationalized this disproportionate burden placed on compliant producers. They have not taken steps to address the structural issues that have allowed such unfair financial burdens to be placed on compliant producers. The implementation of SB 54 has therefore deprived Plaintiffs

and their members of the fundamental fairness guaranteed under Due Process.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the First Amendment as to SB 343
### Injunctive and Declaratory Relief—42 U.S.C. § 1983
### (as to Defendant Bonta only)

306. The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

307. The Free Speech Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The Fourteenth Amendment to the United States Constitution made this proscription applicable to the States and their political subdivisions. *See id.* amend. XIV, § 1.

308. SB 343's restrictions on speech violate the Free Speech Clause of the First Amendment to the United States Constitution.

309. An actual controversy exists between Plaintiffs and Defendant Bonta over the constitutionality of SB 343's restrictions on speech.

310. Section 1983 of Title 42, U.S. Code, provides in relevant part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

311. Plaintiffs and their members are persons within the meaning of 42 U.S.C. § 1983 and have a right to free speech under the First Amendment to the United States Constitution, as applicable to the States and their political subdivisions through the Fourteenth Amendment to the United States Constitution.

312. Defendant Bonta and his officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are authorized to enforce Public Resources Code sections 18015(d) and 42355.51 either directly or under Business & Professions Code section 17200, *et seq.*, and do so under color of state law.

313. Plaintiffs and their members include businesses that have already been harmed by SB 343's unconstitutional restrictions on speech and will continue to be injured now that these provisions are in effect, if forced to comply with these restrictions or to defend themselves in actions to enforce SB 343's restrictions on speech.

314. Defendant Bonta and his officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are therefore liable to Plaintiffs, their members, and all persons they represent. An order enjoining enforcement of SB 343 would redress the harms described above to Plaintiffs, their members, and all persons they represent.

315. Plaintiffs, their members, and all persons they represent are also entitled to a declaration of their rights pursuant to 28 U.S.C. § 2201, that SB 343's restrictions on speech are unconstitutional and unenforceable.

**COUNT II**
**Void for Vagueness Under the Fourteenth Amendment as to SB 343**
**Injunctive and Declaratory Relief— 42 U.S.C. § 1983**
**(as to Defendant Bonta only)**

316. The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

317. The Due Process Clause of the Fourteenth Amendment of the United States Constitution provides that no State shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.

318. SB 343's restrictions on speech violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

319. Plaintiffs, their members, and all those they represent are persons within the meaning of 42 U.S.C. § 1983 and have a right to due process under the Fourteenth

Amendment to the United States Constitution.

320. Defendant Bonta and his officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are authorized to enforce Public Resources Code sections 18015(d) and 42355.51 either directly or under Business & Professions Code section 17200, *et seq.*, and do so under color of state law.

321. An actual controversy exists between Plaintiffs, their members, and all persons they represent, on the one hand, and Defendant Bonta, on the other hand, over the constitutionality of SB 343's restrictions on speech.

322. Plaintiffs, their members, and all persons they represent include businesses that have already been harmed by SB 343's unconstitutional restrictions on speech and will continue to be injured now that these provisions are in effect, if forced to comply with these restrictions or to defend themselves in actions to enforce SB 343's restrictions on speech.

323. Defendant Bonta and his officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are therefore liable to Plaintiffs, their members, and all persons they represent. An order enjoining enforcement of SB 343 would redress the harms to Plaintiffs and their members described above.

324. Plaintiffs, their members, and all those they represent are also entitled to a declaration of their rights pursuant to 28 U.S.C. § 2201, that SB 343's restrictions on speech are unconstitutional and unenforceable.

**COUNT III**
**Void for Vagueness Under the Fourteenth Amendment**
**as to the 2032 Mandate of SB 54**
**Injunctive and Declaratory Relief— 42 U.S.C. § 1983**
**(as to Defendants Bonta and Heller)**

325. The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

326. SB 54's requirement (Public Resources Code section 42050(b)) that all

single-use packaging and single-use plastic food service ware be recyclable by January 1, 2032, violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

327. Plaintiffs, their members, and all persons they represent include businesses that have already been harmed by SB 54's looming, indeterminate recyclability requirement and will be further injured when it comes into effect on January 1, 2032, if forced to comply with these restrictions or to defend themselves in actions to enforce SB 54's recyclability requirement.

328. An actual controversy exists between Plaintiffs, their members, and all persons they represent, on the one hand, and Defendants Bonta and Heller, on the other hand, over the constitutionality of SB 54's 2032 recyclability requirement.

329. Defendants Bonta and Heller, and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are authorized to enforce Public Resources Code section 42050(b) either directly or under Business & Professions Code section 17200, *et seq.*, and do so under color of state law.

330. Plaintiffs, their members, and all persons they represent include businesses that will be injured when the requirements of California Public Resources code section 42050(b) come into effect if forced to comply with this requirement or to defend themselves in actions to enforce SB 54's recyclability requirement.

331. Defendants Bonta and Heller, and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are therefore liable to Plaintiffs, their members, and all persons they represent. An order enjoining enforcement of SB 54's 2032 Mandate would redress the harms to Plaintiffs and their members described above.

332. Plaintiffs, their members, and all those they represent are also entitled to a declaration of their rights pursuant to 28 U.S.C. § 2201, that SB 54's 2032 recyclability requirement is unconstitutional and unenforceable.

**COUNT IV**
**Void for Vagueness Under the Fourteenth Amendment as to the Recycling Rate Requirement of SB 54 Injunctive and Declaratory Relief— 42 U.S.C. § 1983**

**(as to Defendants Bonta and Heller)**

333. The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

334. SB 54's failure to define compliance with the Recycling Rate Requirement violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

335. Plaintiffs, their members, and all persons they represent include businesses that will be injured when the requirements of California Public Resources Code section 42050(c) come into effect if forced to comply with this requirement or to defend themselves in actions to enforce SB 54's Recycling Rate Requirement.

336. An actual controversy exists between Plaintiffs, their members, and all persons they represent, on the one hand, and Defendants Bonta and Heller, on the other hand, over the constitutionality of SB 54's Recycling Rate Requirement.

337. Defendants Bonta and Heller, and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are authorized to enforce Public Resources Code section 42050(c) either directly or under Business & Professions Code section 17200, *et seq.*, and do so under color of state law.

338. Plaintiffs, their members, and all persons they represent include businesses that will be harmed by SB 54's pending, unconstitutional Recycling Rate Requirement if forced to comply with this requirement or to defend themselves in actions to enforce this requirement.

339. Defendants Bonta and Heller, and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are therefore liable to Plaintiffs, their members, and all persons they represent. An order enjoining enforcement of SB 54's Recycling Rate Requirement would redress the harms

to Plaintiffs and their members described above.

340. Plaintiffs, their members, and all those they represent are also entitled to a declaration of their rights pursuant to 28 U.S.C. § 2201, that SB 54's Recycling Rate Requirement is unconstitutional and unenforceable.

**COUNT V**
**Void for Vagueness Under the Fourteenth Amendment as to Covered Material Categories under SB 54 Injunctive and Declaratory Relief— 42 U.S.C. § 1983 (as to Defendants Bonta and Heller)**

341. The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

342. SB 54's indeterminate definitions of Covered Material Categories violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

343. Plaintiffs, their members, and all persons they represent include businesses that will be injured when the requirements of California Public Resources Code sections 42050(b) and (c) come into effect if forced to comply with these requirements, defend themselves in actions to enforce SB 54's recyclability or recycling rate requirements, or pay fees based on SB 54's indeterminate definitions of Covered Material Categories.

344. An actual controversy exists between Plaintiffs, their members, and all persons they represent, on the one hand, and Defendants Bonta and Heller, on the other hand, over the constitutionality of SB 54's recyclability and recycling rate requirements.

345. Defendants Bonta and Heller, and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are authorized to enforce Public Resources Code sections 42050(b) and (c) either directly or under Business & Professions Code section 17200, *et seq.*, and do so under color of state law.

346. Plaintiffs, their members, and all persons they represent include businesses that will be harmed by SB 54's pending, unconstitutional recyclability and recycling rate requirements if forced to comply with these requirements, defend themselves in actions

to enforce these requirements, or pay fees based on SB 54's indeterminate definitions of Covered Material Categories.

347. Defendants Bonta and Heller, and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are therefore liable to Plaintiffs, their members, and all persons they represent. An order enjoining enforcement of SB 54's provisions that rely on Covered Material Categories would redress the harms to Plaintiffs and their members described above.

348. Plaintiffs, their members, and all those they represent therefore are entitled to a declaration of their rights pursuant to 28 U.S.C. § 2201, that SB 54's requirements that rely on Covered Material Categories are unconstitutional and unenforceable.

**COUNT VI**
**Void for Vagueness Under the Fourteenth Amendment**
**as to the Source Reduction Requirements of SB 54**
**Injunctive and Declaratory Relief — 42 U.S.C. § 1983**
**(as to Defendants Bonta and Heller)**

349. The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

350. SB 54's indeterminate definitions of "nonrecyclable" and "less likely to be recycled" violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

351. Plaintiffs, their members, and all persons they represent include businesses that will be injured when the requirements of California Public Resources Code sections 42050(a) and 42057 come into effect if forced to comply with these requirements, defend themselves in actions to enforce SB 54's source reduction requirements, or pay fees based on source reduction requirements.

352. An actual controversy exists between Plaintiffs, their members, and all persons they represent, on the one hand, and Defendants Bonta and Heller, on the other hand, over the constitutionality of SB 54's source reduction requirements.

353. Defendants Bonta and Heller, and their officers, employees, or agents, and

all those in privity with and/or acting in concert with those entities or individuals are authorized to enforce Public Resources Code sections 42050(a) and 42057 either directly or under Business & Professions Code section 17200, *et seq.*, and do so under color of state law.

354. Plaintiffs, their members, and all persons they represent include businesses that will be harmed by SB 54's pending, unconstitutional source reduction requirements if forced to comply with these requirements, defend themselves in actions to enforce these requirements, or pay fees based on source reduction requirements.

355. Defendants Bonta and Heller, and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are therefore liable to Plaintiffs, their members, and all persons they represent. An order enjoining enforcement of SB 54's source reduction requirements would redress the harms to Plaintiffs and their members described above.

356. Plaintiffs, their members, and all those they represent are also entitled to a declaration of their rights pursuant to 28 U.S.C. § 2201, that SB 54's source reduction requirements are unconstitutional and unenforceable.

**COUNT VII**
**Deprivation of Property Without Due Process Under the Fourteenth Amendment as to the 2032 Mandate of SB 54**
**Injunctive and Declaratory Relief — 42 U.S.C. § 1983**
**(as to Defendants Bonta and Heller)**

357. The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

358. SB 54's requirement that all single-use packaging and plastic single-use food service ware be recyclable by January 1, 2032, violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

359. Plaintiffs, their members, and all persons they represent include businesses that have already been harmed by SB 54's looming recyclability requirement and will be further injured when it comes into effect on January 1, 2032, if forced to comply with

these restrictions or to defend themselves in actions to enforce SB 54's recyclability requirement.

360. An actual controversy exists between Plaintiffs, their members, and all persons they represent, on the one hand, and Defendants Bonta and Heller, on the other hand, over the constitutionality of SB 54's 2032 recyclability requirement.

361. Defendants Bonta and Heller, and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are authorized to enforce Public Resources Code section 42050(b) either directly or under Business & Professions Code section 17200, *et seq.*, and do so under color of state law.

362. Plaintiffs, their members, and all persons they represent include businesses that have already been harmed by SB 54's looming recyclability requirement and will be further injured when it comes into effect on January 1, 2032, if forced to comply with these restrictions or to defend themselves in actions to enforce SB 54's 2032 recyclability requirement.

363. Defendants Bonta and Heller, and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are therefore liable to Plaintiffs, their members, and all persons they represent. An order enjoining enforcement of SB 54's 2032 recyclability requirement would redress the harms to Plaintiffs and their members described above.

364. Plaintiffs, their members, and all those they represent are also entitled to a declaration of their rights pursuant to 28 U.S.C. § 2201 that SB 54's 2032 recyclability requirement is unconstitutional and unenforceable.

**COUNT VIII**
**Deprivation of Property Without Due Process Under the Fourteenth Amendment as to the Recycling Rate Requirement of SB 54**
**Injunctive and Declaratory Relief— 42 U.S.C. § 1983**
**(as to Defendants Bonta and Heller)**

365. The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

366. SB 54's requirement that all plastic covered material achieve specified recycling rates starting in 2028 violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

367. Plaintiffs, their members, and all persons they represent include businesses that have already been harmed by SB 54's looming recycling rate requirement and will be further injured when it comes into effect on January 1, 2028, if forced to comply with these restrictions or to defend themselves in actions to enforce SB 54's recycling rate requirement.

368. An actual controversy exists between Plaintiffs, their members, and all persons they represent, on the one hand, and Defendants Bonta and Heller, on the other hand, over the constitutionality of SB 54's recycling rate requirement.

369. Defendants Bonta and Heller, and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are authorized to enforce Public Resources Code section 42050(c) either directly or under Business & Professions Code section 17200, *et seq.*, and do so under color of state law.

370. Plaintiffs, their members, and all persons they represent include businesses that have already been harmed by SB 54's looming recycling rate requirement and will be further injured when it comes into effect on January 1, 2028, if forced to comply with these restrictions or to defend themselves in actions to enforce SB 54's recycling rate requirement.

371. Defendants Bonta and Heller, and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are therefore liable to Plaintiffs, their members, and all persons they represent. An order enjoining enforcement of SB 54's recycling rate requirement would redress the harms to Plaintiffs and their members described above.

372. Plaintiffs, their members, and all those they represent are also entitled to a declaration of their rights pursuant to 28 U.S.C. § 2201, that SB 54's recycling rate requirement is unconstitutional and unenforceable.

**COUNT IX**
**Violation of the First Amendment**
**as to Section 42053(a)(1) of SB 54**
**Injunctive and Declaratory Relief — 42 U.S.C. § 1983**
**(as to Defendants Bonta and Heller)**

373. The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

374. SB 54's restriction on speech contained in the last sentence of Public Resources Code section 42053(a)(1) violates the Free Speech Clause of the First Amendment to the United States Constitution.

375. Plaintiffs and their members include businesses that will be harmed by SB 54's looming, unconstitutional restriction on speech if forced to comply with this restriction or to defend themselves in actions to enforce SB 54's restriction on speech.

376. An actual controversy exists between Plaintiffs and Defendants over the constitutionality of SB 54's restriction on speech.

377. Defendants Bonta and Heller and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are authorized to enforce Public Resources Code section 42053(a)(1) either directly or under Business & Professions Code section 17200, *et seq.*, and do so under color of state law.

378. Plaintiffs and their members include businesses that face the imminent risk of harm under SB 54's looming, unconstitutional restriction on speech if forced to comply with this restriction or to defend themselves in actions to enforce SB 54's restrictions on speech.

379. Defendants and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are therefore liable to Plaintiffs, their members, and all persons they represent. An order enjoining enforcement of SB 54's restriction on speech contained in Public Resources Code section 42053(a)(1) would redress the harms described above to Plaintiffs, their members, and all persons they represent.

380. Plaintiffs, their members, and all persons they represent are also entitled to a declaration of their rights pursuant to 28 U.S.C. § 2201, that SB 54's restriction on speech contained in Public Resources Code section 42053(a)(1) is unconstitutional and unenforceable.

**COUNT X**
**Violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment as to the Plastic Pollution Mitigation Fund Payments under SB 54**
**Injunctive and Declaratory Relief — 42 U.S.C. § 1983**
**(as to all Defendants)**

381. The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

382. Defendants and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are authorized to enforce Public Resources Code section 42064(e), and do so under color of state law.

383. Plaintiffs' members and all persons they represent include producers registered with the PRO that are subject to disproportionate financial burden because substantially fewer producers have registered with CAA than CalRecycle estimated would be required to register when developing, justifying, and implementing SB 54. Thus, implementation of SB 54 treats producers differently where the statute dictates equal treatment. Unregistered producers may continue doing business without paying into the Plastic Pollution Mitigation Fund while registered producers not only have to pay into the Fund, but have to make up for the share that otherwise would be paid by those not in compliance. The financial burden is compounded by uncertainty concerning how assessments will be calculated and whether previously remitted payments will be reimbursed as additional producers register with the PRO. Further, CalRecycle's failure to address or justify this disparate treatment deprives compliant producers of the fundamental fairness guaranteed by the Due Process Clause.

384. Defendants and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are therefore liable to

Plaintiffs, their members, and all persons they represent. An order staying their funding obligations under Public Resources Code section 42064(e) would redress the harms to Plaintiffs' members described above.

385. Plaintiffs, their members, and all persons they represent are also entitled to a declaration of their rights pursuant to 28 U.S.C. § 2201, that the funding obligations contained in Public Resources Code section 42064(e) are unconstitutional and unenforceable.

## COUNT XI

## Deprivation of Property Without Due Process Under the Fourteenth Amendment as to Eco-Modulated Fees Assessed Under Public Resources Code Section 42053(e)

## Injunctive and Declaratory Relief — 42 U.S.C. § 1983 (as to Defendants Bonta and Heller)

386. The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

387. Defendants and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are authorized to enforce Public Resources Code section 42053 and Cal. Code Regs., tit. 14, section 18980.6.7, and do so under color of state law.

388. Paragraphs 288 to 297 are incorporated by reference as if set forth in full herein.

389. Plaintiffs' members and all persons they represent include producers registered with the PRO that are subject to malus fees and credits, pursuant to Public Resources Code section 42053(e), as part of eco-modulated fees assessed without sufficient government oversight. Specifically, SB 54 and its implementing regulations force Plaintiffs' members to incur eco-modulated fees set by a private entity without meaningful government review or any avenue of challenging those fees.

390. An actual controversy exists between Plaintiffs, their members, and all persons they represent, on the one hand, and Defendants Bonta and Heller, on the other

hand, over the constitutionality of SB 54's inadequate government oversight over eco-modulated fees.

391. Defendants and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are therefore liable to Plaintiffs, their members, and all persons they represent. An order staying the enforcement of the obligation to impose eco-modulated fees pursuant to Public Resources Code section 42053 and Cal. Code Regs., tit. 14, section 18980.6.7 would redress the harms above to Plaintiffs, their members, and all persons they represent.

392. Plaintiffs, their members, and all persons they represent are also entitled to a declaration of their rights pursuant to 28 U.S.C. § 2201, that SB 54's vesting of regulatory fee-setting authority in a private entity without sufficient government oversight is unconstitutional and unenforceable.

**COUNT XII**
**Violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment as to Producers' Other Funding Obligations under SB 54**
**Injunctive and Declaratory Relief — 42 U.S.C. § 1983**
**(as to all Defendants)**

393. The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

394. Defendants and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are authorized to enforce Public Resources Code section 42053 to enable the implementation of SB 54's source reduction requirements (*id.* §§ 42050(a), 42057), recyclability requirements (*id.* §§ 42050(b), 42061), and Recycling Rate Requirement (*id.* §§ 42050(c), 42061, 42062), as well as requirements to reimburse related expenditures (*id.* § 42051.1), and do so under color of state law.

395. Plaintiffs' members and all persons they represent include producers registered with the PRO that are subject to disproportionate financial burden because substantially fewer producers have registered than CalRecycle estimated would be

required to register when developing, justifying, and implementing SB 54. The financial burden is compounded by uncertainty concerning how assessments will be calculated and whether previously remitted payments will be reimbursed as additional producers register with the PRO.

396. Defendants and their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals are therefore liable to Plaintiffs, their members, and all persons they represent. An order staying all requirements of SB 54 that result in funding obligations on producers under Public Resources Code section 42053, including but not limited to its source reduction requirements (*id.* §§ 42050(a), 42057), recyclability requirements (*id.* §§ 42050(b), 42061), and Recycling Rate Requirement (*id.* §§ 42050(c), 42061, 42062), as well as requirements to reimburse related expenditures (*id.* § 42051.1), would redress the harms to Plaintiffs and their members described above.

397. Plaintiffs, their members, and all persons they represent are also entitled to a declaration of their rights pursuant to 28 U.S.C. § 2201, that the funding and reimbursement obligations contained in Public Resources Code sections 42053 and 42051.1 are unconstitutional and unenforceable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

1. A declaration, pursuant to 28 U.S.C. § 2201 and/or 42 U.S.C. § 1983, in favor of Plaintiffs, their members, and all persons they represent, that the speech restrictions set forth in Public Resources Code sections 18015(d) and 42355.51 violate the First and Fourteenth Amendments of the United States Constitution, both facially and as applied;

2. Prospective preliminary and permanent injunctions, pursuant to 42 U.S.C. § 1983 and other applicable law, in favor of Plaintiffs, their members, and all persons they represent, prohibiting Defendant Bonta or any of his officers, employees, or agents,

and all those in privity with and/or acting in concert with those entities or individuals, from enforcing or threatening to enforce the prohibition on communicating the recyclability of a product or packaging under California Public Resources Code sections 18015(d) and 42355.51;

3. A declaration, pursuant to 28 U.S.C. § 2201 and/or 42 U.S.C. § 1983, in favor of Plaintiffs, their members, and all persons they represent, that the recyclability and recycling rate requirements set forth in Public Resources Code sections 42050(b) and (c) violate the Fourteenth Amendment of the United States Constitution, both facially and as applied;

4. Prospective preliminary and permanent injunctions, pursuant to 42 U.S.C. § 1983 and other applicable law, in favor of Plaintiffs, their members, and all persons they represent, prohibiting Defendants Bonta and Heller, or any of their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals, from enforcing or threatening to enforce the recyclability and recycling rate requirements under California Public Resources Code sections 42050(b) and (c);

5. A declaration, pursuant to 28 U.S.C. § 2201 and/or 42 U.S.C. § 1983, in favor of Plaintiffs, their members, and all persons they represent, that the provisions of SB 54 that rely on Covered Material Categories, including funding and fee requirements, violate the Fourteenth Amendment of the United States Constitution, both facially and as applied;

6. Prospective preliminary and permanent injunctions, pursuant to 42 U.S.C. § 1983 and other applicable law, in favor of Plaintiffs, their members, and all persons they represent, prohibiting Defendants or any of their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals, from enforcing or threatening to enforce all requirements of SB 54, including funding and fee requirements, that rely on the Covered Material Categories;

7. A declaration, pursuant to 28 U.S.C. § 2201 and/or 42 U.S.C. § 1983, in

favor of Plaintiffs, their members, and all persons they represent, that the source reduction requirements set forth in Public Resources Code sections 42050(a) and 42057 violate the Fourteenth Amendment of the United States Constitution, both facially and as applied;

8. Prospective preliminary and permanent injunctions, pursuant to 42 U.S.C. § 1983 and other applicable law, in favor of Plaintiffs, their members, and all persons they represent, prohibiting Defendants Bonta and Heller, or any of their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals, from enforcing or threatening to enforce the source reduction requirements under California Public Resources Code sections 42050(a) and 42057;

9. A declaration, pursuant to 28 U.S.C. § 2201 and/or 42 U.S.C. § 1983, in favor of Plaintiffs, their members, and all persons they represent, that the speech restriction set forth in the last sentence of Public Resources Code sections 42053(a)(1) violates the First Amendment of the United States Constitution, both facially and as applied;

10. Prospective preliminary and permanent injunctions, pursuant to 42 U.S.C. § 1983 and other applicable law, in favor of Plaintiffs, their members, and all persons they represent, prohibiting Defendants Bonta and Heller, or any of their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals, from enforcing or threatening to enforce the prohibition on communicating PRO fees of a product or packaging under the last sentence of California Public Resources Code sections 42053(a)(1);

11. A declaration, pursuant to 28 U.S.C. § 2201 and/or 42 U.S.C. § 1983, in favor of Plaintiffs, their members, and all persons they represent, that assessment and enforcement of fees for the Plastic Pollution Mitigation Fund, as established by Public Resources Code section 42064, on the subset of producers who have registered with the PRO as opposed to the subset of producers who have not registered violates the Fourteenth Amendment of the United States Constitution, both facially and as applied;

12. Prospective preliminary and permanent injunctions, pursuant to 42 U.S.C. § 1983 and other applicable law, in favor of Plaintiffs, their members, and all persons they represent, prohibiting Defendants or any of their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals, from enforcing or threatening to enforce the $500 million annual environmental mitigation surcharge into the Fund set forth in Public Resources Code section 42064(e)(1), until CalRecycle satisfies the following conditions: (1) explains the discrepancy between its estimates and the number of producers actually registered; (2) submits a plan to increase the number of producers registered with the PRO; and (3) certifies that the registration shortfall percentage is no greater than the Franchise Tax Board's estimate of the percentage of businesses that are required to file but do not file required California tax returns, bringing the registration rate into parity with taxation regimes in California;

13. A declaration, pursuant to 28 U.S.C. § 2201 and/or 42 U.S.C. § 1983, in favor of Plaintiffs, their members, and all persons they represent, that SB 54's vesting of regulatory fee-setting authority as to eco-modulated fees in a private entity without sufficient government oversight is unconstitutional and unenforceable;

14. Prospective preliminary and permanent injunctions, pursuant to 42 U.S.C. § 1983 and other applicable law, in favor of Plaintiffs, their members, and all persons they represent, prohibiting Defendants or any of their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals, from enforcing or threatening to enforce eco-modulated fees pursuant to Public Resources Code section 42053 and Cal. Code Regs., tit. 14, section 18980.6.7;

15. A declaration, pursuant to 28 U.S.C. § 2201 and/or 42 U.S.C. § 1983, in favor of Plaintiffs, their members, and all persons they represent, that the funding and reimbursement obligations contained in Public Resources Code sections 42053 and 42051.1 are unconstitutional and unenforceable under the Fourteenth Amendment;

16. Prospective preliminary and permanent injunctions, pursuant to 42 U.S.C. § 1983 and other applicable law, in favor of Plaintiffs, their members, and all persons

they represent, prohibiting Defendants or any of their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals, from enforcing or threatening to enforce all other funding obligations under SB 54, including but not limited to those under Public Resources Code section 42053 and 42051.1, until CalRecycle satisfies the following conditions: (1) explains the discrepancy between its estimates and the number of producers actually registered; (2) submits a plan to increase the number of producers registered with the PRO; and (3) certifies that the registration shortfall percentage is no greater than the Franchise Tax Board's estimate of the percentage of businesses that are required to file but do not file required California tax returns, bringing the registration rate into parity with taxation regimes in California;

17. Prospective preliminary and permanent injunctions, pursuant to 42 U.S.C. § 1983 and other applicable law, in favor of Plaintiffs, their members, and all persons they represent, prohibiting Defendants or any of their officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals, from enforcing or threatening to enforce all requirements of SB 54 that result in funding obligations on producers under Public Resources Code section 42053, including but not limited to its source reduction requirements (Cal. Pub. Res. Code §§ 42050(a), 42057), recyclability requirements (*id.* §§ 42050(b), 42061), and Recycling Rate Requirement (*id.* §§ 42050(c), 42061, 42062), as well as requirements to reimburse related expenditures (*id.* § 42051.1), until the constitutionality of SB 54 and CalRecycle's regulations is resolved by other courts presiding over relevant pending litigation, including but not limited to *Nebraska et al. v. Heller et al.*, No. 2:26-cv-02214-CKD (E.D. Cal. June 22, 2026) and *Natural Resources Defense Council et al. v. CalRecycle*, S.F. Sup. Ct. Case No. CPF-26-519769 (filed June 25, 2026);

18. An award of all costs, attorney's fees, and expenses that Plaintiffs reasonably incur, *see, e.g.*, 42 U.S.C. § 1988; and

19. An award of such other and further relief as this Court deems just and proper.

Dated: October 8, 2026

Respectfully submitted,

By: */s/ Trenton H. Norris*

Trenton H. Norris (CA Bar No. 164781)
Alexander Tablan (CA Bar No. 346309)
Andrew Muse-Fisher (CA Bar No. 364086)
HOGAN LOVELLS CADWALADER US LLP
Four Embarcadero Center, 35th Floor
San Francisco, CA 94111
Tel: (415) 374-2300
trent.norris@hlc.com

*Attorneys for Plaintiffs*
California League of Food Producers
American Forest & Paper Association
California Apple Commission
California Blueberry Commission
California Grocers Association
California Restaurant Association
California Retailers Association
California Strawberry Commission
California Table Grape Commission
California Walnut Commission
Californians for Affordable Packaging
Consumer Brands Association
Dairy Institute of California
Flexible Packaging Association
Grower Shipper Association of Central California
Olive Oil Commission of California
Personal Care Products Council
Pet Food Institute
Print Creative Alliance
SNAC International
Western Growers Association